# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF NEW YORK

| In re Novartis Wage and Hour Litigation | 06-MD-1794 (PAC) |
| --- | --- |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## THE PARTIES' JOINT MOTION FOR:
## (1) FINAL CERTIFICATION OF SETTLEMENT CLASS; AND
## (2) FINAL APPROVAL OF SETTLEMENT, ATTORNEYS' FEES AND EXPENSES
## <u>AND SERVICE PAYMENTS</u>

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................... 1

II.  SUMMARY AND FACTUAL BACKGROUND ................................................... 3

    A.  Filing of the Original Complaints, Consolidation of Cases, and Certification of
        Original Classes ........................................................................................... 3

        1.  *Lopes, et al.*: the New York Litigation ............................................... 3

        2.  *White, et al.*: the California Litigation ............................................... 3

        3.  MDL Consolidation: *In re Novartis Wage and Hour Litigation* ............ 4

        4.  Certification of New York and California Classes and a Nationwide FLSA
            Collective Action ........................................................................... 4

    B.  Development of the Record in *In re Novartis Wage & Hour Litigation* .......... 4

    C.  Summary Judgment and Second Circuit Appeal ......................................... 5

    D.  Petition to the United States Supreme Court ............................................. 6

    E.  Litigation of Related Matters, The Department of Labor and pending Supreme Court
        Review ........................................................................................................ 6

    F.  Settlement Negotiations ............................................................................. 7

        1.  Risks to Novartis in Continued Litigation ..................................... 8

        2.  Risks to Plaintiffs in Continued Litigation ..................................... 8

        3.  The Second Amended Complaint and Expanded Class ...................... 9

    G.  Settlement Agreement ............................................................................. 11

        1.  Summary of Settlement Terms .................................................... 11

            a.  The Settlement Fund ....................................................... 11

            b.  The Subclasses and Applicable Periods ............................. 12

            c.  Allocation Formula and Weighting ................................... 14

        2.  Distribution Mechanism and the Claims Administrator ................... 16

3.  Releases ............................................................................. 16

4.  Service Awards ................................................................... 16

5.  Attorneys' Fees and Expenses .............................................. 17

H.  Notice to the Class and the Response to the Same ….................….. 17

I.  Calculation of Awards ...............................................................19

J.  Class-Member Assistance .......................................................... 20

III. Argument ....................................................................................... 22

A.  The Settlement Meets All Rule 23 Standards and Is Fair, Reasonable and Adequate .... 23

1.  Certification of the Remaining States Subclass Is Appropriate
    Under Rule 23........................................................................ 24

2.  The Substantive Terms of the Settlement Meet the *Grinnell* Test ...................... 30

    a.  The Complexity, Expense and Likely Duration of this Litigation
        Favor Final Approval ....................................................…........…......... 31

    b.  The Reaction of the Class to the Settlement Favors Final Approval .............. 32

    c.  The Stage of the Proceedings and the Amount of Discovery Completed
        Favor Final Approval ..................................................…....…... 33

    d.  The Risks of Litigation—Establishing Liability, Damages and Maintaining
        the Class Action Through Trial—All Also Favor Final Approval ................. 34

    e.  Establishing a Class and Maintaining It Through Trial Would Not
        Be Simple ................................................................…...…........ 35

    f.  Defendant's Ability to Withstand a Greater Judgment ..............….……..... 35

    g.  The Net Settlement Amount Is Reasonable in Light of the Best
        Possible Recovery and All Attendant Risks of Litigation ...................... 36

3.  The Arm's Length Negotiations between Experienced Counsel Ensures
    that the Settlement Is Procedurally Fair ...................................... 38

    a.  Experienced Counsel Represented Both Parties in This Case ...................... 38

     b.  The Settlement Was Negotiated by Experienced Counsel Over the Course of Several Months ................................................................................. 40

     c.  The Settlement Was Reached After Parties Conducted Meaningful Discovery ...................................................................................... 40

B.  The FLSA Settlement Subclass II Should Be Finally Certified and Approved .............40

    1. Certification of the FLSA II Settlement Sub-Class is Appropriate........................ 40

    2. The Substantive Terms of the FLSA II Settlement Agreement Meet the Lower Standard for Final Approval .......................................................................... 42

C.  Plaintiffs' Application for Attorneys' Fees Should Be Approved .......................... 42

    1.  An Award of Attorneys' Fees Is Standard .................................................. 43

    2.  The Class Approved an Award Greater Than What Is Sought Here ................... 44

    3.  The Fees Are Justified by the Relevant Factors ........................................... 45

     a.  The "Risk of Litigation" Was Substantial ............................................. 45

     b.  Counsel for Both Parties Have a High Standing at the Bar ......................... 47

     c.  Class Counsel's Dedicated Significant Time and Labor to This Matter ......... 48

     d.  This Litigation was Extremely Complex, Requiring Significant Efforts .......... 50

     e.  The Litigation Has Bestowed Substantial Benefits on Plaintiffs ................... 51

    4.  The Fees Requested Are Reasonable and Appropriate under Both the Percentage and Lodestar Approaches .................................................................................. 52

     a.  A Twenty-Eight Percent of Gross Settlement Benefit Is Well Within the Range of Reasonableness ............................................................... 53

     b.  The Lodestar Sought is Well within the Range of Reasonableness ................. 56

D.  Plaintiffs' Application for Reimbursement of $400,000 in Litigation Expenses Should Be Granted .......................................................................... 59

E.  The Named Plaintiffs and Deponents Are Entitled to Service Payments in the Amounts Requested ............................................................................................. 59

1. Courts Commonly Award Service Payments to Class Representatives and Class Members Who Provide Substantial Assistance ............................... 61

2. Service Awards Are Especially Appropriate in Employment Class Actions ......... 61

3. Courts Have Often Awarded Service Payments in Amounts Larger Than Those Applied for Here ........................................................................ 62

4. The Service Payments at Bar Are More Than Justified .................................. 63

F. Settlement Notice Procedures Were Adequate and Complied with Court Orders ......... 64

1. FLSA I, NY I and CA I Subclass Notices ................................................. 65

2. Rule 23 Remaining States Subclass Notices .............................................. 65

3. FLSA Settlement Subclass II Notices....................................................... 67

4. Process for Mailing and Response ......................................................... 67

G. The Lone "Objection" Poses No Credible Challenge to the Settlement ................... 69

1. Ms. Haney's Contact with Class Counsel and Her Substantive Concern ............ 69

2. Ms. Haney Lacks Standing to Object ...................................................... 71

3. The "Objection" Lacks Substantive Merit ................................................. 71

4. Modifications Were Made For Legitimate and Documented Flaws .................... 72

IV. Conclusion ............................................................................................. 74

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                    **PAGE(S)**

*Amchem Products Inc. v. Windsor,*
    521 U.S. 591 (1997)............................................................... 25, 29

*Aponte v. Comprehensive Health Mgmt.,*
    No. 10 Civ. 4825, 2011 U.S. Dist. LEXIS 60882 (S.D.N.Y June 1, 2011)............... 72

*Banyai v. Mazur,*
    No. 00 Civ. 9806, 2007 U.S. Dist. LEXIS 22342 (S.D.N.Y. Mar. 27, 2007)... ... 35, 38

*Bebi Alli v. Boston Market Corp.,*
    No. 10-00004-JCH, 2012 U.S. Dist LEXIS 54695 (D.Conn. Apr. 17, 2012) .... 54, 62

*Beck v. Boeing Co.,*
    No. C00-301P, 2004 U.S. Dist. LEXIS 27622 (W.D. Wash. Apr. 9, 2004)............... 62

*Bellifemine v. Sanofi-Aventis,* No. 07 Civ. 2207,
    2010 U.S. Dist. LEXIS 79679 (S.D.N.Y. Aug. 5, 2010)................................ *passim*

*Binetti v. Washington Mutual Bank,*
    No. 06 Civ. 1732, slip op. (S.D.N.Y. Apr. 15, 2008) ...................................... 48

*Blum v. Stenson,*
    465 U.S. 886 (1984)......................................................................... 52

*Boeing Co. v. Van Gemert,*
    444 U.S. 472 (1980)........................................................................43, 44

*Borcea v. Carnival Corp.,*
    238 F.R.D. 664, 673-674 (S.D.Fla. 2006)................................................ 37

*Brotherton v. Cleveland,*
    141 F. Supp. 2d 907 (S.D. Ohio 2001)............................................ 63

*Bryan v. Pittsburgh Plate Glass Co.,*
    59 F.R.D. 616, 617 (D. Pa. 1973)..................................................... 60

*Camp v. Progressive Corp.,*
    Nos. 01-2680 et al., 2004 U.S. Dist. LEXIS 19172 (E.D. La. Sept. 23, 2004)............. 60

*Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco*
    *Managed Care, LLC,* 504 F.3d 229 (2d Cir. 2007)................................. 43

*City of Detroit v. Grinnell Corp.,*
    495 F.2d 448 (2d Cir. 1974)...................................................... 24, 30, 33

*Chatelain v. Prudential-Bache Secs.,*
    805 F. Supp. 209 (S.D.N.Y. 1992)............................................... 39, 40

*Christopher, et al. v. SmithKline Beecham Corp.,*
    No. 11-204, 2011 U.S. LEXIS 8505 (Nov. 28, 2011)........................ 7, 9, 31, 35, 46

*Clark v. Ecolab, Inc.,* Nos. 07-8623, 04-4488, 06-5672, 2009 U.S. Dist. LEXIS 108736
    (S.D.N.Y. Nov. 17, 2009) ("*Clark I*")......................................... 26, 38, 68

*Clark v. Ecolab, Inc.,* Nos. 07 Civ. 8623, 06 Civ. 5672, 04 Civ. 4488,
    2010 U.S. Dist. LEXIS 47036 (S.D.N.Y. May 11, 2010) ("*Clark II*") (Crotty, J.)
    ................................................................................... *passim*

*Cohen v. Apache Corp.,*
    No. 89 Civ. 0076, 1993 U.S. Dist. LEXIS 5211 (S.D.N.Y. Apr. 21, 1993)................ 54

*Cohen v. J.P. Morgan Chase & Co.,*
    262 F.R.D. 153 (E.D.N.Y. 2009)................................................... 24

*Collins v. Olin Corp.,*
    No. 3:03-cv-945, 2010 U.S. Dist. LEXIS 39862 (D. Conn. Apr. 21, 2010)............... 32

*Cronas v. Willis Group Holdings, Ltd.,*
    No. 06-15295, 2011 U.S. Dist. LEXIS 122736 (S.D.N.Y. Oct. 18, 2011)............... 23

*Cruz v. Hook-Superx, LLC,* No. 09 Civ. 7717,
    2010 U.S. Dist. LEXIS 81021 (S.D.N.Y. Aug. 5, 2010) ....................28, 29, 64, 71

*D'Amato v. Deutsche Bank,*
    236 F.3d 78 (2d Cir. 2001)....................................................... 24, 38

*Damassia v. Duane Reade, Inc.,*
    250 F.R.D. 152 (S.D.N.Y. 2008)................................................... 30, 60

*Davis v. J.P. Morgan Chase & Co.,*
    No. 01 Civ. 6492, 2011 U.S. Dist. LEXIS 117082
    (W.D.N.Y. Oct. 11, 2011)....................................................... 24, 35, 54, 58

*deMunecas v. Bold Food LLC,*
    No. 09 Civ. 440, 2010 U.S. Dist. LEXIS 87644
    (S.D.N.Y. Aug. 23, 2010)........................................................ *passim*

*Denney v. Deutsche Bank AG,*
    443 F.3d 253 (2d Cir. 2006)..................................................................... 28

*Duchene v. Michael Cetta, Inc.,* No. 06 Civ. 4576 (PAC) (GWG),
    2009 U.S. Dist. LEXIS 85955 (S.D.N.Y. Sept. 10, 2009) (Crotty, J.).....24, 31, 53, 62, 71

*Ebbert v. Nassau Cty,*
    No. 05-5445, 2011 U.S. Dist. LEXIS 150080 (S.D.N.Y. Dec. 22, 2011)................. 32

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,*
    137 F.R.D. 240 (S.D. Ohio 1991)............................................................... 63

*Equal Rights Center v. Washington Metro Area Transit Authority,*
    573 F. Supp. 2d 205 (D.D.C. 2008)...........................................................60

*Fears v. Wilhelmina Model Agency, Inc.,*
    No. 02 Civ. 4911, 2005 U.S. Dist. LEXIS 7961 (S.D.N.Y. May 5, 2005).................. 61

*Frank v. Eastman Kodak Co.,*
    228 F.R.D. 174 (W.D.N.Y. 2005)............................................... 29, 33, 62

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982).............................................................................. 26

*Gilliam v. Addicts Rehab. Ctr. Fund,*
    No. 05 Civ 3452, 2008 U.S. Dist. LEXIS 23016 (S.D.N.Y. Mar. 24, 2008)............... 37

*Goldberger v. Integrated Res. Inc.,*
    209 F.3d 43 (2d Cir. 2000)................................................................. 30,53

*Grant v. Bethlehem Steel Corp.,*
    823 F.2d 20 (2d Cir. 1987)................................................................... 23

*Green v. Wolf Corp.,*
    406 F.2d 291 (2d Cir. 1968)................................................................... 29

*Grunin v. Int'l House of Pancakes,*
    513 F.2d 114 (8th Cir. 1975)............................................................. 68, 69

*Han v. Sterling Nat'l Mortg. Co.,*
    No 09-CV-5589, 2011 U.S. Dist. LEXIS 103453 (E.D.N.Y. Sept. 14, 2011).......... 72

*Hardin v. Belmont Textile Mach., Co.,*
    No. 3:05-cv-00492, 2008 U.S. Dist. LEXIS 64081 (W.D.N.C. Aug. 20, 2008),
    *rev'd on other grounds,* 355 Fed. Appx. 717 (4th Cir. 2009)15............................. 15

*Hernandez v. C&S Wholesale Grocers, Inc.,*
      No. 06 CV 2675 (CLB) (MDF), slip op. (S.D.N.Y. July 31, 2008)...................... 39, 48, 60

*Hertzberg v. Asia Pulp & Paper Co.,*
      197 Fed. Appx. 38 (2d Cir. 2006)………....………...............................................… 23

*Hicks v. Morgan Stanley & Co.,*
      No. 01 Civ. 10071, 2005 U.S. Dist. LEXIS 24890 (S.D.N.Y. Oct. 24, 2005)…….......... 52

*Hoffman-LaRoche, Inc. v. Sperling,*
      493 U.S. 165 (1989)………….…….................................................................. 65, 72

*Huguley v. General Motors Corp.,*
      128 F.R.D. 81 (E.D. Mich. 1989)…………………………………………..……. 60

*In re AOL Time Warner ERISA Litig.,*
      No. 02 Civ. 8853, 2006 U.S. Dist. LEXIS 70474 (S.D.N.Y. Sept. 27, 2006)……… 40, 68

*In re Austrian and German Bank Holocaust Litig.,*
      80 F. Supp. 2d 164 (S.D.N.Y. 2000), aff'd, 236 F.3d 78 (2d Cir. 2001)…………... 31, 33

*In re Avon Prods. Inc. Sec. Litig.,*
      No. 89 Civ. 6216, 1992 U.S. Dist. LEXIS 17072 (S.D.N.Y. Nov. 6, 1992)……………. 54

*In re BankAmerica Corp. Sec. Litig.,*
      210 F.R.D. 694 (E.D. Mo. 2002)…………………………………………….....… 68

*In re Blech Sec. Litig.,*
      No. 94 Civ. 7696, 2002 U.S. Dist. LEXIS 23170 (S.D.N.Y. Dec. 4 2002)…………… 54

*In re Comverse Tech., Inc.,*
      No. 06-1825, 2010 U.S. Dist. LEXIS 63342 (E.D.N.Y. June 24, 2010)……………...… 57

*In re Drexel Burnham Lambert Grp., Inc.,*
      130 B.R. 910 (S.D.N.Y. 1991)……………………………………………....……. 71

*In re EVCI Career Colleges Holding Corp. Secs. Litig.,*
      No. 05 Civ. 10240 2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. July 27, 2007)……. 39, 40

*In re Giant Interactive Group, Inc. Securities Litig.,*
      No. 07-10588, 2011 U.S. Dist. LEXIS 127634 (S.D.N.Y. Nov. 2, 2011)…………. 32, 36

*In re Global Crossing Secs. and ERISA Litig.,*
      225 F.R.D. 436 (S.D.N.Y. 2004)………………...................................................... 39

*In re Gulf Oil/Cities Service Tender Offer Litigation,*
    142 F.R.D. 588 (S.D.N.Y. 1992)..........................................…...... 54

*In re Host Am. Corp. Secs. Litig.,*
    No. 3:05-cv-1250, 2008 U.S. Dist. LEXIS 17405 (D. Conn. Mar. 7, 2008).............. 32

*In re Initial Public Offering Secs. Litig.,*
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)........…....………......................... 37

*In re Initial Pub. Offering Sec. Litig.,*
    No. MC 92, 2011 U.S. Dist. LEXIS 103698 (S.D.N.Y. Aug. 25, 2011)...... 2, 71, 74, 75

*In re: Interpublic Secs. Litig.,* No. Civ. 6527 Class Action, 03 Civ. 1194
    Derivative Action, 2004 U.S. Dist. LEXIS 21429 (S.D.N.Y. Oct. 26, 2004).............. 58

*In re Lloyd's American Trust Fund Litig.,*
    No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002)............. 54

*In re Marsh ERISA Litig.,*
    265 F.R.D. 128 (S.D.N.Y. 2010) ...............................................…............ *passim*

*In re Michael Milken & Assocs. Secs. Litig.,*
    150 F.R.D. 46 (S.D.N.Y. 1993)...…............……....................................... 33, 66

*In re NASDAQ Market Makers Antitrust Litigation,*
    187 F.R.D. 465 (S.D.N.Y. 1998).............................................................. 52

*In re Novartis Wage & Hour Litig.,*
    611 F.3d 141 (2d Cir. 2010)......................................................... 5

*In re NTL Inc. Secs. Litig.,*
    No. 02 Civ. 3013, 2007 U.S. Dist. LEXIS 13661 (S.D.N.Y. March 1, 2007).............. 57

*In re Oxford Health Plans, Inc. Secs. Litig.,*
    MDL Dkt. No. 1222, 2003 U.S. Dist. LEXIS 26795 (S.D.N.Y. June 12, 2003)........... 55

*In re Paine Webber Ltd. Partnerships Litig.,*
    147 F.3d 132 (2d Cir. 1998)...............…....................................................... 23

*In re Priceline.com, Inc. Secs. Litig.,*
    No. 3:00-CV-1884, 2007 U.S. Dist. LEXIS 52538 (D. Conn. July 20, 2007)............. 55

*In re Prudential Inc. Secs. Ltd. Partnerships Litig.,*
    MDL No. 1005, M-21-67, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995).... 37

*In re RJR Nabisco, Inc. Sec. Litig.*,
   Nos. 818, 88 Civ 7905, 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992)....... 58

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
   No. 06 Civ 5173, 2008 U.S. Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008)............... 36

*In re Telik Secs. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008)........................................... 23, 39, 40, 52

*In re Tyson Foods, Inc.*,
   No. RDB-08-1982, 2010 U.S. Dist. LEXIS 48518 (D. Md. May, 11, 2010)........... 59

*In re Xcel Energy Inc. Sec., Derivative & "ERISA" Litig.*,
   364 F. Supp. 2d 980 (D. Minn. 2005)................................................. 44

*Ingram v. The Coca-Cola Co.*,
   200 F.R.D. 685, 687 (N.D. Ga. 2001)................................................ 62, 63

*Joel A. v. Giuliani*,
   218 F.3d 132 (2d Cir. 2000)............................................................. 23

*Johnson v. Brennan*,
   No. 1:10-cv-04082, 2011 U.S. Dist. LEXIS 105775 (S.D.N.Y. Sept. 16, 2011)...... 30, 42

*Liberte Capital Group v. Capwill*,
   No. 5:99 CV 818, 2007 U.S. Dist. LEXIS 64869 (N.D. Ohio Aug. 29, 2007)........... 62

*Kaplan v. Rand*,
   192 F.3d 60 (2d Cir. 1999)............................................................. 58

*Lopes et. al. v. Novartis Corporation et. al*,
   Case No. 1:06–cv–02268–PAC (S.D.N.Y. March 23, 2006)...................... 3, 6, 11

*Malchman v. Davis*,
   706 F.2d 426 (2d Cir. 1982)........................................................... 38

*Maley v. Del Global Techs.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ........................................... *passim*

*Masters v. Wilhelmina Model Agency, Inc.*,
   473 F.3d 423 (2d Cir. 2007)........................................................... 53

*Matheson v. T-Bone Rest. LLC.*,
   No. 09 Civ 4214, 2011 U.S. LEXIS 143773 (S.D.N.Y. Dec. 13, 2011).................. 42

*Mba v. World Airways, Inc.*,
　　369 Fed. Appx. 194 (2d Cir. 2010)……...……….…………............................. 24

*McClain v. Lufkin Industries, Inc.*,
　　No. 9:97-cv-63, 2009 U.S. Dist. LEXIS 125630 (E.D. Tex. Dec. 22, 2009)…….......… 59

*McDaniel v. County of Schenectady*,
　　595 F.3d 411 (2d Cir. 2010)…………………………………………..………… 52

*McGee v. Continental R.R. North America Inc.*,
　　No. 06-6234, 2009 U.S. Dist. LEXIS 17199 (D.N.J. Mar. 4, 2009)…………………… 44

*McReynolds v. Richards-Cantave*,
　　588 F.3d 790 (2d Cir. 2009)………………….............................................................22, 38

*Miller v. Republic Nat'l Life Ins. Co.*,
　　559 F.2d 426 (5th Cir. 1977)…………………………………………………… 69

*Mohney v. Shelley's Prime Steak*, No. 06 Civ. 4270,
　　2009 U.S. Dist. LEXIS 27899 (S.D.N.Y. Mar. 31, 2009) (Crotty, J.)…………....… *passim*

*Morris v. Affinity Health Plan, Inc.*,
　　No. 09-cv-1932, 2011 U.S. Dist. LEXIS 144543 (S.D.N.Y. December 15, 2011)…… 68

*N.J. Carpenters Health Fund v. DLJ Mortg. Capital*,
　　No. 08-5653, 2011 U.S. Dist.LEXIS 92597 (S.D.N.Y. Aug. 16, 2011) (Crotty, J.)…… 26

*New York v. Reebok Int'l Ltd.*,
　　96 F.3d 44, 47 (2d Cir. 1996)……………………………………………………….. 2

*Nilsen v. York County*,
　　382 F. Supp. 2d 206 (D. Me. 2005)………………………………………….......... 60

*Novartis Pharm. Corp. v. Lopes*,
　　131 S. Ct. 1568 (2010) (No. 10-460)……………………………………………… 6

*O'Connor v. AR Res., Inc.*,
　　No. 08-1703, 2012 U.S. Dist. LEXIS 861 (D. Conn. Jan 4, 2012)…………………… 44

*O'Donnell v. TD Ameritrade, Inc.*,
　　No. 07cv0123, 2008 U.S. Dist. LEXIS 49829 (S.D. Cal. June 17, 2008)…………… 30

*Ozga v. U.S. Remodelers, Inc.*,
　　No. C 09-05112, 2010 U.S. Dist. LEXIS 91196 (N.D. Cal. Aug. 9, 2010)…………… 59

*Parker v. Jekyll & Hyde Entm't Holdings, L.L.C.,*
     No. 08 Civ. 7670, 2010 U.S. Dist. LEXIS 12762 (S.D.N.Y. Feb. 9, 2010)......... 58, 62

*Parker v. Time Warner Entertainment Co.,*
     631 F. Supp. 2d 242 (E.D.N.Y. 2009)....................................................... 33

*Perkins v. Southern New England Telephone Co.,*
     669 F. Supp. 2d (D. Conn. 2009).......................................................... 29

*Plummer v. Chemical Bank,*
     668 F.2d 654 (2d Cir. 1982)............................................................ 34

*Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
     370 U.S. 414 (1968)................................................................... 24

*Rabin v. Concord Assets Grp., Inc.,*
     No. 89 Civ. 6130, 1991 U.S. Dist. LEXIS 18273 (S.D.N.Y. Dec. 19, 1991)........... 58

*Reyes v. Buddha-Bar NYC,*
     No. 08 Civ. 2494, 2009 U.S. Dist. LEXIS 45277 (S.D.N.Y. May 28, 2009)...... ... 60, 72

*RMED Int'l, Inc., v. Sloan's Supermarkets, Inc.,*
     No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239 (S.D.N.Y. May 15, 2003)......….... 61

*Roberts v. Texaco, Inc.,*
     979 F. Supp. 185 (S.D.N.Y. 1997) ....................................... 58, 61, 63

*Romero v. Producers Dairy Foods, Inc.,*
     No. 1:05cv0484 DLB, 2007 U.S. Dist. LEXIS 86270 (E.D. Cal. Nov. 14, 2007) ...... 60

*Rosenberg v. IKON Office Solutions,*
     No. 05-cv-09131, slip op. (S.D.N.Y. Jan. 22, 2008) (Crotty, J.) ..............… 48, 53, 68

*Sand v. Greenberg,* No. 08-7840,
     2011 U.S. Dist. LEXIS 36266 (S.D.N.Y. Mar. 22, 2011) (Crotty, J)........... 26, 28, 66

*Savoie v. Merchants Bank,*
     166 F.3d 456 (2d Cir. 1999)..................................…........................ 53

*Sewell v. Bovis Lend Lease, Inc.,*
     No. 09 Civ. 6548 (RLE), 2012 LEXIS 53556
     (S.D.N.Y. April 16, 2012)................................................... *passim*

*Siewmungal v. Nelson Mgmt. Group Ltd.,*
     No. 11-CV-5018, 2012 U.S. Dist. LEXIS 28181 (E.D.N.Y. Mar. 2, 2012)............... 72

*Sipas v. Sammy's Fishbox, Inc.,*
        No. 05-10319, 2006 U.S. Dist. LEXIS 24318 (S.D.N.Y. Apr. 24, 2006) (Crotty, J.)..... 41

*Stop & Shop Supermarket Co. v. Smith Kline Beecham Corp.,*
        No. Civ.A. 03-4578, 2005 U.S. Dist. LEXIS 9705 (E.D.Pa. May 20, 2005)................ 44

*Strougo ex rel Brazilian Equity Fund, Inc.v. Bassini,*
        258 F. Supp. 2d 254 (S.D.N.Y. 2003)............................................. 23, 52, 54, 63

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N. Ltd.,*
        No. 01 Civ. 11814, 2004 U.S. Dist. LEXIS 8608 (S.D.N.Y. May 14, 2004)............... 37

*Telecomm. Sys. v. Mobile 365, Inc.,*
        No. 06-485, 2009 U.S. Dist. LEXIS 126761 (E.D.Va. Mar. 31, 2009)..................... 57

*Thomas v. Citifinancial Auto Ltd.,*
        No. 07 Civ. 00721, slip op. (D.Md. Aug. 20, 2009).............................................. 48

*Torres v. Bank of Am. (In re Checking Account),*
        Nos. 09-MD-02036, 08-23323, 09-21963, 09-2186, 10-24316, 10-01185,
        2011 U.S. Dist. LEXIS 135014 (S.D. Fla. Nov. 22, 2011)..................................... 55

*Torres v. Gristede's Operating Corp.,* No. 04-3316, 2006
        U.S. Dist. LEXIS 74039 (S.D.N.Y. Sept. 29, 2006) ("*Torres I*") (Crotty, J.)......... *passim*

*Torres v. Gristede's Operating Corp.,* Nos. 04-3316, 08-8531, 08-9627,
        2010 U.S. Dist. LEXIS 139144 (S.D.N.Y. Dec. 21, 2010) ("*Torres II*")
        (Crotty, J.)............................................................................................ *passim*

*Torrisi v. Tucson Elec. Power Co.,*
        8 F.3d 1370 (9th Cir. 1993)........................................................................ 69

*Toure v. Cent. Parking Sys. of N.Y.,*
        No. 05 Civ. 5237, 2007 U.S. Dist. LEXIS 74056 (S.D.N.Y. Sept. 28, 2007)............. 28

*Van Vranken v. Atlantic Richfield Co.,*
        901 F. Supp. 294 (N.D. Cal. 1995)................................................................. 63

*Velez v. MaJik Cleaning Serv., Inc.,*
        No. 03 Civ. 8698, 2007 U.S. Dist. LEXIS 46223 (S.D.N.Y. June 22, 2007)............. 61

*Velez v. Novartis Pharmas. Corp.,*
        No. 04-9194, 2010 U.S. Dist. LEXIS 125945
        (S.D.N.Y. Nov. 30, 2010) ...................................................................... *passim*

*Vizcaino v. Microsoft Corp.,*

290 F.3d 1043, 1047-1050 (9th Cir. May 15, 2002)...........................................55

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)...............….................................................22, 23, 32, 52

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982)......................................…...........................38

*White v. Murtis M. Taylor Multi-Service Ctr.*,
188 Ohio App. 3d 409 (Ohio Ap. 2010)............................................…....15

*White et. al. v. Novartis Corporation et.al.*,
Case No. BC349490 (Sup. Ct. Cal., Los Angeles County, March 23, 2006)...............3

*White, et. al. v. Novartis Corporation et.al.*,
Case No. 2:06-cv-02764-AHM-FFM (C.D.Ca. May 5, 2006).........................…... *passim*

*Willix v. Healthfirst, Inc.*,
No. 07-1143, 2011 U.S. Dist. LEXIS 21102
(E.D.N.Y. Feb. 18, 2011)...........................................................................54, 72

*Wineland v. Casey's General Stores, Inc.*,
267 F.R.D. 669 (S.D. Iowa 2009)..................................................…......60

*Wong, et al . v. Novartis Pharmaceuticals Corporation, et al.*,
No. 11-Civ.-4749 (S.D.N.Y. 2011)..........................................................8

*Wright v. Stern*,
553 F. Supp. 2d 337 (S.D.N.Y. 2008)...........................…....................34, 35, 37, 62

## STATUTES

010 14 Ark. Code R. §002 (Lexis Nexis 2012)..................................…..........15

29 C.F.R. 541.601(a) (2004) ...............................................................…........15

29 U.S.C. § 216, the Fair Labor Standards Act.................................................... *passim*

803 Ky. Admin. Regs. 1:070 § 9 (2011)..........................................…...............15

Federal Rule of Civil Procedure 23.......................................................... *passim*

Mont. Admin. Reg. 24.16.211 (2011)...............................................…...........15

**OTHER AUTHORITIES**

"Biggest Lawyers Grab Fee Bounty," The Wall Street Journal (April 16, 2012)...... .......... 56

*In Focus: Billing; A Firm-by-Firm Sampling of Billing Rates Nationwide,*
    Nat'l L.J., December 6, 2004............................................................................................. 57

Theodore Eisenberg and Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action*
    *Settlements: 1993-2008*, NYU Center for Law, Economics and Organization,
    Working Paper No. 09-50 (November 2009),  *available at*
    http://ssrn.com/abstract=1497224............................................................................. 55, 59

National Law Journal 2011 Billing Survey, *available at*
    www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202535905815........................................ 57

NERA Economic Consulting, *"Trends in Wage and Hour Settlements: 2011 Update,"*
    (Mar. 22, 2012)........................................................................................................... 51, 52

## I.   INTRODUCTION

The Parties jointly move for final approval of a more than $99 Million proposed settlement that resolves all claims brought by the five classes of current and former "Sales Representatives" of Defendant Novartis Pharmaceuticals Corporation ("Novartis" or the "Company") (collectively, the "Settlement Class"), alleging primarily that Novartis failed to pay employees overtime wages pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA") and state wage and hour laws.  Class Counsel hereby submits Plaintiffs' Memorandum in Support of the Joint Motion for Final Certification and Approval of the Settlement.

On January 25, 2012, this Court certified the Settlement Classes as meeting the requirements of Rule 23 and FLSA.  *In re Novartis Wage and Hour Litigation*, No. 06-md-1794 (PAC), Doc. 146 (Order Preliminarily Approving Settlement) (S.D.N.Y. Jan. 25, 2012); *see also* Doc. 147 (Transcript of 1/24/12 Conference) at 33:23-25, 34:1-4 (attached hereto as Exh. A) (all subsequent references to the *In re Novartis* Docket shall be "Doc. #").  Describing the settlement at the preliminary approval hearing, the Court noted approvingly that the settlement was crafted with "two new classes [to] fill the gaps and provide additional benefits to Novartis employees and provide Novartis the comfort of putting all of these legal questions behind it."  Doc. 147, at 33:20-22.  Accordingly, the Court decided to

> preliminarily approve the settlement as being fair, adequate [and] reasonable, subject to the right of class members to challenge the fairness, reasonableness or adequacy of the settlement agreement and to show cause, if any exists, why a final judgment . . . should not be entered following a final fairness hearing.

*Id.* at 36:10-16.

The Court ordered notice to more than 7,000 of the Settlement Class Members, giving them the opportunity to review the terms of the settlement and detailing the procedures to file objections and, for some subclasses, to formally opt into or opt out of the Settlement Class.  The

response from class members in support of the Settlement Agreement has been exceptional. Eighty-four percent (84%) of eligible FLSA II members opted into the FLSA II Settlement subclass. Only one individual opted out of the Remaining States Settlement subclass, and **not a single class member objected.**[1]  **In total, 7,324 out of a potential total of 7,730 settlement class members – an astounding 95% – have agreed to resolve their wage and hour claims pursuant to the terms of this Agreement.**[2]  These numbers resoundingly endorse the agreement reached by the Parties and ratify the Court's initial assessment that the settlement is fair, adequate and reasonable.

Given the substantial relief in the Settlement Agreement and the virtually unanimous support from the class members themselves, Plaintiffs respectfully request that this Court grant the parties' joint request (1) to approve as final the Settlement Agreement and all its terms, including an award of attorneys' fees and incentive payments; (2) to dismiss the Civil Action with prejudice; and (3) to require that all discovery materials marked as containing Confidential or Highly Confidential Information pursuant to the Protective Order entered in the case be returned to the producing Party or destroyed.

---

[1] The lone "objection"—a letter submitted to the Court requesting to opt into the FLSA I subclass that had been previously certified in 2007—was voiced by a **non-class member** and therefore was improper per the terms of this Court's Order Preliminarily Approving the Settlement. As discussed further below in Section III.G., it is settled that non-class members lack standing to object to a class action settlement. *See, e.g., New York v. Reebok Int'l Ltd.,* 96 F.3d 44, 47 (2d Cir. 1996); *In re IPO Secs. Litig.,* No. 21-mc-92, 2011 U.S. Dist. LEXIS 103698, at *3 n.1 (S.D.N.Y Aug. 25, 2011); *New York v. Reebok Int'l Ltd.,* 96 F.3d 44, 47 (2d Cir. 1996).

[2] A total of 7,730 individuals were eligible to participate in the settlement, including: 2,206 Members who either opted in to the FLSA collective action in 2007 or who did not opt out of the New York I or California I Subclasses; 3,004 Remaining States Subclass Members who were given the opportunity to opt out; and 2,520 FLSA II Subclass Members who could participate by opting in. In total, 7,328 Class Members – including 2,210 original Members, 3,003 Remaining States Subclass Members, and 2,115 FLSA II Subclass Members – agreed to resolve their wage and hour claims pursuant to the terms of this Agreement. Class Counsel Dec. ¶46.

2

## II.   SUMMARY AND FACTUAL BACKGROUND

### A.   Filing of the Original Complaints, Consolidation of Cases, and Certification of Original Classes

#### 1.   *Lopes. et al.*: the New York Litigation

On March 23, 2006, Sales Representatives Simona M. Lopes and Carol Bollinger filed a Class Action and Collective Action Complaint against Novartis in the United States District Court for the Southern District of New York. *Lopes, et. al. v. Novartis Corporation et. al*, Case No. 1:06–cv–02268–PAC, at Doc. 1 (S.D.N.Y. March 23, 2006). Lopes alleged that she and similarly-situated Novartis employees were misclassified as exempt employees under the New York Labor Law and the FLSA; she sought withheld overtime payments for herself and the class. On May 4, 2006, Ms. Lopes filed her First Amended Class Action and Collective Action Complaint. *Id.* at Doc. 3.

#### 2.   *White, et al.*: the California Litigation

On March 23, 2006, two Novartis Sales Representatives, Catherine E. White and Minel A. Hider-Tobertga, filed a Class Action Complaint against Novartis in Superior Court of the State of California for the County of Los Angeles. *White, et. al. v. Novartis Corporation et.al.*, Case No. BC349490, at Doc. 1 (Sup. Ct. Cal., Los Angeles County, March 23, 2006). Ms. White and Ms. Hider-Tobertga were Sales Representatives at Novartis in California. Ms. White and Ms. Hider-Tobertga alleged that they and similarly-situated Novartis employees were misclassified as exempt employees and denied meal breaks, rest breaks, itemized statements, timely payments of wages and accurate records of time in violation of the California Labor Code, the California Business and Professions Code and the California Code of Regulations. On May 5, 2006, the action was removed by Novartis to the United States District Court for the Central District of California. *White, et. al. v. Novartis Corporation et.al.*, Case No. 2:06-cv-

02764-AHM-FFM, at Doc. 1 (C.D.Ca. May 5, 2006).

### 3.  MDL Consolidation: *In re Novartis Wage and Hour Litigation*

On October 31, 2006, the New York and California cases were consolidated by the Judicial Panel on Multidistrict Litigation for pretrial proceedings in the United States District Court for the Southern District of New York as *In Re Novartis Wage and Hour Litigation*, Case No. 06-md-1794 (PAC).  On February 1, 2007, the Named Plaintiffs in the California case filed a First Amended Complaint and Demand for Jury Trial in the Southern District of New York.  *In re Novartis Wage and Hour Litigation*, No. 06-md-1794 (PAC), at Doc. 30 (S.D.N.Y. Feb. 1, 2007).

### 4.  Certification of New York and California Classes and a Nationwide FLSA Collective Action

In February 2007, the Parties jointly moved for an order certifying a nationwide FLSA collective action and certifying two Rule 23(b) classes consisting of Novartis Sales Representatives who worked for the Company in New York and California. Doc. 17.   On February 15, 2007, the Court granted the motion.  Doc. 19.

The Court-appointed Class Action Administration, Inc. ("CAA") mailed the notice via first class mail.  *Id.*  In 2007 and 2008, approximately 489 plaintiffs opted in as parties to the FLSA collective action, joining approximately 1,700 plaintiffs in the NY and CA state Rule 23 classes.

### B.      Development of the Record in *In re Novartis Wage & Hour Litigation*

After the Classes were certified, the Parties engaged in extensive merits and expert discovery, which included approximately 39 fact, expert and 30(b)(6) corporate designeee depositions throughout the United States.   Class Counsel reviewed and produced more than 5,000 pages of documents to Novartis and reviewed and catalogued hundreds of thousands of

pages of documents produced by Novartis.

### C.   Summary Judgment and Second Circuit Appeal

On May 2, 2008, following the close of discovery, the Parties submitted cross-motions for summary judgment.  Doc. 100, "Defendant's Motion for Summary Judgment," and Doc. 105, "Plaintiffs' Motion for Summary Judgment."  Throughout May, June and July 2008, both parties submitted Opposition and Reply briefs.  On November 18, 2008, the Parties presented oral arguments for the Court.  Doc. 131.  On January 12, 2009, the Court granted Novartis's motion for summary judgment, ruled that Novartis's sales representatives are exempt from overtime compensation under the outside sales and administrative exemptions of the FLSA and New York and California wage and hour laws and directed the Clerk of the Court to enter judgment and terminate the Civil Action.  Doc. 132.

Plaintiffs appealed the Court's grant of summary judgment in favor of Novartis to the United States Court of Appeals for the Second Circuit.  During the briefing before the Second Circuit, the U.S. Department of Labor filed an amicus brief in support of Plaintiffs-Appellants on October 14, 2009.  *See* Brief for the Secretary of Labor as *Amicus Curiae* in Support of Plaintiffs-Appellants, Case No. 09-0437 (2d Cir. Oct. 14, 2009).  On February 19, 2010, the Parties presented oral arguments before the Second Circuit Court of Appeals.  On July 6, 2010, the Second Circuit Court of Appeals vacated the Court's summary judgment decision and granted summary judgment for the Plaintiffs, holding that Novartis's sales representatives are *not* exempt from overtime compensation under *either* the outside sales or administrative exemptions of the FLSA, New York or California wage and hour laws. *In re Novartis Wage and Hour Litig.*, 611 F.3d 141 (2d Cir. 2010).  The case was remanded for damages proceedings.

### D.    Petition to the United States Supreme Court

On October 4, 2010, Novartis filed a Petition for *certiorari* to the United States Supreme Court, requesting review of the Second Circuit's decision. Petition for a Writ of Certiorari, *Novartis Pharm. Corp. v. Lopes*, 131 S. Ct. 1568 (2010) (No. 10-460). The U.S. Chamber of Commerce and Pharmaceutical Manufacturers of America submitted amicus briefs on behalf of Novartis. *See* Brief for U.S. Chamber of Commerce as Amicus Curiae Supporting Appellee and Affirmance, *Novartis Pharm. Corp. v. Lopes* (Nov. 5, 2010); Brief for Pharm. Mgrs. of America as Amicus Curiae, *Novartis Pharm. Corp. v. Lopes* (Nov. 5, 2010). Plaintiffs submitted an Opposition to Novartis's Petition. *See* Brief in Opposition, *Novartis Pharm. Corp. v. Lopes* (Jan. 5, 2011). On February 28, 2011, the United States Supreme Court denied Novartis's Petition for certiorari, leaving the Second Circuit's decision intact. *Novartis Pharm. Corp. v. Lopes*, 131 S. Ct. 1568 (No. 10-460). On March 1, 2011, the Second Circuit Court of Appeals issued a Mandate remanding the Civil Action to the district court for a jury trial principally on the amount of back overtime damages owed by Novartis to Plaintiffs. Doc. 140.

### E.    Litigation of Related Matters, The Department of Labor and pending Supreme Court Review

After Plaintiffs filed the *Lopes* and *White* complaints in March 2006, numerous other firms across the country began filing and litigating similar matters against other pharmaceutical companies. Many of these other cases were prosecuted quickly and without the thorough and careful development of the record Class Counsel achieved here.[3] Consequently, many of these other pharmaceutical lawsuits rapidly were handed losses. Specifically, many courts ruled that, given the facts as developed in these cases, pharmaceutical sales representatives were not eligible

---

[3] The Department of Labor's *amicus* brief extensively referenced Plaintiffs' well-developed record. *See* Brief for the Secretary of Labor as *Amicus Curiae* in Support of Plaintiffs-Appellants, Case No. 09-0437 (2d Cir. Oct. 14, 2009).

for overtime under applicable wage and hour law because they were exempt under either the administrative exemption, the outside sales exemption or both.

Although the United States Supreme Court declined to take up the question of overtime pay for the pharmaceutical sales industry when it denied Novartis's petition for *certiorari* in the present matter, it later granted *certiorari* in a different pharmaceutical wage and hour matter. On November 28, 2011, the United States Supreme Court granted certification on the question of whether the outside sales exemption applies to pharmaceutical sales representatives in *Christopher, et al. v. SmithKline Beecham Corp.* No. 11-204, 2011 U.S. LEXIS 8505 (Nov. 28, 2011). The Court heard oral argument on April 16, 2012, and a decision is expected in the Summer of 2012.[4]

### F.    Settlement Negotiations

After the present matter was remanded to this Court for a jury trial principally on the amount of back overtime damages owed by Novartis to the Class Members certified in 2007, Doc. 140, the Parties agreed to attempt to resolve the Litigation through private settlement negotiations. *See* Doc. 210, 5-18-12 Joint Declaration of David Sanford, Jeremy Heisler and Katherine Kimpel at ¶15 (hereinafter "Class Counsel Dec."). In April 2011, the Court granted the Parties' request for a stay of proceedings to permit the Parties to pursue settlement discussions.

Over the course of approximately ten months, the Parties met numerous times for face-to-face negotiations. Class Counsel Dec. at ¶21. In addition, the Parties exchanged significant correspondence and engaged in frequent telephonic negotiations. *Id.* The negotiation related not only to the claims originally asserted in the Civil Action in 2006, but also to claims covering the

---

[4] The isssue of the applicability of the FLSA's administrative exemption to GSK's sales representatives is not before the Supreme Court.

period after the Court certified a class and collective action in 2007 and in states other than New York and California.   Class Counsel, in that context, performed extensive research on the overtime laws of all fifty states, Puerto Rico and Washington, D.C. *Id.*

### 1.   Risks to Novartis in Continued Litigation

The negotiations included a detailed analysis of the risks faced by Novartis should the litigation proceed.   First among these risks was the fact that *In re Novartis Wage and Hour Litigation* was remanded for a jury trial on damages for the approximately 2,200 certified class members with an average total compensation rate of $91,500 with testimony of working an average of 10-20 hours overtime per week.   Doc. 94, Opinion and Order Granting Defendant's Motion for Summary Judgment, at 2; Class Counsel Dec. at ¶24.   Additionally, Novartis risked ongoing exposure from the more than 5,500 sales representatives who work or worked for Novartis but were not members of the originally certified 2007 class.[5] *Id.*

### 2.   Risks to Plaintiffs in Continued Litigation

Although Plaintiffs won at the Second Circuit in July 2010 and although the United States Supreme Court denied Novartis's petition for certiorari on February 28, 2011, Plaintiffs also faced significant risk of continued litigation.   First among these risks was the possibility that the United States Supreme Court would take up the issue of overtime pay for pharmaceutical sales representatives and rule in a way that would foreclose recovery for the Plaintiffs in the present matter.   Class Counsel Dec. at ¶25.   As noted above, that possibility became more real when, on November 28, 2011, the United States Supreme Court granted *certiorari* on the

---

[5] For example, three individuals filed a similar FLSA putative collective action in *Wong, et al. v. Novartis Pharmaceuticals Corporation, et al.*, No. 11-Civ.-4749 (S.D.N.Y. 2011).   Subsequent to preliminary approval of the Settlement of the present matter, the three *Wong* named plaintiffs opted into the FLSA II Subclass here and dismissed their claims in *Wong* with prejudice.   Novartis agreed to pay counsel for the three named plaintiffs $10,000 to defray attorneys' fees and costs. *Id,.* Doc. 19. For a more detailed discussion of the other risks of this litigation, please see pp. 45-47, *infra.*

question of whether the outside sales exemption applies to pharmaceutical sales representatives in *Christopher, et al. v. SmithKline Beecham Corp.*

Other factors posing risks to Plaintiffs included the inevitable delay that comes with determining damages by jury trial and the possibility that appeals stemming from that trial might further delay the recovery to the class; the risk that the U. S. Department of Labor could change its position regarding the exemptions at issue in this matter should there be a change in Administration; the risk that this Court would not certify a class including Novartis sales representatives from April 2007 to the present in light of Novartis's representation that it changed the duties of sales representatives and reduced the hours sales representatives work per week; the risk that this Court would apply the "fluctuating work week rule" of calculating overtime pay, thereby greatly reducing damages; and the risk that the "highly compensated employee" exemption would be held to apply, thereby potentially excluding thousands of employees from the class. See p. 15 n.8, *infra*; Class Counsel Dec. at ¶26.

### 3. The Second Amended Complaint and Expanded Class

Novartis sought to fully, finally and forever settle, compromise and discharge all disputes and claims of any and all current or former pharmaceutical sales representatives who might bring a claim for failure to pay overtime under federal or state wage and hour law up to the date of final approval of the settlement. Class Counsel Dec. at ¶27. Plaintiffs sought to provide the benefits of any settlement to a larger group of employees – including the hundreds who contacted Class Counsel in the wake of Plaintiffs' victory at the Second Circuit – who were not members of the Subclasses originally certified in 2007. *Id.* In the process of these negotiations, the Parties considered (a) which employees might be covered by state law and which employees would be covered only by the Federal FLSA; (b) the applicable statute of limitation periods; and (c) the corresponding Rule 23 opt-out or FLSA opt-in procedures required. *Id.*

Plaintiffs filed their Second Amended Complaint ("SAC") on January 25, 2012. Doc. 144, Exh. B. In addition to the Class Representatives already named in the First Amended Complaint, the SAC also names Kelli Shannon as the Class Representative for the new Rule 23 Settlement Subclass (identified as "Remaining States Settlement Subclass" in the Settlement Agreement at ¶2.34) and names Terri Kelly as a Class Representative for the new FLSA Settlement Subclass (identified as "FLSA Settlement Subclass II" in the Settlement Agreement at ¶2.21). *See* SAC ¶¶8-9.

Specifically, Plaintiff Kelli Shannon brought claims in the SAC under state law on behalf of herself and:

> all persons who worked for Novarits as a full-time, active sales representative or sales consultant, or in the states of Alaska, California or Puerto Rico as a full or part-time active sales representative or sales consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all NPC sales divisions or business units, including Mass Market, Specialty and Select Field Forces:
>
> (a) in Alaska, Arkansas, Connecticut, the District of Columbia, Illinois, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, Washington, Wisconsin at any time from March 23, 2008 to the present;
>
> (b) in Kentucky at any time from March 23, 2006 to the present;
>
> (c) in Maine or Vermont from March 23, 2005 to the present; or
>
> (d) in New York or California from April 8, 2007 to the present
>
> and who are not part of the certified FLSA I, New York I, or California I Classes.

SAC at ¶71.

Plaintiff Terri Kelly brought FLSA claims in the SAC on behalf of herself and:

> all persons who worked for Novartis Pharmaceuticals Corporation ("Novartis" or "NPC") in the States of Alabama, Arizona, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Michigan, Mississippi, Nebraska, New Hampshire, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia or Wyoming as a full-time, active Sales Representative or Sales Consultant, including all non-manager

10

job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all NPC sales divisions or business units, including Mass Market, Specialty and Select Field Forces, for at least one day during the period January 25, 2009 through January 25, 2012, who timely opt-in to this action, and and who are not FLSA Class I members, New York Class I members, California Class I members, or members of the Remaining States Subclass.

SAC at ¶62.

### G.     Settlement Agreement

In September 2011 the Parties reached an agreement in principle to resolve all claims asserted in the 2006 Complaints and Amended Complaints in the *Lopes* and *White* Actions. Class Counsel Dec. at ¶31. In January 2012, the Parties reached a broader agreement to resolve all claims asserted in the January 25, 2012 SAC. *Id.*

The Parties then executed a Settlement Agreement to settle any and all federal and state wage and hour claims for any current or former Novartis pharmaceutical sales representatives under applicable laws. Doc. 145. The total value of the Settlement is just over $99 Million.

### 1.     Summary of Settlement Terms

#### a.     The Settlement Fund

The Settlement Agreement creates a fund of $99,000,000.00 to settle this action ("the Settlement Fund"). Doc. 145 at ¶8.1. The Settlement Fund covers Class Members' awards, service payments, attorneys' fees and costs, and employer taxes and other withholdings. *Id.* at ¶¶9.1-10.3. In addition to the Settlement Fund, Novartis will pay up to $170,000.00 in settlement administration expenses. *Id.* at ¶8.4. In the event that the Settlement Fund is not completely distributed for any reason, including any Settlement Class Member's failure to cash the settlement check within one (1) year, any and all such remaining funds and any interest generated by such funds after the mailing of settlement checks to Settlement Class Members will revert to Novartis. *Id.* at ¶8.7.

11

### b.  The Subclasses and Applicable Periods

The Settlement Class includes five subclasses, defined in the Settlement Agreement (1) California Settlement Subclass I, (2) FLSA Settlement Subclass I, (3) New York Settlement Subclass I, (4) FLSA Settlement Subclass II and (5) Remaining States Settlement Subclass.  Doc. 145 at ¶¶2.3, 2.18, 2.21, 2.25, 2.34.  Those five subclasses correspond into three overall groups: (a) Members of the three 2007 Certified Subclasses; (b) Members of the 2012 FLSA Opt-In Settlement Subclass; and (c) Members of the 2012 Rule 23 Opt-Out Settlement Subclass.

The employees eligible to partake in the settlement as Members of the 2007 Certified Class will participate either through the California Settlement Subclass I, the FLSA Settlement Subclass I or the New York Settlement Subclass I.

- The "California Settlement Sub-Class I" consists of each person who worked for Novartis in the State of California as a full or part-time, active Sales Representative or Sales Consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all Novartis Sales Division or Business Units, including Mass Market, Specialty and Select Field Forces for at least one day during the period March 23, 2002 through April 7, 2007 and who did not timely opt out of the Civil Action in 2007.  Doc. 145 at ¶2.3.

- The "FLSA Settlement Sub-Class I" consists of each person who worked for Novartis as a full-time, active Sales Representative or Sales Consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all Novartis Sales Divisions or Business Units, including Mass Market, Specialty and Select Field Forces for at least one day during the period March 23, 2003 through April 7, 2007 and who filed Consent to Join as Party Plaintiff forms in the Civil Action in 2007 and June 2008.  Doc. 145 at ¶2.18.

- The "NY Settlement Sub-Class I" consists of each person who worked for Novartis in the State of New York as a full-time, active Sales Representative or Sales Consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all Novartis Sales Divisions or Business Units, including Mass Market, Specialty and Select Field Forces for at least one day during the period March 23, 2000 through April 7, 2007 and who did not timely opt out of the Civil Action in 2007.  Doc. 145 at ¶2.25.

All class members defined above received the "Notice of Proposed Settlement and Settlement Hearing for California Settlement Subclass I, New York Settlement Subclass I, and Federal Fair Labor Standards Act ('FLSA') Settlement Subclass I." *See* Doc. 145, Exh. A; Sec. II.H., *infra*. Any individual who fell into one of the above three categories was automatically a member of the Settlement Class. Doc. 145 at ¶¶2.3, 2.18, 2.25, 2.38.

The employees eligible to participate in the settlement as Members of the 2012 FLSA Opt-In Settlement Sub-Class are defined as "FLSA Settlement Sub-Class II" and received the "Notice of Proposed Settlement and Settlement Hearing; Opportunity to Participate by Opting Into the Federal Fair Labor Standards Act ('FLSA') II Settlement Subclass." Doc. 145, Exh. B. *See* Sec. VII.E., *infra*. The "FLSA Settlement Sub-Class II" or "FLSA II" consists of:

> each person who worked for Novartis in the States of Alabama, Arizona, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Michigan, Mississippi, Nebraska, New Hampshire, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia or Wyoming as a full-time, active Sales Representative or Sales Consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all Novartis Sales Divisions or Business Units, including Mass Market, Specialty and Select Field Forces for at least one day during the period January 25, 2009 through the Preliminary Approval Date and who timely opt in to the Settlement by submitting an Opt In and Release Form and who are not FLSA Settlement Sub-Class I Members, California Settlement Sub-Class I Members, New York Settlement Sub-Class I Members or Remaining Settlement Sub-Class Members.

Doc. 145 at ¶2.21. Any individual who fell into the above category had to opt-in to become a member of the Settlement Class. *Id.* at ¶¶2.21, 2.38.

The employees eligible to participate in the settlement as members of the 2012 Rule 23 Opt-Out Settlement Sub-Class are defined as "Remaining States Settlement Sub-Class" and received the "Notice of Proposed Settlement and Settlement Hearing; Opportunity to Participate In Remaining States Settlement Subclass." *See* Doc. 145, Exh. C; Sec. VII.E., *infra*. The "Remaining States Settlement Sub-Class" consists of:

each person who worked for Novartis in the States of Arkansas, Connecticut, Illinois, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Wisconsin and/or the District of Columbia as a full-time, active Sales Representative or Sales Consultant, or in the States of Alaska, California or Puerto Rico as a full or part-time, active Sales Representative or Sales Consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all Novartis Sales Divisions or Business Units, including Mass Market, Specialty and Select Field Forces during the Remaining States Settlement Sub-Class Eligibility Periods as defined in Paragraph ¶2.35. of the Settlement Agreement and who are not FLSA Settlement Sub-Class I Members, California Settlement Sub-Class I Members or New York Settlement Sub-Class I Members.

Doc. 145 at ¶2.34. Any individual who fell into the above category was a member of the

Settlement Class unless he or she affirmatively opted out. *Id.* at ¶¶2.34, 2.38, 11.23.

### c.  *Allocation Formula and Weighting*

In negotiating how the Settlement Fund would be distributed, the Parties sought to

distribute the Class Monetary Award as equitably as possible.  Of particular concern was

devising a formula that reflected both the relative likelihood of success and the comparative scale

of a reasonably-expected recovery were each Settlement Class Member to proceed in standard

litigation.

Accordingly, the Parties devised a formula for the calculation of each individual's

settlement award that ensures that each individual's recovery amount takes into account:

(1)  his/her tenure at the Company;

(2)  the applicable statute of limitations based on state or federal law;

(3)   whether he or she made over $100,000 in any year(s) within the class period, and if so, whether Novartis might have raised a highly-compensated employee defense based on the applicable law; *and*

(4)  the relative likelihood of his/her claims succeeding as reflected by membership in the 2007 certified class or in the newly-defined subclasses pursuant to the 2012 Second Amended Complaint.

First, tenure is captured by basing the distribution on the number of eligible months worked,

14

rather than by a division of shares equally across the Settlement Class.   Second, Novartis reported to the Claims Administrator the maximum number of months for which each individual has standing to recover as provided by the statute of limitations for the most protective state or federal law individually applicable.

Third, the Parties agreed that the "highly-compensated employee defense" might well preclude or greatly reduce the recovery of much of the Settlement Class.[6]   The parties resolved that any months worked by highly-compensated individuals should be commensurately less valuable in the allocation formula.   Specifically, the Parties agreed that class members should receive two times the amount for any months in which there is no potential for establishing a highly-compensated exemption.

Fourth, the Parties agreed that the difference in the stage of proceedings must also be reflected in the value of each individual award.   Specifically, the Parties accounted for the difference between (a) a certified class that, after years of discovery and litigation, has secured a liability finding and (b) a prospective class that would likely require years of discovery and litigation before any such liability finding might be secured and that would have to do so in a very different and arguably less favorable legal environment for the Plaintiffs.[7]   Accordingly, the Parties agreed that class members should receive six times the amount for those claims that were covered by the 2007 certified class.

---

[6] By "highly-compensated employee defense," the Parties refer generally to the provision in federal law that if an individual makes $100,000 or more in any given year, that individual is considered "highly-compensated," and the employer need only meet a reduced burden in showing that individual is not eligible for overtime compensation. *See* 29 C.F.R. 541.601(a) (2004).  Multiple states may recognize a similar defense either under their own law or through incorporation of the FLSA.  *See, e.g.*, 010 14 Ark. Code R. §002 (Lexis Nexis 2012); 803 Ky. Admin. Regs. 1:070 § 9 (2011); Mont. Admin. Reg. 24.16.211 (2011); *Hardin v. Belmont Textile Mach., Co.*, No. 3:05-cv-00492, 2008 U.S. Dist. LEXIS 64081, at *11-12 (W.D.N.C. Aug. 20, 2008), *rev'd on other grounds*, 355 Fed. Appx. 717 (4th Cir. 2009); *White v. Murtis M. Taylor Multi-Service Ctr.*, 188 Ohio App. 3d 409, 413 (Ohio App. 2010).

[7] In addition, Novartis asserts that the job responsibilities of its sales force employees have changed since the close of discovery in the *Lopes* and *White* actions, such that, as of the date of this Settlement Agreement, these duties would comply with the Second Circuit's construction of the FLSA's administrative exemption.

### 2.   Distribution Mechanism and the Claims Administrator

In negotiating the Settlement, the Parties sought to avoid a complicated claims process that might result in a lower participation rate or in fewer dollars actually distributed to the Class. Accordingly, the Parties agreed that monies would be automatically distributed without the presentation of any individualized proof or the completion of any prolonged claims process. Doc. 145 at ¶10.3.

Under the Settlement Agreement, the Claims Administrator is responsible for the distribution of the Class Monetary Award Fund. *Id.* at ¶11.1.  The Parties jointly suggested Rust Consulting, Inc. ("Rust") should serve as the Claims Administrator, and this Court appointed Rust to serve as such on January 25, 2012.  Doc. 146.  Subsequently, Rust mailed Notices to all potential Class Members on February 24, 2012.  Rust Dec. ¶9.

### 3.   Releases

The Settlement Agreement provides that every Settlement Class Member (as defined as (1) any member of the NY I Subclass, CA I Subclass or FLSA I Settlement Subclass; (2) any Remaining States Settlement Subclass member who does not timely opt out of the settlement; or (3) every FLSA II Settlement Subclass member who timely opts into the settlement) will release his or her wage claims and all derivative claims.  Doc. 145 at ¶¶2.33, 6.1.

### 4.   Service Awards

The Settlement Agreement provides for service awards to those individuals who significantly contributed to the litigation during the past six years.  Doc. 145 at ¶9.8.  However, the amounts sought are minimal: a total of $233,500 – a mere 0.24% of the Settlement Fund.

First, the Agreement allows service payments for the Named Plaintiffs in recognition of (a) the substantial time and energy devoted in litigating this lawsuit; and (b) the risks incurred as a result of active participation in prosecuting the class claims and bringing about and carrying

out the terms of this settlement. Doc. 145 at ¶9.8.  Original Named Plaintiffs Simona M. Lopes, Catherine E. White and Minel A. Hider-Tobertga seek an award of $40,000 each as a Service Award Payment from the Settlement Fund. *Id.* at ¶9.8(i).  SAC Named Plaintiffs Terri Kelly and Kelli Shannon seek an award of $20,000 each as a Service Award Payment from the Settlement Fund. *Id.* at ¶9.8(ii).

In addition, the Agreement provides for modest service payments to those deponents whose testimony served as the basis for the record on which the victory at the Second Circuit was obtained, and who otherwise assumed many of the same risks incurred by the Named Plaintiffs.  Accordingly, twenty-one deponents – Valerie Bobry, Deborah Davis, Wiah Dogbeh, Geraldine Dominic, Donald Duritsch, Kimberly Elliot, Cynthia Foletta, Robert Hartshorn, Marc Hileman, Demetra Hutchinson, Rosa Madueno, Christine Mills, Curtis Moore, Jennifer Peldiak, Abraham Quinones, Ronni Reiburn, Christin Robison, John Rubin, Amy Velez, Raymond Watkins and Eva Winger – each seek a $3,500 Service Award Payment from the Settlement Fund. *Id.* at ¶9.8(iii).

5.  Attorneys' Fees & Expenses

The Settlement Agreement provides for an award of attorneys' fees up to 30% of the Settlement Fund and for expenses up to $400,000.00.  Doc. 145 at ¶¶9.1, 9.2.  As discussed further in Secs. III.C-D., *infra*, Class Counsel now seeks (a) twenty-eight percent (28%) from the remaining Settlement Fund to compensate them for attorneys' fees and (b) reimbursement from the Settlement Fund for $400,000.00 in litigation costs and expenses.  This constitutes less than the amount allowed pursuant to the Settlement and noticed to the Class.

**H.    Notice to the Class and The Response to the Same**

As noted above, on January 25, 2012, the Court appointed Rust Consulting to administer the settlement.  The following facts are distilled from the Declaration of Stacy L. Roe, Senior

Project Administrator for Rust (hereinafter "Rust Dec.").

On February 24, 2012, Rust sent Notices to 7,730 Proposed Settlement Class Members via First Class Mail. Rust Dec. ¶9.  Rust mailed:

- 2,206 Notices of the Proposed Class Action Settlement and Settlement Hearing to the members of the California I Settlement Subclass, the New York I Settlement Subclass and the FLSA Settlement Subclass I Members;
- 3,004 Notices of Proposed Settlement, Settlement Hearing and Opportunity to Participate to the Remaining States Subclass Members; and
- 2,520 Notices of Proposed Settlement, Settlement Hearing, and Opportunity to Participate, Opt-In and Release Form to the FLSA Settlement Subclass II Members. Rust Dec. ¶9.[8]

The deadline for FLSA II Subclass Members to submit their Opt-In & Release Forms was Monday April 16, 2012.  2,115 of the 2,520 current and former Sales Representatives who were required to submit a FLSA II opt-in form did so.   This represents an extraordinary opt-in rate of approximately 84%.  As of May 21, 2012, all complete opt-in forms have all been filed in accordance with the Court's March 23, 2012 Order. *See* Docs. 152-190, 192-207 (opt-in filings).

The deadline for the Remaining States Subclass to Submit Requests for Exclusions was also Monday, April 16, 2012.   Only one Subclass Member, which represents approximately three-hundredths of one percent (0.03%) of the Remaining States Subclass and only one-hundredth of a percent (0.01%) of the entire Class, has timely excluded himself from the Settlement.[9]  Rust Dec. ¶17.

The deadline for Settlement Class Members to submit objections to the Settlement was also Monday, April 16, 2012.  SA ¶11.16.  **Not a single objection was filed by the Settlement**

---

[8] An additional 216 FLSA II Notices were also mailed to individuals who live in North Carolina and qualify as Remaining States Subclass members, pursuant to Settlement Agreement ¶¶ 2.21, 2.34. Rust Dec. ¶9.

[9] That individual is represented by counsel in an independent action filed in state court in Puerto Rico.  Class Counsel Dec. ¶15.

**Class.**[10]  *See* Rust Dec. ¶18.

### I.    Calculation of Awards

Should this Court approve the Settlement as final, **all 7,328 Settlement Class Members will receive an automatic payment** from the $99 Million Settlement Fund, less service awards, attorneys' fees and expenses, per the terms of the Settlement.  Class Counsel Dec. ¶62.

After the opt-in and opt-out periods expired on April 16, 2012,[11] Novartis and Class Counsel began working on verifying and finalizing the details of the class list.  Once that process is completed and submitted to Rust Consulting, Rust – with the ongoing assistance of Novartis and Class Counsel – will calculate the total number of months worked by Settlement Class Members within the relevant class period.  Using that total number of months and applying the weights described above, Rust will calculate a base Monthly Amount that will be the constant in the calculation of each individual's award using the following formula:

**Monthly Amount** = Class Monetary Award Fund ÷

(1[*total HCE*[12] *Months worked by Settlement Class Members in New Classes*][13]

+ 2[*total Non-HCE Months worked by Settlement Class Members in New Classes*]

+ 6[*total HCE Months worked by Settlement Class Members in Original Certified Classes*][14]

+ 12[*total Non-HCE Months worked by Settlement Members in Original Certified*

---

[10] The single arguable "objection" to the settlement came from an individual who failed to submit her FLSA I opt-in form in 2007.  Doc. 191.  Because this individual stopped working at Novartis in October 2007, she does not fall within the definition of the new Remaining States and/or FLSA II Proposed Settlement Subclasses (SA ¶¶2.21, 2.34-2.35).  Her letter to the Court is discussed fully at Sec. III(H) *infra*.

[11] With the agreement of Novartis, approximately 15 opt-in forms that were submitted after the deadline and an additional 15 opt-in forms with illegible postmark dates were nonetheless treated as timely and filed with the Court. Those individuals are included in the 7,328 count.  Class Counsel Dec. ¶61.

[12] "HCE" stands for "Highly Compensated Employee" as construed by the Parties in accordance with applicable federal and state law, *see supra* Sec.II.G.1.c.

[13] The "New Classes" are comprised of the FLSA II Settlement Subclass and the Remaining States Settlement Subclass.

[14] The "Original Certified Classes" are comprised of the California Settlement Subclass I, the FLSA Settlement Subclass I and the New York Settlement Subclass I.

*Classes*]).

Doc. 145, Exs A-C

Should the Settlement Agreement be approved as final, Rust will calculate the individual's award, making the appropriate deductions and withholdings using Novartis's records for each Settlement Class Member's Work State, employment dates and compensation. *See* Doc. 145 ¶2.41.   Each Settlement Class Member's award will be calculated using the following formula:

> **Class Member Individual Award Amount =**
> ([*Monthly Amount **x** New Class Member's HCE months worked*]
> + 2[*Monthly Amount **x** New Class Member's Non HCE months worked*]
> + 6[*Monthly Amount **x** Original Certified Class Member's HCE months worked*]
> + 12[*Monthly Amount **x** Original Certified Class Member's Non HCE months worked*]).

Doc. 145, Exs. A-C. Rust will then issue and mail a settlement check.  Assuming Final Approval is granted in June 2012, the Settlement Agreement anticipates that Settlement Class Members should receive their awards no later than August 2012. *Id.* at ¶11.25.

### J.     Class-Member Assistance

Since the announcement of the Court's Preliminary Approval of the Settlement on January 25, 2012, Class Counsel has devoted more than 1,000 hours to directly assisting over 750 individuals regarding the Settlement.[15]   *See* Class Counsel Dec. at ¶47.   Since Rust sent Notice to Class Members on February 24, 2012, approximately 340 individuals have contacted Class Counsel's offices with specific questions about the Notice or questions about their eligibility to participate in the Settlement. *Id.*

Class Counsel staffs six attorneys and paralegals to handle Class Members' questions.

---

[15] These contacts are in addition to the hundreds of inquiries and calls Class Counsel fielded in 2011 after the Supreme Court denied Novartis' *cert* petition.  Class Counsel Dec. at ¶47.

For each individual who contacts Class Counsel, the staff conducts a call intake, which can range from two minutes to an hour. The average call lasts about eight minutes. Class Counsel Dec. ¶48. During these calls, Class Counsel staff clarifies terms of the Settlement; explains what each Class Member must do in order to participate in the Settlement; and, in general, assists with the overall Settlement process. *Id.* Some callers require multiple calls, with increasing levels of attention from associates and, in some cases, Partners. *Id.*

In addition, Class Counsel has spent significant time working with Rust, Novartis and the Claims Administrator who handled the 2007 notice to assist anomalous claimants and address other issues that have arisen throughout this process. Class Counsel Dec. ¶49. In this capacity, Class Counsel has and continues to review individuals' employment histories, verifies that time records are correct and conducts extensive research, factual and otherwise. Through this process, Class Counsel has identified and resolved at least seven omissions or other issues related to settlement class composition.

The lack of *any* objection from *even one* Class Member to *any* component of the Settlement is a testament to Class Counsel's diligence in responding to inquiries, frustrations and concerns and in making sure that Class Members were fully informed and comfortable with the settlement process and terms.

Class Counsel's work and involvement will continue in the upcoming months. After a final settlement approval, Class Counsel will (1) remain directly involved throughout the monetary fund distribution process; (2) address any issues regarding individuals' eligibility to participate in the Settlement; (3) communicate with class members regarding questions on the settlement, the release and timing of the payment; (4) respond to the inevitable inquiries regarding taxation of the award during the first quarter of 2013; and (5) communicate with

Novartis's Counsel and the Claims Administrator to address any other issues that may arise. Class Counsel Dec. ¶50.

Based on prior experience in other matters, Class Counsel anticipates that such involvement is likely to continue to demand considerable time and resources. For example, in the *Velez* matter, also handled by Class Counsel, a similar number of settlement class members have required approximately 2,000 hours of additional staff and attorney time since the Court gave final approval in late 2010; of those, at least 600 are directly comparable to the work that will be required in this matter. *See* Class Counsel Dec. ¶51. In fact, because there are multiple subclasses in the present matter and because the formula is somewhat complicated, components of this settlement are more complicated than the *Velez* matter. *Id.* at ¶52. As such, it is likely that ***more*** than 600 hours will be expended is responding to class member concerns regarding payout amounts and whether the payout was properly calculated. *Id.*

## III.   ARGUMENT

In its 2010 *Torres v. Gristede's Operating Corp.* decision, this Court succinctly set out the standard by which class action settlements should be considered as follows:

> Courts examine the procedural and substantive fairness [of a proposed settlement] in light of the strong judicial policy favoring settlements of class action suits. Absent fraud or collusion, courts should be hesitant to substitute their judgement for that of the parties who negotiated the settlement. In evaluating the settlement, the Court should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation; a presumption of fairness, adequacy and reasonableness may attach to a class action settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery. The Court gives weight to the parties' judgment that the settlement is fair and reasonable.

Nos. 04-3316, 08-8531, 08-9627, 2010 U.S. Dist. LEXIS 139144, at *11-12 (S.D.N.Y. Dec. 21, 2010) (Crotty, J.) ("*Torres II*") (internal quotations, citations and alterations omitted); *see also* *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009) (citing *Wal-Mart Stores, Inc.*

*v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)); *In re Paine Webber Ltd. Partnerships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998); *In re Telik Sec. Litig.*, 576 F. Supp. 2d. 570 575 (2d Cir. 1998); *Cronas v. Willis Group Holdings, Ltd.*, No. 06-15295, 2011 U.S. Dist. LEXIS 122736, at *4 (S.D.N.Y. Oct. 18, 2011); *Clark v. Ecolab Inc.*, Nos. 07 Civ. 8623, 06 Civ. 5672, 04 Civ. 4488, 2010 U.S. Dist. LEXIS 47036, at *17-18 (S.D.N.Y. May 11, 2010) (Crotty, J.) ("*Clark II*"); *Strougo ex rel Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 257 (S.D.N.Y. 2003) ("[c]ourts have consistently refused to act as Monday morning quarterbacks in evaluating the judgment of counsel"). In short, there is a strong, bedrock presumption that a negotiated class settlement is "fair and reasonable."

Viewed in this same context, the present settlement should be approved. Not only does the law favor settlement generally, but the value of the negotiated relief, the process by which it was negotiated and the lack of objection from any Class Member each speak to the unqualified fairness and propriety of the settlement. Indeed, all criteria for procedural and substantive fairness are more than met here.

### A. The Settlement Meets All Rule 23 Standards And Is Fair, Reasonable and Adequate.

In order to approve a class action settlement under Rule 23, a district court must "ensure that it is procedurally and substantively fair, reasonable, and adequate." *Clark II*, at *17; *see also Joel A. v. Giuliani*, 218 F. 3d 132, 138 (2d Cir. 2000); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987); *Torres II*, at *11; *Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar*, No. 06-4270, 2009 U.S. Dist. LEXIS 27899, at *12 (S.D.N.Y. Mar. 31, 2009) (Crotty, J.). Courts within this Circuit make the fairness determination based upon "two types of evidence:" (1) substantive and (2) procedural. *Wal-Mart Stores*, 396 F.3d at 116; *see also Hertzberg v. Asia Pulp & Paper Co.*, 197 Fed. Appx. 38, 40 (2d Cir. 2006).

"To determine procedural fairness, courts examine the negotiating process leading to the settlement.  To determine substantive fairness, courts determine whether the settlement's terms are fair, adequate, and reasonable according to the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)." *Torres II*, at *11; *Clark II*, at *17; *see also Davis v. J.P. Morgan Chase & Co.*, No. 01 Civ. 6492, 2011 U.S. Dist. LEXIS 117082, at *4-5 (W.D.N.Y. Oct. 11, 2011).  Substantive evidence includes a comparison of the substantive terms of the settlement with the likely rewards of litigation.  *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 370 U.S. 414, 434-25 (1968); *see also Mba v. World Airways, Inc.*, 369 Fed. Appx. 194, 197 (2d Cir. 2010); *deMunecas v. Bold Food LLC*, No. 09 Civ. 440, 2010 U.S. Dist. LEXIS 87644, at *10 (S.D.N.Y. Aug. 23, 2010); *Clark II*, at *17.

Procedural evidence includes whether the settlement is the product of arm's length negotiations between experienced counsel and is untainted by collusion.  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001); *Clark II*, at *17 ("[A] presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery") (internal quotation omitted); *see also Torres II*, at *12; *deMunecas*, at *10; *Duchene v. Michael Cetta, Inc.*, No. 06 Civ. 4576 (PAC) (GWG), 2009 U.S. Dist. LEXIS 85955, at *6-7 (S.D.N.Y. Sept. 10, 2009) (Crotty, J.).

1. Certification of the Remaining States Settlement Subclass Is Appropriate Under Rule 23

"As the initial and fundamental principle, when considering [class] certification in the context of a proposed settlement, 'courts must take a liberal rather than a restrictive approach.'" *Velez v. Novartis Pharmas. Corp.*, No. 04-9194, 2010 U.S. Dist. LEXIS 125945, at *25 (S.D.N.Y. Nov. 30, 2010) (quoting *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 157-58 (E.D.N.Y. 2009)).  Accordingly, many of the restrictions or considerations that come into play in

24

the standard certification analysis do not receive the same treatment at the settlement stage. For example, although considerations of manageability weigh heavily in class certification determinations *before* trial, manageability carries no weight at all in the settlement context, where the aim is to have no trial. *See Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 619-29 (1997); *see also* p. 29, n.23, *infra*.

For pupposes of this Settlement, Plaintiff Kelli Shannon seeks to certify a multistate Rule 23 Settlement Subclass.[16] The "Remaining States Settlement Subclass" is defined as:

> All Novartis Sales Representatives and Sales Consultants who worked for Novartis in the States of Arkansas, Connecticut, Illinois, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Wisconsin and/or the District of Columbia as a full-time, active Sales Representative or Sales Consultant, or in the States of Alaska, California or Puerto Rico as a full or part-time, active Sales Representative or Sales Consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all Novartis Sales Divisions or Business Units, including Mass Market, Specialty and Select Field Forces during the Remaining States Settlement Sub-Class Eligibility Periods as defined in Paragraph ¶2.35 of the Settlement Agreement and who are not FLSA Settlement Sub-Class I Members, California Settlement Sub-Class I Members or New York Settlement Sub-Class I Members.

Doc. 146. At the Preliminary Approval Hearing, this Court commented that "the state class satisfies [Rule] 23(a) requirements of numerosity, commonality, typicality and adequacy and meets the 23(b)(3) requirements, [including] common questions of law or fact. So I approve the state law settlement class." Doc. 147 at 33:23-25; 34:1.

The Remaining States Settlement Subclass satisfies the **numerosity** requirement because the more than 3,000 Remaining States Members render joinder impractical.[17] As this Court has

---

[16] This Court has previously certified as final two Rule 23 Subclasses: the "New York I Subclass" and the "California I Subclass." *See* Doc. 19 (Order Certifying Class) (S.D.N.Y. Feb. 15, 2007).

[17] Analysis of all Rule 23 requirements herein is made in the context of this Settlement. Novartis has not conceded to the certification of the Remaining States Settlement Subclass were litigation to resume.

noted, numerosity is presumed when there are more than 40 class members. *Mohney*, at \*10; *see also Sand v. Greenberg*, No. 08-7840, 2011 U.S. Dist. LEXIS 36266, \*4 (S.D.N.Y. Mar. 22, 2011) (Crotty, J.) ("Plaintiffs satisfy Fed. R. Civ. P. 23(a)(1), numerosity, because there are approximately 400 Class Members and, thus, joinder is impracticable."); *Clark II*, at \*14 (finding joinder is impracticable because there were approximately 345 class members); *Torres v. Gristede's Operating Corp.*, No. 04-3316, 2006 U.S. Dist. LEXIS 74039, \*38 (S.D.N.Y. Sept. 29, 2006) ("*Torres I*") (Crotty, J.) ("Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Impractiability does not mean impossibility of joinder, but rather difficult or inconvenience of joinder.") (internal quotations omitted).

The Remaining States Settlement Subclass also meets, for purposes of settlement, the **commonality** requirement that the named plaintiffs' claims and the class claims are so "interrelated that the interests of the class members will be fairly and adequately protected in their absence." *N.J. Carpenters Health Fund v. DLJ Mortg. Capital,* No. 08-5653, 2011 U.S. Dist.LEXIS 92597, at \*8 (S.D.N.Y. Aug. 16, 2011) (Crotty, J.); *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Applying this principle to wage and hour settlements, this Court has held that commonality is satisfied where common issues include "whether Defendant violated wage and hour laws by failing to pay overtime premium pay for hours [class members] worked over 40 in a workweek, and failing to keep accurate records of time worked." *Clark v. Ecolab, Inc.*, Nos. 07-8623, 04-4488, 06-5672, 2009 U.S. Dist. LEXIS 108736, at \*17 (S.D.N.Y. Nov. 17, 2009) ("*Clark I*"); *see also Clark II*, at \*14-15 (same). Here, all Class Members assert and seek resolution of substantially identical claims that Defendant failed to pay them overtime in violation of their respective state wage and hour laws and misclassified them as

exempt from overtime under those laws.[18]

The Remaining States Settlement Subclass satisfies Rule 23's **typicality** mandate.  This Court has held that typicality was satisfied because "Plaintiffs' claims arise from the same factual and legal circumstances that form the bases of the Class Members' claims." *Clark II*, at *15; *Torres I*, at *46-47.  Here, under the liberal approach applied in the settlement context, all of the Settlement Class Members' wage and hour claims, including those of the Named Plaintiffs, arise from the same factual and legal circumstances, as all performed the same or similar job duties, were misclassified as exempt from wage and hour laws, and were not paid overtime as a result.

The Remaining States Settlement Subclass meets Rule 23's **adequacy of representation** requirement.  This requirement contains two elements: "(1) class counsel must be qualified; and (2) class members must not have interests that are antagonistic to each other." *Torres I*, at *49. In prior cases, this Court has found class counsel to be qualified based on a declaration that "they are experienced in and have previously prosecuted labor dispute actions such as this." *Id.*  Class Counsel, Sanford Wittels & Heisler LLP, has just the sort of established record contemplated by the Rules.  *See, e.g., Velez v. Novartis Pharmas. Corp.*, No. 04-9194, Doc. 315 (Transcript of 11/19/11 Final Fairness Hearing) at p. 26 (S.D.N.Y. Dec. 1, 2011) (approving a settlement secured by Sanford Wittels & Heisler and noting that "[class] counsel have achieved a result that – and I'm prepared to say in the opinion that will come out next week – is extraordinary. . . a tribute to the years of litigation. . . a one-of-a-kind-settlement.") (attached hereto as Exh. B); *Bellifemine* v. *Sanofi-Aventis*, No. 07 Civ. 2207, 2010 U.S. Dist. LEXIS 79679 at *4 (S.D.N.Y. Aug. 5, 2010) (approving a nation-wide settlement negotiated by Sanford Wittels & Heisler and

---

[18] Novartis's exemption defenses, the administrative, outside sales and highly compensated exemptions, are substantially equivalent under those laws.

affirming the adequacy of Class Counsel).

Remaining States Settlement Subclass Representative Kelli Shannon is an **adequate representative** for settlement purposes under Rule 23 because her interests coincide with those of Settlement Class Members. *See Sand*, at *6 (finding class representatives satisfied the adequacy requirement in a wage and hour case because their interests were "not antagonistic or at odds with those of the Class Members"); *Torres I*, at *50-51 (rejecting defendants' argument that class representatives in a wage and hour matter are not representative of the class); *Clark II*, at *15; *Toure v. Cent. Parking Sys. of N.Y.*, No. 05 Civ. 5237, 2007 U.S. Dist. LEXIS 740456, at *18-19 (S.D.N.Y. Sept. 28, 2007) (noting that the "adequacy requirement exists to ensure that the named representatives will 'have an interest in vigorously pursuing the claims of the class, and have no interests antagonistic to the interests of other class members'") (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)). Indeed, not a single member of the class objected in any way to the negotiated Settlement Agreement, the subclasses as assigned, the weights given to different class months, or Ms. Shannon's role as the Remaining States Subclass Representative.

The Remaining States Settlement Subclass Members' common factual allegations and common legal theory – that Defendant violated state wage and hour law by misclassifying its Sales Representatives as exempt and failing to pay them overtime – **predominate** over any factual or legal variations in the context of this settlement. As this Court has noted, the "Second Circuit has instructed district courts to apply Rule 23 according to a liberal, rather than restrictive, interpretation, and to adopt a standard of flexibility." *Torres I*, at *26 (internal quotation omitted). At the same time, the issue of whether employees were supposed to be paid overtime is "'about the most perfect question for class treatment.'" *Mohney*, at *7; *see also Cruz*

28

*v. Hook-Superx, LLC*, No. 09 Civ. 7717, 2010 U.S. Dist. LEXIS 81021, at *14 (S.D.N.Y. Aug. 5, 2010) ("Plaintiffs' allegation is simple and identical across all claims: Defendants have misclassified employees to escape overtime wage obligations."); *Clark II*, at *16 (common factual allegations and common legal theory predominated over factual and legal variations among class members in settlement of wage and hour misclassification case); *Torres I*, at *51-53 (explaining predominance in a wage and hour matter "because the Court must inquire as to every employee 1) whether the employee is exempt, and 2) whether employee was deprived of overtime wages by improper editing"); *Perkins v. Southern New England Telephone Co.*, 669 F. Supp. 2d at 224-25 (D. Conn. 2009) ("the 'genuine controversy' of [] misclassification facing all potential class members outweighs any individualized defenses.").

The Remaining States Settlement Subclass also meets Rule 23's **superiority** standards. Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to the superiority inquiry, including: class members' interests in individually controlling the prosecution or defense of separate actions; whether individual class members wish to bring, or have already brought, individual actions; and the desirability of concentrating the litigation of the claims in the particular forum.   Fed. R. Civ. P. 23(b)(3).[19]   Most fundamentally, superiority addresses whether "the class action device [is] superior to other methods available for a fair and efficient adjudication of the controversy." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968); *see also Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to

---

[19] Another factor, whether the case would be manageable as a class action at trial, is not of consequence in the context of a proposed settlement. *See Amchem*, 521 U.S. at 620 ("[C]onfronted with a request for settlement-only class certification, a [trial] court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."); *Frank*, 228 F.R.D. 174, 183 (W.D.N.Y. 2005) ("The court need not consider the [manageability] factor, however, when the class is being certified solely for the purpose of settlement.").

bring a solo action prosecuting his or her rights."); *Torres I*, at *55.  Here, class members have limited financial resources with which to prosecute their individual actions.  Moreover, their claims are already consolidated into this jurisdiction: proceeding as a class will achieve economies of scale for the class members, conserve the resources of the judicial system and preserve public confidence in the integrity of the system by avoiding the waste and delay of repetitive proceedings and prevent inconsistent adjudications of similar issues and claims.  *See Johnson v. Brennan*, No. 1:10-cv-04082, 2011 U.S. Dist. LEXIS 105775, at *6 (S.D.N.Y. Sept. 16, 2011) (class adjudication conserves judicial resources); *Perkins*, 669 F. Supp. 2d at 225; *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 161, 164 (S.D.N.Y. 2008); *see also O'Donnell v. TD Ameritrade, Inc.*, No. 07cv0123, 2008 U.S. Dist. LEXIS 49829, at *12 (S.D. Cal. June 17, 2008) ("[I]ndividual claims offer no more than the prospect of random and fragmentary enforcement of the employer's legal obligation to pay overtime.").

For all these reasons, final certification of the Remaining States Settlement Subclass should be ordered.

2.  <u>The Substantive Terms of the Settlement Meet the *Grinnell* Test</u>

More than three decades ago, the Second Circuit erected the analytical framework for evaluating the substantive fairness of a class action settlement in *City of Detroit v. Grinnell Corp.*  495 F.2d 448 (2d Cir. 1974), *abrogated on other grds.* by *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  Under *Grinnell*, a district court, in determining whether to approve a proposed settlement, should consider the following nine factors:

> (1) the complexity, expense, and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;

30

(6) the risks of maintaining the class action through the trial;

(7) the ability of the Defendant to withstand a greater judgment;

(8) the range of reasonableness of the settlement in light of the best possible recovery; and

(9) the range of reasonableness of the settlement in light of all attendant risks of litigation.

*Id.* at 462-63.  The Settlement Agreement here meets the *Grinnell* test in its entirety.

> a.  *The Complexity, Expense and Likely Duration of this Litigation Favor Final Approval.*

The first factor of the *Grinnell* test—the complexity, expense and likely duration of this case—certainly favors final settlement approval here.   Class actions as such are typically complex.   *See, e.g., In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd*, 236 F.3d 78 (2d Cir. 2001); *see also Torres I*, at *14; *Clark II*, at *20. This particular case has involved both complex legal issues and an extensive litigation process – even when compared to average class action durations.  Although the Parties have incurred great expenses and burdens in this litigation already, they would likely incur much more by moving forward with litigation.   Trial on damages for the original 2,210 class members would be both expensive and time consuming; additionally, the parties would need to litigate fully the claims of approximately 5,118 new settlement class members.  These facts strongly militate in favor of the Settlement.

Moreover, the risks associated with future litigation are amplified by the uncertainty surrounding the pending Supreme Court decision in *Christopher, et al. v. SmithKline Beecham Corp.*, No. 11-204 (U.S. cert. granted Nov. 28, 2011; argued April 16, 2012).  In sum, this is a case where "serious questions of law and fact exist such that the value of an immediate recovery outweighs the mere possibility of further relief after protracted and expensive litigation." *Duchene*, at *7.

b.   *The Reaction of the Class to the Settlement Favors Final Approval.*

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." *Maley v. Global Techs. Corp.*, 186 F. Supp. 2d at 362-63 (S.D.N.Y. 2002).  As this Court has noted in prior cases, "[t]he fact that the vast majority of class members neither objected nor opted out is a strong indication of fairness." *Torres II*, at *15; *Clark II*, at *21.  In fact, "[i]f only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." *Wal-Mart Stores*, at 118; *see also Torres II*, at *15; *Clark II*, at *21.  Additionally, low opt-out rates evidence a positive reaction of the class. *See, e.g., Sewell v. Bovis Lend Lease, Inc.*, No. 09 Civ. 6548 (RLE), 2012 U.S. Dist. LEXIS 53556, at *20-21 (S.D.N.Y. April 16, 2012) (noting, in approving a settlement agreement, that only three class members opted out of the settlement); *Ebbert v. Nassau Cty*, No. 05-5445, 2011 U.S. Dist. LEXIS 150080, at *26-27 (S.D.N.Y. Dec. 22, 2011) (considering opt-out rates in approving a settlement agreement); *In re Giant Interactive Group, Inc. Securities Litig.*, No. 07-10588, 2011 U.S. Dist. LEXIS 127634, at *18 (S.D.N.Y. Nov. 2, 2011) (approving a settlement agreement in part because "very few [class members] have opted out").

The reaction of class members to the Settlement has been overwhelmingly positive. Approximately 7,730 full-form notices were sent to the Class, and not a single Class Member objected. *See infra* Sec. III.G. and Rust Dec. ¶¶9, 18.  The overwhelming lack of objections argues strongly for judicial approval. *See, e.g., Torres II*, at *15; *Clark II*, at *21; *see also Maley*, 186 F. Supp. 2d at 362-63; *Collins v. Olin Corp.*, No. 3:03-cv-945, 2010 U.S. Dist. LEXIS 39862, at *13 (D. Conn. Apr. 21, 2010); *In re Host Am. Corp. Secs. Litig.*, No. 3:05-cv-1250. 2008 U.S. Dist. LEXIS 17405, at *7 (D. Conn. Mar. 7, 2008).  Additionally, after this Court preliminarily approved the Settlement in January 2012, only one individual requested

32

exclusion from the newly-certified Remaining States Subclass, representing a negligible .03% of individuals who fit the Remaining States Subclass definition.   *See* Rust Dec. ¶17.   "This favorable response favors final approval."   *Torres II*, at *15.

> c. *The Stage of the Proceedings and the Amount of Discovery Completed Favor Final Approval.*

After more than six years of litigation, class certification and briefing before both the Second Circuit and the United States Supreme Court, the Parties in this matter are "clearly in a position to realistically evaluate the strengths and weaknesses of the claims, and . . . the fairness of the proposed Settlement."   *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 139; *see also Parker v. Time Warner Entmt. Co.*, 631 F. Supp. 2d 242, 259 (E.D.N.Y. 2009) ("This factor relates to whether the Plaintiffs had sufficient information on the merits of the case and to enter into a settlement."); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 185 (W.D.N.Y. 2005) (settlement at a late stage affords the court an opportunity to "intelligently make . . . an appraisal of the Settlement"); *In re Michael Milken & Assocs. Secs. Litig.*, 150 F.R.D. 46, 55-56 (S.D.N.Y. 1993) ("the stage of the proceedings and the amount of discovery completed is another factor which the Courts consider in approving a settlement") (citing *Grinnell*, 495 F.2d at 463).   That same experience enables the Parties to evaluate and assess the additional related claims asserted in the SAC.

Courts have approved settlement agreements even in early stages of discovery.   *See Frank*, 228 F.R.D. at 185 (approving settlement of case "in relatively early stages of discovery" where parties had exchanged extensive information pertaining to the identities of class members and to Defendant's time and pay practices and where counsels' negotiations, while "cooperative," had "been in no way collusive"); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. at 176 ("To approve a proposed settlement, the Court need not find that the parties

have engaged in extensive discovery.") (citing *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982)).  During the post-class certification period, the Parties engaged in extensive merits, expert and damages discovery, including taking and defending approximately 39 fact, expert and 30(b)(6) depositions throughout the United States.  Class Counsel Dec. ¶14.

In order to secure certain, prompt and extensive relief for the class and to avoid the risk of future litigation and appeals, the Parties engaged in extensive settlement negotiations over the course of approximately ten months starting in February 2011.  The Parties' discussions related not only to the claims originally asserted in the Civil Action in 2006, but also claims covering the period after the Court certified a class and collective action in 2007 and covering states other than New York and California, so that the broadest group of employees would be covered by and might benefit from a settlement.  Each Party conducted a thorough and extensive investigation of the relevant facts and circumstances underlying the issues raised in the Civil Action, including issues specifically relating to the exempt status of and overtime hours worked by Novartis's sales force employees.  Class Counsel Dec. ¶23.

As this Court has noted in evaluating this factor, "[t]he pertinent question is whether counsel had an adequate appreciation of the merits of the case before negotiating."  *Torres II*, at *16 (internal quotation omitted).  Here, where the Parties have litigated this action for more than six years, they are particularly well-suited to evaluate the strengths and weaknesses of the case.

> d.   *The Risks of Litigation—Establishing Liability, Damages and Maintaining the Class Action Through Trial—All Also Favor Final Approval.*

As federal courts in this Circuit have consistently recognized, litigation inherently involves risks, and the purpose of settlement is to avoid uncertainty.  *See, e.g., Wright v. Stern*, 553 F. Supp. 2d 337, 346-47 (S.D.N.Y. 2008); *deMunecas v. Bold Food LLC*, No. 09 Civ. 440, 2010 U.S. Dist. LEXIS 87644, at *14 (S.D.N.Y. Aug. 23, 2010) ("[T]he risk of establishing

liability and damages further weighs in favor of final approval."); *Clark II*, at *22;  *Banyai v. Mazur*, No. 00 Civ. 9806, 2007 U.S. Dist. LEXIS 22342 (S.D.N.Y. Mar. 27, 2007).  In addition to the expenses and risks of a jury trial, continued litigation of this case would impose a significant additional risk to counsel and the class members based on the current legal landscape. The Supreme Court's decision to grant certiorari in *Christopher v. SmithKline Beecham*, a case involving many of the same issues disputed in this case, weighs heavily in favor of final approval. *See Wright*, 553 F. Supp. 2d at 346-47 (holding that this factor weighed "strongly" in favor of final settlement approval because the Supreme Court had recently granted certiorari in a case in which it could reach a decision that would "have an adverse impact on some of the class members' retaliation claims in this case").  The Settlement resolves this significant and cumulative uncertainty in a manner favorable for all.  This factor therefore also weighs in favor of final Settlement approval. *Torres II*, at *17; *Clark II*, at *22.

> e.. *Establishing a Class and Maintaining It Through Trial Would Not Be Simple.*

The risk of obtaining class certification and maintaining it through trial is also present. As noted above, the Proposed Settlement encompasses two additional subclasses, certification of which would likely require years of additional discovery and litigation before even reaching a liability determination.  Establishing a class and maintaining it through trial would thus involve considerable risk and uncertainty.  Accordingly, this factor too weighs in favor of approval.

> f. *Defendant's Ability to Withstand a Greater Judgment.*

It is well settled that a defendant's ability to withstand a greater judgment is a *Grinnell* factor that should be assigned "relatively little weight." *Davis v. J.P. Morgan*, at *10.  Applying this principle in *Torres*, this Court stated that "a defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." *Torres II*, at *18

(internal quotation omitted).  "[A] defendant is not required to 'empty its coffers' before a settlement can be found adequate." *Giant Interactive Grp., Inc. Sec. Litig.*, No. 07 Civ. 10588, 2011 U.S. Dist. LEXIS 127634, at *23 (S.D.N.Y. Nov. 2, 2011) (quoting *In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173, 2008 U.S. Dist. LEXIS 36093, at *23-24 (S.D.N.Y. May 1, 2008)).  Accordingly, "where, as here, the other *Grinnell* factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair." *Id.*

> g.   *The Net Settlement Amount Is Reasonable in Light of the Best Possible Recovery and All Attendant Risks of Litigation.*

Under the terms of the Settlement, each Class Member will receive an award that is more than reasonable given the risks and time attendant to the post-trial motion and appeals process. As this Court has noted,

> [t]he substantial amount of the settlement weighs in favor of final approval. The determination of whether a settlement amount is reasonable does not involve the use of a mathematical equation yielding a particular sum.  Instead, there is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.

*Torres II*, at *20 (internal citations and quotations omitted).   As discussed above, many uncertainties remain in this litigation.  "Settling avoids delay as well as uncertain outcome . . . on appeal" and "the appellate process . . . with the risk of reversal, make the fairness of this substantial settlement readily apparent." *Maley*, 186 F. Supp. 2d at 366.

Because settlement can provide certain and immediate recovery, courts often approve settlements even where the benefits obtained are less than those originally sought.   As the Second Circuit stated in *Grinnell*: "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth of a single percent of the potential recovery." 495 F.2d at 455 n.2; *see also In re Marsh ERISA Litig.*, 265 F.R.D. at 141. Courts in fact often approve class settlements even where the benefits represent only a fraction of

the potential recovery. *See, e.g., In re Initial Public Offering Secs. Litig.*, 671 F. Supp. 2d 467, 483-85 (S.D.N.Y. 2009) (approving settlement which provided only "miniscule" 2 percent of defendants' maximum possible liability, observing that "the Second Circuit has held that even a fraction of the potential recovery does not render a proposed settlement inadequate"); *Gilliam v. Addicts Rehab. Ctr. Fund*, No. 05-3452, 2008 U.S. Dist. LEXIS 23016, at *13-14 (S.D.N.Y. Mar. 24, 2008) (holding that the wage and hour settlement was reasonable even though the settlement amount represented only "a fraction of the best possible recovery,"); *In re Prudential Inc. Secs. Ltd. Partnerships Litig.*, MDL No. 1005, M-21-67, 1995 U.S. Dist. LEXIS 22103 (S.D.N.Y. Nov. 20, 1995) (approving settlement of between 1.6% and 5% of claimed damages); *see also Borcea v. Carnival Corp.*, 238 F.R.D. 664, 673-674 (S.D.Fla. 2006) ($6,250,000 fund reasonable for class of 40,000 employees; each participating class member will receive award based on length of service).

Moreover, when settlement assures prompt payment of substantial amounts to class members, "even if it means sacrificing 'speculative payment of a hypothetically larger amount years down the road,'" settlement is reasonable under this factor. *See Gilliam*, at *13 (quoting *Teachers' Ret. Sys. of Louisiana v. A.C.L.N. Ltd.*, No. 01 Civ. 11814, 2004 U.S. Dist. LEXIS 8608, at *16 (S.D.N.Y. May 14, 2004)).

Here, the value of the settlement is significant and the settlement awards will likely be distributed to class members in a matter of months. Given the length and difficulty of the process needed to reach this result, it is Class Counsel's informed judgment that "there is little reason to believe that further settlement negotiations would result in any additional settlement funds." *Wright*, 553 F. Supp. 2d at 347. Moreover, "[t]here is simply no assurance that more years of litigation would result in any greater recovery." *Id.* at 339. For these reasons, the

Settlement Agreement is reasonable in light of the maximum possible recovery.

### 3. The Arm's Length Negotiations between Experienced Counsel Ensures that the Settlement Is Procedurally Fair.

After the district court has analyzed the substantive fairness of a proposed settlement, it turns to the procedural fairness, which examines the negotiating process by which the settlement was reached. *McReynolds*, 588 F.3d at 803-04; *see also Torres II*, at *11; *Clark I*, at *18-20. As the Second Circuit has instructed, when a district court examines a proposed settlement's procedural fairness, the court must "pay close attention to the negotiating process, to ensure that the settlement resulted from arm's length negotiations and that plaintiff's counsel possessed the necessary experience and ability" to effectively vindicate the interests of the class. *McReynolds*, 588 F.3d at 804 (quotation and alteration omitted). In other words, a settlement is procedurally fair if it is the product of arms-length negotiations conducted after meaningful discovery in which both sides were represented by experienced, capable counsel. *See Torres II*, at *12-13; *Clark I*, at *18-19.

The proper focus of this inquiry is on "the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1982) (citing *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)); *see also D'Amato*, 236 F.3d at 85 (citing *Malchman*, 706 F.2d at 433, for same proposition). Accordingly, "so long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." *Maley*, 186 F. Supp. 2d at 366 (internal quotation omitted); *see also Banyai*, at *11.

#### a. Experienced Counsel Represented Both Parties in This Case.

Both Parties were represented by experienced counsel with substantial experience in

employment class action litigation.    For example, Class Counsel has been recognized by numerous courts for their work in securing similar class action settlements.  *See, e.g., Velez*, at *46 (approving a class action settlement and noting SWH is "experienced counsel with substantial experience in employment class action litigation"); *Bellifemine*, at *16-17 (approving a class action settlement and noting that the "action was litigated zealously by [SWH]"); *Hernandez v. C&S Wholesale Grocers, Inc.*, No. 06 CV 2675 (CLB)(MDF), slip op. (S.D.N.Y. July 31, 2008) (Karas, J.) (approving a wage and hour class and collective action settlement; describing SWH as "exceptionally able and experienced;" praising "the work that counsel have put in, not just in terms of the quantity, but what it was that counsel did, with obviously the tremendous amount of work . . . ;" and acknowledging a highly favorable result in "obviously a very complex dispute, both in terms of the law and in terms of the facts").    Novartis is represented by the law firms of Cravath, Swaine and Moore LLP and Kaye Scholer LLP, both preeminent law firms in the United States.  Evan Chesler, Novartis's Lead Counsel, is Cravath's Presiding Partner and is also an adjunct professor of law at NYU Law School.  Class Counsel Dec. ¶22.

In such circumstances, Courts accord "great weight" to the recommendations of Counsel, who are in the best position to evaluate the strengths and weaknesses of their cases.  *In re Telik*, 576 F. Supp. 2d at 576; *In re EVCI Secs. Litig.*, at *10; *In re Global Crossing Secs. and ERISA Litig.*, 225 F.R.D. 436, 461 (S.D.N.Y. 2004); *Maley*, 186 F. Supp. 2d at 366; *Chatelain v. Prudential-Bache Secs.*, 805 F. Supp. 209, 212 (S.D.N.Y. 1992).

> b.    *The Settlement Was Negotiated by Experienced Counsel Over the Course of Several Months.*

The protracted settlement discussions in this case were conducted over approximately ten months, during which the parties met numerous times for face-to-face negotiations.    Class

Counsel Dec. at ¶21. In addition, the parties exchanged significant correspondence and engaged in frequent telephonic negotiations. *Id.* These exchanges then shifted to focus on similar lengthy, arms-length negotiations regarding the preparation and drafting of the voluminous settlement documentation now on file with the Court. Class Counsel Dec. ¶21. In sum, the arduous process leading to the Settlement was procedurally sound and fair. *See, e.g., In re Telik,* 576 F. Supp. 2d at 576 (appropriate negotiations included face-to-face meetings, an unsuccessful mediation, numerous telephone conferences and substantial concessions by both sides); *Torres II,* at *13 (approving negotiations that included several settlement conferences and negotiations); *In re EVCI Secs. Litig.,* at *10 (negotiations took place over several weeks by capable counsel); *In re AOL Time Warner ERISA Litig.,* No. 02 Civ. 8853, 2006 U.S. Dist. LEXIS 70474, at *16-17 (S.D.N.Y. Sept. 27, 2006) (negotiations conducted by counsel well-informed of the merits of the claims at that stage of litigation); *Chatelain,* 805 F. Supp. at 212 (court relies on counsels' description of "arms-length" negotiations).

   c. *The Settlement Was Reached After Parties Conducted Meaningful Discovery.*

   The litigation of this matter involved significant discovery. The Parties conducted extensive merits and expert damages discovery, including approximately 39 fact, expert and 30(b)(6) depositions throughout the United States. Class Counsel Dec. ¶14. Class Counsel reviewed and produced more than 5,000 pages of documents to Novartis and reviewed and analyzed tens of thousands of pages of documents produced by Novartis. *Id.* As such, this factor also weighs in favor of final approval.

## B. The FLSA Settlement Subclass II Should Be Finally Certified and Approved.

   1. <u>Certification of the FLSA Settlement Sub-Class II is Appropriate.</u>

For purposes of this Settlement, Plaintiff Terri Kelly seeks to finally certify a multistate

FLSA Settlement Subclass.[20]  The "FLSA Settlement Subclass II" is defined as:

> All persons who worked for Novartis in the States of Alabama, Arizona,
> Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas,
> Louisiana, Michigan, Mississippi, Nebraska, New Hampshire, North Carolina,
> Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia,
> West Virginia or Wyoming as a full-time, active Sales Representative or Sales
> Consultant, including all non-manager job progressions from, and variations in,
> the Sales Representative and Sales Consultant titles in all Novartis Sales
> Divisions or Business Units, including Mass Market, Specialty and Select Field
> Forces for at least one day during the period January 25, 2009 through the
> Preliminary Approval Date and who timely opt in to the Settlement by submitting
> an Opt In and Release Form and who are not FLSA Settlement Sub-Class I
> Members, California Settlement Sub-Class I Members, New York Settlement
> Sub-Class I Members or Remaining States Settlement Sub-Class Members.

Doc. 146.  At the Preliminary Approval Hearing, this Court decided to "certify the proposed

FLSA collective action in connection with the settlement process," as it was "the appropriate

thing to do." Doc. 147 at 34:2-4.

Notably, the standard for FLSA collective action certification is that plaintiffs be

"similarly situated." 29 U.S.C. § 216(b).  This "requires a less rigorous standard than Rule 23

given that due process concerns are not implicated in the same fashion." *Sewell*, at *27.  The

Rule 23 requirements of numerosity, typicality, commonality and representativeness do not

apply to collective actions under the FLSA. *Sipas v. Sammy's Fishbox, Inc.*, No. 05-10319, 2006

U.S. Dist. LEXIS 24318, at *6 (S.D.N.Y. Apr. 24, 2006) (Crotty, J.).  Courts typically consider

three factors in the context of FLSA collective action certification: "(1) disparate factual and

employment settings of the individual plaintiffs; (2) the various defenses available to defendant

which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."

*Torres I*, at *30 (internal quotation omitted).  For the reasons stated above with respect to the

Remaining States Subclass's satisfaction of Rule 23 requirements for certification, the members

---

[20] This Court has previously certified the FLSA I collective action subclass under 29 U.S.C. § 216(b). *See* Order,
Feb. 15, 2007 (Doc. 19).  No further certification of the previously-certified FLSA I subclass is necessary.

of the FLSA Subclass II easily meet the more liberal FLSA certification standard for purposes of this Settlement.

> 2. The Substantive Terms of the FLSA II Settlement Agreement Meet the Lower Standard for Final Approval.

"The standard for approval of an FLSA settlement is lower than for a Rule 23 settlement because an FLSA settlement does not implicate the same due process concerns as does a Rule 23 settlement." *Torres II*, at *20; *see also Clark II*, at *24-25. Unlike Rule 23 classes, FLSA classes include only individuals who have opted in, and their failure to opt in does not preclude them from bringing their own suits at a later date. *See Matheson v. T-Bone Rest. LLC.*, No. 09 Civ. 4214, 2011 U.S. LEXIS 143773, at *16 (S.D.N.Y. Dec. 13, 2011); *Johnson*, at *35. "If the proposed FLSA settlement reflects a reasonable compromise over contested issues, it should be approved." *Torres*, at *21 (internal quotation omitted). As explained above, this global settlement "was the result of contested litigation and arm's length negotiation" and should therefore be approved. *Id.*

## C. Plaintiffs' Application for Attorneys' Fees and Expenses Should Be Approved.

The Settlement Agreement provides that, subject to Court approval, Class Counsel will receive up to 30 percent of the $99 Million dollar Settlement Fund, after $400,000.00 is deducted for expenses. Doc. 145 at ¶9.2. Thirty percent of $98,600,000.00 is $29,580,000.00.

During the preliminary approval hearing on January 24, 2012, this Court indicated that it would consider an application for Attorneys' Fees "up to 30%" and $400,000 in expenses. Doc. 147 (Transcript of 1/24/12 Conference) at 8:12-23; 25:11-14. Accordingly, the Notices mailed to the Settlement Class Members detailed that Class Counsel was entitled to seek 30%, plus expenses. Doc. 145, Exh. A-C. *No individual* – class member or otherwise – objected to a 30% award to Class Counsel.

Despite the lack of objection to Class Counsel's seeking 30% of the Settlement Fund, Class Counsel now asks this Court to approve fees *less* than the $29.58 Million approved by the class members. Instead, Class Counsel requests a more modest percentage of 28%, bringing the requested fee award down to $27,608,000.00. **This constitutes a nearly $2 Million reduction in fees sought, despite the approval of the class to the full 30%.**

Class Counsel has placed 76 attorneys and staff members on this matter since 2005. Class Counsel Dec. ¶74. In all, Class Counsel spent 14,728 hours prosecuting this matter and an additional 1,407 hours since the Preliminary Approval of the Settlement Agreement. *Id.* Moreover, Class Counsel expects to devote substantial additional hours overseeing the Settlement in the future. *Id.*

In view of the extraordinary results secured by Class Counsel both in litigation and then through the Settlement, the time-consuming and diligent efforts of Class Counsel to that same end and the lack of objections to an even greater award than now sought, this Court should approve the attorneys' fees requested in full. As shown below, this application is fair and reasonable and should be approved under either of this Circuit's prevailing methods of evaluating Class Counsel fees.

1.   An Award of Attorneys' Fees and Expenses Is Standard.

Federal courts have long recognized that a lawyer whose efforts create a common fund may recover a reasonable fee from the fund as a whole. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 249 (2d Cir. 2007) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("under the 'equitable fund' doctrine, attorneys for the successful party may petition for a portion of the fund as compensation for their efforts")). The United States Supreme Court has recognized the goal of preventing "inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionally among those

benefited by the suit." *Boeing*, 444 U.S. at 478; *see also O'Connor v. AR Res., Inc.*, No. 08-1703, 2012 U.S. Dist. LEXIS 861, at at *18 (D. Conn. Jan 4, 2012) ("In wage and hour class action lawsuits . . . public policy favors a common fund attorney's fee award.").

2.   The Class Approved an Award Greater Than What Is Sought Here.

Although almost 8,000 individuals were given notice of the Settlement and the fee award that would be sought as a part of that Settlement, not a single person objected to the 30% fee allocation.  In addition, of the more than 750 individuals to whom Class Counsel spoke, not a single person raised any questions or voiced any concerns about the fee award.  Class Counsel Dec. at ¶73.

The universally positive reaction of the class to the Settlement serves as an endorsement of Counsel's fee application and to the reasonableness of the request. *Maley*, 186 F. Supp. 2d at 374 ("**The reaction by members of the Class is entitled to great weight by the Court.**") (emphasis added); *see also Sewell*, at *30 (noting that a lack of objections "does lend support for the approval of the award."); *McGee v. Continental R.R. North America Inc.*, No. 06-6234, 2009 U.S. Dist. LEXIS 17199 (D.N.J. Mar. 4, 2009) (holding that the absence of substantial objections to class counsel's requested attorneys' fee "strongly supports approval" of such fees); *Stop & Shop Supermarket Co. v. Smith Kline Beecham Corp.*, No. Civ.A. 03-4578, 2005 U.S. Dist. LEXIS 9705, at *28, *60 (E.D.Pa. May 20, 2005) (holding the support of named plaintiffs and lack of objection from class members "neutralized" any questions as to reasonableness of fee award amounting to lodestar multiplier of 15.6); *In re Xcel Energy Inc. Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 1002 (D. Minn. 2005) (finding the lack of objection to fee request "can be read as an endorsement of the results received and the services rendered by plaintiffs' counsel").  Where, as here, the amount sought is less than what the Class approved, the presumptive fairness of the fee request is particularly strong.

44

### 3. The Fees Sought Are Justified by the Relevant Factors.

To decide an appropriate amount of attorneys' fees in class actions, the courts have adopted the principles articulated by the Second Circuit in *Grinnell*:

> We are not under the illusion that a "just and adequate fee" can necessarily be ascertained by merely multiplying attorney's hours and typical hourly fees.... [L]ess objective factors can be introduced into the calculus. Perhaps the foremost of these factors is the attorney's "**risk of litigation**" *i.e.* the fact that despite the most vigorous and competent of efforts success is never guaranteed.

495 F.2d 448, 471 (2d Cir. 2007) (emphasis added). Other generally accepted factors as stated in *Grinnell* include: (2) the **standing of counsel** at the bar – both counsel receiving award and opposing counsel; (3) **time and labor spent**; (4) magnitude and **complexity of the litigation**; (5) **responsibility undertaken**; (6) the **amount recovered**; and (7) what would be a **reasonable charge** for counsel's services. *Id.* at 470.

#### a. The "Risk of Litigation" Was Substantial.

The most significant factor in determining the reasonableness of attorneys' fees – the risk of litigation – weighs heavily in favor of an award of fees in this case.

Success for the Plaintiff-Class was never guaranteed in this matter. Indeed, Class Counsel filed this case as a matter of first impression, being the first law firm in the United States to bring a class action suit alleging wage and hour violations on behalf of pharmaceutical representatives against a pharmaceutical company. Since Class Counsel filed this suit against Novartis in March 2006, numerous other firms around the United States have brought similar suits against other pharmaceutical companies. The majority of federal and state courts have ruled against plaintiffs in those actions.

Class Counsel is the **only** firm to win both the administrative and outside sales exemptions at the federal appellate level. Class Counsel, along with the Department of Labor, persuaded the United States Court of Appeals for the Second Circuit to rule that neither the

administrative exemption nor the outside sales exemption applied to the Novartis sales representatives. The Second Circuit is the only federal appellate court to rule in favor in favor of pharmaceutical representatives on both the outside sales and administrative exemptions.

After winning the Second Circuit appeal, Class Counsel successfully opposed Novartis's and the pharmaceutical industry's petition for *certiorari* to the United States Supreme Court. 131 S. Ct. 1568. In their petition for Supreme Court review, Novartis and the industry argued that the Department of Labor's amicus position that pharmaceutical representatives were not exempt constituted a reversal and produced unfair surprise. To answer that assertion, Class Counsel conducted extensive research on the history of the pharmaceutical "detailing" job and the changing nature of pharmaceutical representatives' duties over the past seven decades.[21] While the U.S. Supreme Court denied *certiorari* in this matter, there remains great uncertainty surrounding the pending Supreme Court decision in *Christopher, et al. v. SmithKline Beecham Corp.*, No. 11-204 (U.S. cert. granted Nov. 28, 2011; argued April 16, 2012).

In addition to this risk *Christopher* poses, there remains the added risk that the U. S. Department of Labor could reverse its position regarding the exemptions at issue in this matter should there be a change in Presidential Administrations. There are also the risks that:

- this Court would not certify a class including Novartis sales representatives from April 2007 to the present;
- this Court would rule in favor of Novartis on the merits of the administrative exemption, in light of Novartis's representation that it has changed the duties of sales representatives and has reduced the hours of work sales representatives work per week;
- this Court or others would apply the fluctuating work week method of measuring damages, thereby greatly reducing damages; and
- this Court or others would apply the highly-compensated employee exemption, thereby potentially excluding thousands of employees from the class.

---

[21] In addition to this historical research, Class Counsel developed and amplified legal arguments on why pharmaceutical representatives did not qualify either for the outside sales or administrative exemption.

Accordingly, Class Counsel took a great risk in litigating this action – a risk that ultimately proved worthwhile with a substantial reward for the Settlement Class Members. The Parties' agreement to settle this matter avoids the risk detailed above for each side going forward. Notwithstanding the successes in this litigation against Novartis, the risks remain great that – without this settlement – members of this Settlement Class may fail to recover any money.

### b.   Counsel for Both Parties Have a High Standing at the Bar.

The Class was represented by counsel of considerable experience and skill in litigating class actions. Lead Counsel David Sanford and SWH are AV rated, which is the highest rating given to an attorney and law firm through a peer-review rating process monitored by Lexis Nexis. Class Counsel Dec. ¶¶4, 8. Mr. Sanford has been lead or co-lead Class Counsel in more than 50 Title VII and wage and hour matters throughout the United States in approximately 14 states and attained certification in about 30 of those matters. *Id.* at ¶4. Lead Counsel Jeremy Heisler has been active in class action litigation for over 30 years. Class Counsel Dec. ¶5. Mr. Heisler has been involved in approximately 75 class matters and attained certification in about half of those matters. *Id.*

Most recently, SWH was Class Counsel in the Southern District of New York in the Novartis gender discrimination class action, litigating the matter for over six years before successfully mounting a seven-week trial and then negotiating a landmark settlement. Class Counsel Dec. ¶7. Judge McMahon, in approving the settlement, noted that SWH "achieved a[n] [extraordinary] result. . . this was a well prepared case. It was a brilliantly tried case by [SWH]. . . a one-of-a-kind result." Exh. B (Transcript of *Velez* 11/19/10 Final Fairness Hearing) at p. 26; *see also Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 09194, 2010 U.S. Dist. LEXIS 125945, at *62 (S.D.N.Y. Nov. 30, 2010).

In addition to the *Velez* matter, Class Counsel has recently been recognized by this jurisdiction for having "an established record of competent and successful prosecution of large . . . class actions" and has accordingly been awarded requested fees and expenses. *Bellifemine*, at *4, 22; *see also Thomas v. Citifinancial Auto Ltd.*, No. 07 Civ. 00721, slip op. (D. Md. Aug. 20, 2009) (Motz, J.) (also approving similar work of Plaintiffs' counsel, SWH); *Binetti v. Washington Mutual Bank*, No. 06 Civ. 1732, slip op. (S.D.N.Y. Apr. 15, 2008) (Karas, J.); *Hernandez v. C&S Wholesale Grocers, Inc.*, No. 06 cv 2675 (CLB)(MDF), slip op. (S.D.N.Y. July 31, 2008) (in approving a wage and hour settlement, Judge Karas described SWH as "exceptionally able and experienced" and praised "the work that counsel have put in, not just in terms of the quantity, but what it was that counsel did, with obviously the tremendous amount of work . . ." and acknowledged a highly favorable result in "obviously a very complex dispute, both in terms of the law and in terms of the facts"); *Rosenberg v. IKON Office Solutions*, No. 05-cv-09131, slip op. (S.D.N.Y. Jan. 22, 2008) (Crotty, J.).

Novartis is represented by the law firms of Cravath, Swaine and Moore LLP and Kaye Scholer LLP, both preeminent law firms in the United States. Evan Chesler, Novartis's Lead Counsel, is Cravath's Presiding Partner and is also an adjunct professor of law at NYU Law School. Class Counsel Dec. at ¶22.

### c.  Class Counsel Dedicated Significant Time and Labor to This Matter.

The resolution of this matter stands in stark contrast to the vast majority of pharmaceutical wage and hour cases. To successfully prosecute this matter, Class Counsel:

- investigated both the legal and factual allegations of wage and hour violations at Novartis;
- drafted pleadings and engaged in complex motions' practice;
- obtained and interpreted statistical analysis of jobs data;
- conducted extensive document discovery;

- took and defended approximately 39 depositions across the United States, including seven 30(b)(6) depositions of Novartis's corporate designees;

- drafted an appellate brief filed before the Second Circuit Court of Appeals;

- prepared and coordinated with the Department of Labor in the matter before the Second Circuit;

- argued before the Second Circuit;

- drafted and filed briefs before the United States Supreme Court;

- prepared and coordinated with amici before the United States Supreme Court;

- negotiated and drafted the Settlement Agreement and related notices;

- communicated with hundreds of class members and responded to their questions and concerns; and

- prepared the necessary papers to secure final approval of the settlement.

In furtherance of these efforts, Class Counsel devoted approximately 16,135 hours from 76 attorneys and staff members. *See* Class Counsel Dec. at ¶74.

Class Counsel's commitment to this matter has not flagged once a settlement agreement was negotiated. To the contrary, Class Counsel expended approximately 1,408 hours since January 25, 2012 (the date of the preliminary approval). Six attorneys and staff are tasked with assisting Class Members with the Settlement process. To date, Class Counsel has responded to questions from more than 756 individuals regarding eligibility to participate in the Settlement and the Settlement terms. Class Counsel continues to receive and to respond to additional inquiries on a daily basis.

These callers raise: general questions about the history of the litigation; general questions about the settlement terms; questions regarding their previous severance agreements; and questions regarding their eligibility, participation and recovery. While some calls are as short as two minutes, others can last an hour or more and may require extensive follow-up through correspondence or additional phone calls, verification of time records, and additional factual and legal research. Class Counsel Dec. ¶48. Class Counsel also regularly communicates with

Novartis's Counsel and the current and former claims administrators regarding inquiries about class members' eligibility and recovery periods. Class Counsel Dec. ¶49. As a result, at least seven settlement class members have been recategorized to move to the correct sub-class. *Id.*

Attorneys' fees are intended to compensate Class Counsel for time that will be spent administering the settlement **in the future**, in addition to the time already expended. *See deMunecas*, at *24 ("The fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward also supports their fee request" of 33% of the fund). Should the the Settlement be approved, Class Counsel will continue to (1) remain directly involved throughout the monetary fund distribution process; (2) communicate with Class Members as needed; (3) address any issues regarding individuals' eligibility to participate in the Settlement; (4) communicate with Novartis's Counsel; and (5) in general, oversee the Settlement to ensure strict compliance with the terms of the Settlement Agreement. Class Counsel Dec. ¶50.

> d. *This Litigation was Extremely Complex, Requiring Significant Efforts.*

"Courts have recognized that wage and hour cases involved complex legal issues." *Sewell*, at *32 (internal quotation omitted). In addition, many of the issues or particular challenges of litigating this matter involved questions of first impression or matters that otherwise had little development in the law. *Id.* Furthermore, this case involves wage and hour claims under both state and federal law, requiring some class members to opt out and others to opt in, further evidencing the complexity of this litigation. *See id.* (approving an attorneys' fee award of 33% percent in a wage and hour case and noting the case was more complex as class members filing under state law must opt out and class members filing under FLSA must opt in). Overall, the prosecution of this action required a high level of experience and expertise in

complex class action litigation, as well as the ability to provide the highest caliber of legal services under challenging circumstances. Class Counsel Dec. ¶74. Proof that Class Counsel has litigated this action vigorously and leveraged its expertise are seen throughout the construction of the Settlement Agreement itself, including the carefully-crafted allocation formula designed to maximize recovery under all applicable federal and state laws.

> e.   *The Litigation Has Bestowed Substantial Benefits on Plaintiffs.*

As discussed above, the benefits of the Settlement to Plaintiffs are substantial. The Settlement provides $99 million in relief, an extraordinary amount in comparison to other wage and hour settlements. *See* Exh. C, NERA Economic Consulting, "*Trends in Wage and Hour Settlements: 2011 Update,*" at 5 (Mar. 22, 2012) (noting that only 12% of wage and hour cases in 2011 settled for more than $20 million and that the majority of cases settled for between $1 million and $2.5 million). Based on the most recent data available regarding the class eligible months of those individuals participating in the settlement, the base month amount for payout calculations will be approximately $57.39. Class Counsel Dec. ¶64. As such, the lowest settlement award could be $57.39, with the highest award being more than $99,000.00. *Id.* Reasonable average awards (calculated with 3-5 years of eligible work months and a range of multipliers in effect) will be between $4,132.00 and $33,056.00. *Id.* These award amounts are significantly higher than typical FLSA wage and hour payouts, where per-plaintiff settlement amounts are typically between $2,700.00 and $5,600.00. NERA Economic Consulting, *supra*, at 6.

In addition, Novartis asserts that the job responsibilities of its sales force employees have changed since the close of discovery in the *Lopes* and *White* actions, such that the job duties of Novartis's current sales force as of the date of this Settlement Agreement would comply with the

Second Circuit's construction of the FLSA's administrative exemption. Thus, this Settlement will have long-term benefits to Novartis employees that extend well beyond the monetary terms of the agreement which will remain in effect far into the future. Obtaining this relief has required great effort over a number of years, along with a successful outcome before the United States Supreme Court by defeating Novartis's Petition for Certiorari. For these reasons, this Settlement is an impressive achievement.

### 4. The Fees Requested Are Reasonable and Appropriate Under Both the Percentage and Lodestar Approaches.

In this Circuit, the "percentage-of-fund" method is the trend. *McDaniel v. County of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010); *In re Telik Inc. Sec. Litig.*, 576 F. Supp. 2d at 586 ("[T]he administrative problems associated with the lodestar method, and the advantages presented by the percentage of recovery approach. . . led most district courts in this Circuit to adopt the percentage of recovery methodology."); *see also Wal-Mart Stores*, at 122 ("The trend . . . toward the percentage method . . . directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.") (internal citations omitted); *In re Marsh ERISA Litig.*, 265 F.R.D. at 146; *Mohney*, at *16; *In re NASDAQ Market Makers Antitrust Litigation*, 187 F.R.D. 465, 483-85 (S.D.N.Y. 1998) (collecting cases); *Strougo ex rel. Brazilian Equity Fund. Inc.*, 258 F. Supp. 2d at 261-62 (collecting cases); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071, 2005 U.S. Dist. LEXIS 24890, at *22 (S.D.N.Y. Oct. 24, 2005) ("The trend in the Second Circuit recently has been to use the percentage method.").

The percentage method calculates the fee award as some percentage of the settlement fund created for the class. *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). The lodestar method multiplies the number of hours each attorney has expended by the hourly rate attorneys of similar

skill charge in the area, then it applies to that figure a multiplier which factors in the litigation risks and other considerations. *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir. 1999). In combination, the documentation of hours submitted by counsel can be used as a "cross check" on the reasonableness of the requested percentage of the fund. *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).

Under either a "percentage-of-the-fund" analysis or a "lodestar" approach, the $2.7608 million fee sought herein is justified.

> a.   *A Twenty-Eight Percent of Gross Settlement Benefit Is Well Within the Range of Reasonableness.*

As noted above, the Second Circuit favors awarding fees according to the "percentage-of-the-fund" over the "lodestar" method in common fund cases. Moreover, this Circuit has ruled that "[a]n allocation of fees by percentage should therefore be awarded on the basis of total funds made available whether claimed or not." *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007).

As this Court has recognized in prior litigation, a "request for one-third of the [settlement] Fund is reasonable and consistent with the norms of class litigation in this circuit." *Clark II*, at *27; *see also Duchene*, at *8 (awarding attorneys' fee in the amount of **32.2%** of the settlement fund); *Mohney*, at *16 (awarding **33%**). In fact, in *Rosenberg, et al. v IKON Office Solutions*, this Court awarded to SWH **31.4%** of the total fund in a class action settlement. No. 05-cv-09131, slip op. (S.D.N.Y. Jan. 22, 2008) (Crotty, J.). Thus, the requested 28% here falls below the amount usually awarded by this Court, both generally and to SWH specifically.

The requested 28 percent also falls below the mainstream of percentage awards granted

by other courts in the Southern District of New York.[22]  *See, e.g., Sewell*, at *36 ("[C]ourts in

this  Circuit have routinely granted attorney's fees in the amount of **one-third** of the settlement

in state and FLSA wage and hour class action settlements . . . "); *deMunecas v. Bold Food, LLC*,

No. 09 Civ. 00440, 2010 U.S. Dist. LEXIS 87644, at *22 (S.D.N.Y. Aug. 23, 2010) ("Class

Counsel's request for **33 percent** of the Fund is reasonable under the circumstances of this case

and is consistent with the norms of class litigation in this circuit."); *In re Marsh ERISA Litig.*,

265 F.R.D. at 149 (finding fee of over $11M, or **one-third** of the recovery, "fair and reasonable

in relation to the recovery and compares favorably to fee awards in other risky common fund

cases in this Circuit and elsewhere."); *Gilliam*, at *8 (S.D.N.Y. Mar. 24, 2008) (awarding

**33.3%**); *Strougo ex rel. Brazilian Equity Fund*, 258 F. Supp. 2d at 262 (awarding **33.3%** of

settlement fund); *In re Blech Sec. Litig.*, No. 94 Civ. 7696, 2002 U.S. Dist. LEXIS 23170, at *5

(S.D.N.Y. Dec. 4, 2002) (awarding **33.3%** of settlement fund); *In re Lloyd's American Trust

Fund Litig.*, No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663, at *76 (S.D.N.Y. Nov. 26, 2002)

("In this district alone, there are scores of . . . cases where fees . . . were awarded in the range of

**33.3  percent** of the settlement fund."); *Maley*, 186 F. Supp. 2d at 370 (awarding **33.3%** of

settlement fund); *Cohen v. Apache Corp.*, No. 89 Civ. 0076, 1993 U.S. Dist. LEXIS 5211, at *1

(S.D.N.Y. Apr. 21, 1993) (awarding **33.3%** of settlement fund); *In re Gulf Oil/Cities Service

Tender  Offer  Litigation*, 142 F.R.D. 588, 596-597 (S.D.N.Y. 1992) (awarding **33.3%** of

settlement fund); *In re Avon Prods. Inc. Sec. Litig.*, No. 89 Civ. 6216, 1992 U.S. Dist. LEXIS

17072, at *8 (S.D.N.Y. Nov. 6, 1992) ("The request for **30%** is in line with numerous awards in

this Court and elsewhere in recent litigation.").

---

[22] Other courts in this Circuit also routinely award approximately one-third of the settlement fund. *See, e.g., Bebi Alli*, at *9 (awarding **one-third percent** of the total recovery in a case of average risk); *Davis v. J.P. Morgan*, at *24 (awarding **33.3 percent** of settlement fund); *Willix v. Healthfirst, Inc.*, No. 07-1143, 2011 U.S. Dist. LEXIS 21102, at *16 (E.D.N.Y. Feb. 18, 2011) (awarding **33%** of settlement fund).

Attorneys' fees of 28-30% are routinely awarded in cases where the settlement fund approaches $100M as it does here. *See, e.g., In re Priceline.com, Inc. Secs. Litig.*, No. 3:00-CV-1884, 2007 U.S. Dist. LEXIS 52538, at *12-13 (D. Conn. July 20, 2007) (**awarding 30% of $80 million fund**); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-1050 (9th Cir. May 15, 2002) (holding the district court did not abuse its discretion in awarding a **28% of a $98,885,000** settlement fund). In fact, Courts have awarded fees of this amount even when the total value of the settlement fund far exceed the Fund in this case. *See, e.g., Torres v. Bank of Am. (In re Checking Account)*, Nos. 09-MD-02036, 08-23323, 09-21963, 09-2186, 10-24316, 10-01185, 2011 U.S. Dist. LEXIS 135014, at *134 (S.D. Fla. Nov. 22, 2011) (awarding **30% of $410 million** "megafund," rejecting lodestar crosscheck and collecting cases); *In re Oxford Health Plans, Inc., Secs. Litig.*, MDL Dkt. No. 1222, 2003 U.S. Dist. LEXIS 26795, at *13 (S.D.N.Y. June 12, 2003) (awarding $84 million in fees and expenses – **28% of $300 million** fund).

Indeed, the fee requested in this case comports with awards in similar cases across the country. A recent study surveying the award of attorneys' fees in class action settlements reviewed data on cases nationwide and found that the fee awards for class action in cases that are "low/medium" risk average 26.2 percent of total recovery, and in cases that are "high" risk average **35.1%** of total recovery. Theodore Eisenberg and Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, NYU Center for Law, Economics and Organization, Working Paper No. 09-50 (November 2009), *available at* http://ssrn.com/abstract=1497224 at Table 8 (attached hereto as Exh. D). For the reasons explained above, *In Re Novartis Wage and Hour Litigation* was clearly a high-risk case whose outcome was unprecedented. Accordingly, Class Counsel's fee request falls below the average award for a case of this magnitude, complexity, difficulty and risk.

In sum, the fee request at bar is consistent with class action fee awards in the Second Circuit, as well as fee averages in similar cases nationwide. Therefore, the attorneys' fee request should be granted in whole.

### b. The Lodestar Sought is Well within the Range of Reasonableness.

As set forth in the attached Declaration, Class Counsel and staff devoted approximately 14,728 hours to prosecute this litigation from its inception until submitting the preliminary approval papers, and more than 1,407 hours since then. Class Counsel Dec. ¶74. The current hourly rates for Co-Lead Plaintiffs' Counsel are $790.00 for David Sanford, Esq. and $790.00 for Jeremy Heisler, Esq. Class Counsel Dec. ¶78. The rates for other SWH Senior Counsel involved in this case are: $790.00 for Steven Wittels, Esq.; $750.00 for Grant Morris, Esq.; $700 for Janette Wipper, Esq.; and $650.00 for Katherine Kimpel, Esq. See Class Counsel Dec. ¶78-80 (setting forth hourly rates of other attorneys and staff who worked on this matter over the course of the litigation). The average hourly rate for SWH partners is $744. Class Counsel Dec. ¶79.

In approving the *Velez* settlement in 2010, Judge McMahon noted that SWH's "hourly rates are below the rates charged by firms of this caliber (principally defense firms) that litigate regularly in this district; they have also been approved in other matters in this district." *Velez*, at *39. SWH's rates have only increased five percent for most associates and partners since the 2010 *Velez* settlement – despite the fact that in 2011, a quarter of partners nationwide billed at an average rate of $873 per hour. *"Biggest Lawyers Grab Fee Bounty,"* The Wall Street Journal (April 16, 2012) (reporting on a study conducted by TyMetrix Inc. and Corporate Executive Board Co.) (attached hereto as Exh. E). Accordingly, more than a quarter of partners nationwide bill an average of:

- **$223 above the lowest SWH partner rate;**
- **$130 above the average SWH partner rate; and**
- **$80 above than the highest SWH partner rate.**

Furthermore, SWH's hourly rates are well within the range of rates charged by laywers in New York and Washington, D.C. *See* National Law Journal 2011 Billing Survey, *available at* www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202535905815 (including survey data from law firms in New York and Washington, D.C. that charge rates as high as $1120 per hour); *see also Telecomm. Sys. v. Mobile 365, Inc.*, No. 06-485, 2009 U.S. Dist. LEXIS 126761 at *50 n.12 (E.D.Va. Mar. 31, 2009) (finding reasonable $1000-per-hour rates charged by partners in Washington, D.C.). **Of the ten New York and Washington, D.C. law firms that reported their 2011 rates to the National Law Journal, ninety percent charged rates higher than $790 per hour and seventy percent charged rates higher than $925 per hour.** National Law Journal 2011 Billing Survey; *see also In Focus: Billing; A Firm-by-Firm Sampling of Billing Rates Nationwide*, Nat'l L.J., December 6, 2004, at 22 (2004 billing survey showing that, more than seven years ago, senior partners in New York City charged $750.00 per hour) (attached hereto as Exh. F).

Class Counsel further notes that courts have approved attorneys' fees based on similar to the above rates. *See, e.g., In re Comverse Tech., Inc.*, No. 06-1825, 2010 U.S. Dist. LEXIS 63342 at *4 (E.D.N.Y. June 24, 2010) (approving as reasonable rates up to $880 per hour); *In re NTL Inc. Secs. Litig.*, No. 02 Civ. 3013, 2007 U.S. Dist. LEXIS 13661, at *28 (S.D.N.Y. March 1, 2007) (citing cases approving rates up to $850.00 for partners). The hourly rate SWH seeks per partner is less than that approved by the *NTL* Court more than five years ago.

Indeed, Class Counsel's lodestar to date of approximately $8,804,128.00, is substantially lower than it might be if SWH charged at usual rates. When using this reduced lodestar, the

multiplier necessary for a fee award of $27.608 million is approximately **3.14**. Given the relevant hourly rates in the community, the 3.14 multiplier requested by Class Counsel is not only well within the range of multipliers applied by courts in the Southern District of New York, but is in fact far *below* many commonly awarded multipliers.

Likewise, multipliers or enhancements much larger than that requested here are routinely approved in Second Circuit class fee cases. *See, e.g., Sewell*, at *38 (noting courts commonly award lodestar multipliers **up to six**); *Davis v J.P. Morgan*, at *30 (awarding a **5.3 multiplier** in FLSA misclassification case as it was "not atypical for similar fee-award cases"); *In re Interpublic Secs. Litig.*, No. Civ. 6527 Class Action, 03 Civ. 1194 Derivative Action, 2004 U.S. Dist. LEXIS 21429, at *36-37 (S.D.N.Y. Oct. 26, 2004) (**multiplier of 3.96**); *Maley*, 186 F. Supp. 2d at 371 (the "**modest multiplier of 4.65** is fair and reasonable"); *Roberts, v. Texaco, Inc.*, 979 F. Supp. 185, 198 (S.D.N.Y. 1997) (rev'd on other grounds by *Kaplan v. Rand*, 192 F.3d 60 (2d Cir. 1999)) (awarding a **5.5 multiplier** in race discrimination class action); *In re RJR Nabisco, Inc. Sec. Litig.*, Nos. 818, 88 Civ 7905, 1992 U.S. Dist. LEXIS 12702, at *16-22 (S.D.N.Y. Aug. 24, 1992) (awarding **multiplier of 6**); *Rabin v. Concord Assets Grp., Inc.*, No. 89 Civ. 6130, 1991 U.S. Dist. LEXIS 18273, at *1-2 (S.D.N.Y. Dec. 19, 1991) (awarding **multiplier of 4.4**).

Moreover, courts in this Circuit have recognized that where "class counsel will be required to spend significant additional time on this litigation in connection with implementing and monitoring the settlement, the multiplier will actually be significantly lower." *Bellifemine*, at *19; *see also Parker v. Jekyll & Hyde Entm't Holdings, L.L.C.*, No. 08 Civ. 7670, 2010 U.S. Dist. LEXIS 12762, at *7-8 (S.D.N.Y. Feb. 9, 2010) (noting that, "as class counsel is likely to expend significant effort in the future implementing the complex procedure agreed upon for

collecting and distributing the settlement funds, the multiplier will diminish over time"). As noted herein, Class Counsel anticipates spending significant additional time after this Court approves this Settlement. Thus, a **3.14** multiplier would be significantly reduced over time. Class Counsel Dec. ¶¶51-52, 77.

**D.      Plaintiffs' Application for Reimbursement of $400,000 in Litigation Expenses Should be Granted.**

Class Counsel has expended *over* $400,000.00 in expenses. *See* Doc. 210, Exh. D (SWH Expense Report).

As this Court has recognized, "[c]ourts typically allow counsel to recover their reasonable out-of-pocket expenses." *Clark II*, at *30. In class action settlements nationwide, litigation costs and expenses average about 2.8 percent of the total recovery. Eisenberg and Miller, *Attorneys Fees and Expenses in Class Action Settlements: 1993-2008*, at 26. Here, Class Counsel has incurred far less than the $2.9 million in expenses predicted by the average percentage. The approximately $400,000.00 in expenditures over six years of litigation are modest in comparison and represent approximately 0.25% of the Settlement Fund. Accordingly, the Court should grant Plaintiffs' request for recoupment of these expenses.

**E.      The Named Plaintiffs and Deponents Are Entitled to Service Payments in the Amounts Requested.**

Service Awards of the type sought for the Named Plaintiffs and Deponents are commonly awarded in this jurisdiction.[23]      *See, e.g., Torres II*, at *22-23 (discussing the

---

[23] Such service awards extended to non-Named Plaintiff class members are also commonly accepted in other jurisdictions. *See, e.g., Ozga v. U.S. Remodelers, Inc.*, No. C 09-05112, 2010 U.S. Dist. LEXIS 91196, at *6-9 (N.D. Cal. Aug. 9, 2010) (approving a service award of $10,000 to a class member, the same amount awarded to the named plaintiff); *In re Tyson Foods, Inc.*, No. RDB-08-1982, 2010 U.S. Dist. LEXIS 48518, at *14 (D. Md. May, 11, 2010) (awarding a service award to deponents on the ground that "this payment compensates the Plaintiffs and class members for their contribution to the process of the litigation"); *McClain v. Lufkin Industries, Inc.*, No. 9:97-cv-63, 2009 U.S. Dist. LEXIS 125630, at *13-14 (E.D. Tex. Dec. 22, 2009) (awarding "participation awards" to class members based on a point system in which points were assigned for, inter alia, attending mediation, being

importance of awarding service payments "to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff"); *Bellifemine*, at *21 (awarding $25,000 to $60,000 to non-Named Plaintiff class members and $75,000 to the Named Plaintiffs for "the time and energy that they have devoted to this case, and the benefit conferred on the Class"); *Clark II*, at *30-31 (same); *Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819, No. 04 Civ. 2295, 2009 U.S. Dist. LEXIS 77489, at *10-11 (S.D.N.Y. July 27, 2009) ("Such service awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff."); *Reyes v. Buddha-Bar NYC*, No. 08 Civ. 2494, 2009 U.S. Dist. LEXIS 45277 at *13-14 (S.D.N.Y. May 28, 2009) (same); *Hernandez, et. al. v. C&S Wholesale Grocers, et. al.*, No. 06 cv 2675, 2008 U.S. Dist. LEXIS 118666, at *8 (S.D.N.Y. July 30, 2008) (approving service payments to "class members who were interviewed by the defendants or prepared for such interviews, and class members who provided sworn declarations").

---

deposed, and testifying by declaration); *Wineland v. Caseys' General Stores, Inc.*, 267 F.R.D. 669, 677-78 (S.D. Iowa 2009) ("[T]hose who submitted to depositions furthered the litigation in immeasurable ways."); *Equal Rights Center v. Washington Metro Area Transit Authority*, 573 F. Supp. 2d 205, 210, 214 n.10 (D.D.C. 2008) (approving incentive awards to 16 deposed class members); *Romero v. Producers Dairy Foods, Inc.*, No. 1:05cv0484 DLB, 2007 U.S. Dist. LEXIS 86270, at *11 (E.D. Cal. Nov. 14, 2007) (approving service awards to "the class members actually deposed"); *Nilsen v. York County*, 382 F. Supp. 2d 206, 215 (D. Me. 2005) (approving incentive payments to 17 deposed class members); *Camp v. Progressive Corp.*, Nos. 01-2680 et al., 2004 U.S. Dist. LEXIS 19172, at *23-24 (E.D. La. Sept. 23, 2004) (approving incentive payments to class members for being deposed and lower awards for only helping with written discovery); *Huguley v. General Motors Corp.*, 128 F.R.D. 81, 85 (E.D. Mich. 1989) (approving awards to "potential and anecdotal witnesses and named plaintiffs."); *Bryan v. Pittsburgh Plate Glass Co.*, 59 F.R.D. 616, 617 (D. Pa. 1973) (approving "special awards" to "members of the plaintiff class who were most active in the prosecution of this case and who devoted substantial time and expense on behalf of the class").

1. Courts Commonly Award Service Payments to Class Representatives and Class Members Who Provide Substantial Assistance.

In *Roberts v. Texaco, Inc.*, Judge Brieant articulated the prevailing rule in the Second Circuit and throughout the federal judiciary on awarding incentive payments to class members in a class action:

> In this Circuit, the Courts have, with some frequency, held that a successful Class action plaintiff, may, in addition to his or her allocable share of the ultimate recovery, apply for and, in the discretion of the Court, receive an additional award, termed an incentive award . . . .

979 F. Supp. at 200; *Torres II*, at \*22-23 (discussing the importance of awarding service payments "to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff"); *Clark II*, at \*30-31 (same); *see also Sewell*, at \*41-42 (awarding service awards in a wage-and-hour matter because class representatives "risked potential exposure of jeopardizing future employment by joining this suit"); *Velez v. MaJik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 U.S. Dist. LEXIS 46223, at \*21-22 (S.D.N.Y. June 22, 2007) (approving incentive award equal to twice that provided to class members on ground that "[t]he risks to which [class representatives] allowed themselves to be exposed . . . and the effort they expended on behalf of all class members, justifies their receipt of an incentive award"); *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2005 U.S. Dist. LEXIS 7961, at \*9-10 (S.D.N.Y. May 5, 2005); *RMED Int'l, Inc., v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2003 U.S. Dist. LEXIS 8239, at \*2 (S.D.N.Y. May 15, 2003).

2. Service Awards Are Especially Appropriate in Employment Class Actions.

Incentive awards are particularly appropriate in employment class actions. As another court in this District noted in approving incentive awards in a wage and hour case:

> [A]s employees suing their current or former employer, the plaintiffs face the risk

61

of retaliation. The current employees risk termination or some other adverse employment action, while former employees put in jeopardy their ability to depend on the employer for references in connection with future employment. The enhancement awards provide an incentive to seek enforcement of the law despite these dangers.

*Parker v. Jekyll & Hyde*, at *4-5; *see also Torres II*, at *22 (awarding service awards in an employment class action); *Duchene*, at *9 (same); *Mohney*, at *18 (same); *Frank*, 228 F.R.D. at 187 (awarding an incentive award in an overtime case, and finding "such awards are particularly appropriate in the employment context").

> 3. Courts Have Often Awarded Service Payments in Amounts Larger Than Those Applied for Here.

Incentive awards have been awarded to individuals in a variety of contexts, including wage and hour matters, employment discrimination suits, antitrust cases and consumer fraud suits. The service payments Plaintiffs seek – which range from $3,500 to $40,000 and in total represent approximately 0.24% of the entire monetary award – are well within the range of service payments approved as reasonable. *See, e.g., Bebi Alli v. Boston Market Corp.*, No. 10-00004-JCH, 2012 U.S. Dist LEXIS 54695, at *10 (D. Conn. Apr. 17, 2012) (approving service payments in the amount of approximately 1.33% of the settlement amount); *Parker v. Jekyll & Hyde*, at *4-6 (approving enhancement payments that total approximately 11% of the settlement fund); *Wright*, 553 F. Supp. 2d at 345 (approving $50,000.00 awards to each of 11 named plaintiffs in employment discrimination action); *Liberte Capital Group v. Capwill*, No. 5:99 CV 818, 2007 U.S. Dist. LEXIS 64869, at *15 (N.D. Ohio Aug. 29, 2007) ($95,172.47 to class plaintiff); *Frank*, 228 F.R.D. at 187 (awarding an incentive payment that represented 8.4% of the total settlement fund); *Beck v. Boeing Co.*, No. C00-301P, 2004 U.S. Dist. LEXIS 27622, at *4 (W.D. Wash. Apr. 9, 2004) (approving $100,000.00 awards to each of 12 plaintiffs in an employment matter); *Ingram*, 200 F.R.D. 685 (four representative plaintiffs in an employment

matter awarded $300,000.00 each); *Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 913-14 (S.D. Ohio 2001) (approving an incentive award of $50,000.00 in an employment matter); *Roberts*, 979 F. Supp. 185 (awarding $50,000.00 and $85,000.00 to two of the named plaintiffs in an employment class action); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299-300 (N.D. Cal. 1995) ($50,000.00 incentive award); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991) (six class representatives granted incentive awards of $50,000.00 each).

Class members who are not Named Plaintiffs but who have lent substantial assistance to the litigation also should be rewarded.   Service awards are an important way of "reimbursing class representatives who 'take on a variety of risks and tasks when they commence representative actions, such as complying with discovery requests and often must appear as witnesses in the action.'" *In re Marsh ERISA Litig.*, 265 F.R.D. at 150 (quoting *Strougo*, 258 F. Supp. 2d at 264); *see also Bellifemine*, at *20-21 (approving service payments to unnamed class members "for their assistance in the prosecution of this action . . . in light of the time and energy that they have devoted to [the] case, and the benefit conferred on the Class").

### 4. The Service Payments at Bar Are More Than Justified.

Under the case law surveyed above, the Service Payments at bar are more than justified. The Named Plaintiffs and Deponents all gave a significant amount of time and effort to the prosecution of this case, which made it possible for Class Counsel to prevail at the Second Circuit and, ultimately, reach settlement.   Moreover, as the Class Counsel Declaration describes, the Named Plaintiffs and Deponents have all: (1) risked economic harm, or (2) contributed significantly to prosecuting this action.   Class Counsel Dec. at ¶69.

This is particularly true given the high-profile, landmark nature of this lawsuit.   The

pharmaceutical sales field is small and tightly-knit.  Within that community, each of the Named
Plaintiffs and Deponents lent their names to the prosecution of this suit, at great personal
sacrifice, and were instrumental in achieving this settlement.  Additionally, many of the Named
Plaintiffs and Deponents were required to travel to participate in full-day depositions after
extensive preparation.

In all, this case presents a particularly striking warrant for incentive payments, and the
Court should grant Plaintiffs' motion for service awards in the amount of $40,000 for Original
Named Plaintiffs, $20,000 for Named Plaintiffs in the Second Amended Complaint, and $3,500
for each of the twenty-one deponents.  **No class member has filed any objections to the
proposed service awards**.  *See Sewell*, at *43 (noting, in approving service awards, that no class
members objected).

Such service payments are necessary, not only to recognize the significant role that each
of the individuals played in the prosecution of this matter, but also generally to encourage
individuals to play an active role in the private enforcement of public rights.  Again, the
individuals in question here provided assistance which made the difference between success and
failure of the litigation.

F.    **Settlement Notice Procedures Were Adequate and Complied with Court
      Orders.**

Courts in this Circuit and elsewhere agree that settlement notice to class members under
Rule 23 need only be reasonably calculated under the circumstances to apprise interested parties
of the pendency of the settlement proposed, and to afford those parties an opportunity to present
their objections.  *Torres II*, at *12-13.  Furthermore, as this Court has noted, while "[t]he FLSA
does not explicitly provide for notice of a collective action," district courts have "discretionary
power" to authorize notice.  *Cruz v. Hook-SupeRx, L.L.C.*, No. 09-7717,  2010 U.S. Dist. LEXIS

81021, at *6-7 (S.D.N.Y. Aug. 5, 2010). As a general matter, notice to potential FLSA opt-ins should be "timely, accurate, and informative." *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 172 (1989). The notice in this case, which included the Settlement Agreement details described above, meets the standards under Rule 23 and the FLSA, particularly because individual Notices have been fashioned to address the particular concerns of each Subclass.

1.  FLSA I, NY I and CA I Subclass Notices

With respect to members of the FLSA I, New York and California Subclasses, the Court first ordered the mailing of a certification notice in its February 15, 2007 Order certifying the three original classes. Doc. 19. Specifically, the Court approved the Notices to the classes, including the Consent to Participate as a Party Plaintiff form for the FLSA class and ordered that they "be mailed by first class mail to the individuals who fit the class definition[s] at their last known addresses." *Id.* On April 10, 2007, the Class Action Administration ("CAA"), who handled the mailing, verified that the it sent, via first class mail:

- 843 mailings to members of the New York Subclass;
- 959 mailings to members of the California Subclass; and
- 8,462 mailings to individuals eligible to participate in the FLSA I Subclass.

*See* Doc. 210, Exh. A (CAA Verification of Mailing). Accordingly, members of the original classes already received certification notice in this litigation in 2007 or 2008 and already elected to participate in this action and be bound by the result. Accordingly, in January 2012, this Court ordered that these individuals receive a second, detailed notice describing the settlement terms and affording them adequate opportunity to object to the settlement. *See* Doc. 145, Exh. A.

2.  Rule 23 Remaining States Subclass Notices

The Parties' "Notice of Proposed Settlement and Settlement Hearing; Opportunity to Participate In Remaining States Settlement Subclass," which was approved by this Court on

January 25, 2012, fully comports with the requirements of Fed. R. Civ. P. 23(c)(2)(B) and 23(e).

Pursuant to Rule 23(c)(2)(B), the notice must provide:

> the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:
>
> (i)   the nature of the action;
> (ii)  the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv)  that a class member may enter an appearance through an attorney if the member so desires;
> (v)   that the court will exclude from the class any member who requests exclusion;
> (vi)  the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Here, the notice to this Subclass allowed the members of the new Remaining States Rule 23 Settlement Subclass to either opt-out of the action or object to the settlement and in every other respect comports with the requirements outlined above. Additionally, the notice describes the terms of the settlement, informs the classes about the allocation of attorneys' fees and provides specific information regarding the date, time, and place of the final approval hearing. *See* Doc. 145, Exh. C.

Accordingly, the detailed information in the Remaining States Subclass Notice was more than adequate to put class members on notice of the proposed settlement and well within the requirements of Rule 23(c)(2)(B). Courts have approved class notices even when they provided only general information about a settlement. *See Sand*, at *10-11 (quoting In re *Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (class notice "need only describe the terms of the settlement generally")); *see also Torres II*, at *13 (same); *Clark I*, at *22 (same); *Mohney*, at *10 (same). The Remaining States Subclass Notice far exceeded this bare minimum and fully complies with the requirements of Rule 23(c)(2)(B).

### 3. FLSA Settlement Subclass II Notices

Finally, the members of FLSA Settlement Settlement Subclass II were required to file written consents to join this collective litigation in order to participate in the action and receive the benefits of the settlement. *See* 29 U.S.C. §§ 216(b), 256. These individuals must have therefore received not only notice of the settlement but also notice regarding their opportunity to join the action. The content of the proposed "Notice of Proposed Settlement and Settlement Hearing; Opportunity to Participate by Opting Into the Federal Fair Labor Standards Act ("FLSA") II Settlement Subclass," effectively served both of these purposes. *See* Doc. 145, Exh. B.

The Proposed FLSA II Notice was sent to FLSA II Class Members on February 24, 2012, pursuant to the Joint Motion for Preliminary Approval. Rust Dec. ¶9. The Notice also accurately provided information about the nature of the case; the definition of the class; the claims, issues and defenses; the terms of the settlement; the allocation of attorneys' fees; and the date, time and place of the final approval hearing. On March 26, 2012, the settlement administrator sent reminder postcards to all FLSA II-eligible individuals who, according to Rust's records, had not yet submitted their opt-in forms. Rust Dec. ¶14. In addition, on April 4, 2012, the settlement administrator placed automated reminder calls to all FLSA II-eligible individuals who had not yet submitted their forms. Rust Dec. ¶15. The settlement administrator placed a second round of calls on April 5, 2012. *Id.*

### 4. Process for Mailing and Response

The Parties and Rust Consulting undertook an exhaustive process to identify class members and their present addresses. In February 2012, Novartis submitted to the Claims Administrator a list of all Proposed Settlement Class Members, including name, employee ID,

job title, states the employee worked in, last known address and telephone number.  Doc. 145, ¶11.2.  Pursuant to ¶¶11.5 - 11.6 of the Settlement Agreement, Rust ran the list of all Proposed Settlement Class Members through the United States Postal Service's National Change of Address Service.  Rust Dec. 8.  In addition, the Claims Administrator performed address searches using public and proprietary electronic resources that collect their data from various sources such as utility records, property tax records, motor vehicle registration records (where allowed) and credit bureaus.  *Id.*  Further, if envelopes from the mailing of the Notices were returned with forwarding addresses, Rust re-mailed the Notices to the new addresses within three business days of receiving the return envelope.  *Id.*

With respect to response time, all three Notices provided current or potential class members with an approximately forty-five day period in which to opt in, opt out, or submit their objections to the Proposed Settlement, as appropriate.  "Courts have repeatedly found such a time period to constitute sufficient notice."  *Marsh*, at *67-68 (citations omitted); *see, e.g.*, *Morris v. Affinity Health Plan, Inc.*, No. 09-cv-1932, 2011 U.S. Dist. LEXIS 144543 (S.D.N.Y. Dec. 15, 2011) (approving 30 day opt-out and objection submission period); *deMunecas*, at *1 (approving 30 day opt-out and objection submission period); *Clark I*, at *23  (approving 45 day opt-out and objection submission period); *Rosenberg*, No. 1:05-cv-09131, Doc. 26, at ¶4 (Oct. 30, 2007) (Crotty, J.) (approving a 30 day opt-out and objection submission period); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302, 2006 U.S. Dist. LEXIS 63260 (S.D.N.Y. Sept. 6, 2006) (finding distribution of notice thirty-four days before the deadline for objections was adequate); *In re BankAmerica Corp. Sec. Litig.*, 210 F.R.D. 694, 707-08 (E.D. Mo. 2002) (finding that timing of notice comported with due process where "[t]here were three to four weeks between the mailing of class notice and the last date to object") (citing *Grunin v.*

*Int'l House of Pancakes*, 513 F.2d 114, 120-21 (8th Cir. 1975) (finding nineteen-day notice period sufficient, particularly when case had been ongoing for two years); *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374-75 (9th Cir. 1993) (holding that initial notice sent thirty-one days before deadline for written objections was adequate); *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 429-30 (5th Cir. 1977) (concluding, in securities fraud class action, that a period of "almost four weeks between the mailing of the notices and the settlement hearing" was adequate time, particularly when only one class member objected to the timing).

**G.      The Lone "Objection" Poses No Credible Challenge to the Settlement.**

When preliminarily approving the settlement, this Court stated that such approval was "subject to the right of **class members** to challenge [the settlement]. . . and to show cause, if any exists" why it should not be finally approved.  Doc. 147, at 36:11-13 (emphasis added).  The Court went on to detail the procedures which class members must follow in order to have their objection heard.  *Id.* at 39:1-13.  At no point did the Court contemplate or approve any objection process for non-class members.

**Zero class members objected to the settlement.**  The lone "objection" on file is an improper one, submitted by a non-class member whose fundamental dispute is not with this settlement or the administration of it but instead with the 2007 class notice.

1.      Ms. Haney's Contact with Class Counsel and Her Substantive Concern.

This objection regarding the 2007 FLSA I notice procedures was submitted to the Court on April 13, 2012 by Michelle Stahl Haney.  Doc. 191.  Ms. Haney is not a Settlement Class Member, as her dates of employment exclude her from the FLSA II Settlement Subclass, and she did not opt into the FLSA I subclass during the proper period in 2007.

Ms. Haney first raised questions with Class Counsel about her ability to recover as a part

of the Settlement on March 12, 2012. Class Counsel Dec. at ¶55. Because Ms. Haney did not work with Novartis beyond October 2007, her only means of participating in the settlement would have been as a FLSA I member who opted into *In re Novartis* during the 2007 notice period. Upon learning these facts, Ms. Haney stated that she did not receive notice in 2007. *Id.* Class Counsel obtained from Ms. Haney her correct mailing address in 2007 and promised to look into whether the mailing had been properly handled by Class Action Administration ("CAA"). *Id.*

In response to Class Counsel's inquiry, CAA, which handled the 2007 notice, confirmed that notice to Ms. Haney was sent to her proper address in 2007. Its records indicate that there were no mailing errors. *See* Doc. 210, Exh. B (Letter from Matthew E. Pohl, President of Class Action Administration, to Kate Nelson of Sanford Wittels & Heisler, LLP, Apr. 17, 2012). CAA verified that on or around April 9, 2007, notice of the FLSA I action was mailed to Michelle Stahl, Ms. Haney's maiden name, at her proper address; that CAA did not receive a Consent Form from Ms. Haney; and that it has no record of any interaction with her. *Id.*

Accordingly, Class Counsel scheduled a call with Ms. Haney to review the contents of the letter from Class Action Administration and its implications for her interest in recovering a part of the Settlement Fund. Class Counsel Dec. at ¶57. On that call, Ms. Haney expressed that she understood how the statute of limitations came to preclude her from participating through the new settlement subclasses and that her frustration was with the mailing in 2007. *Id.* As she explained to Class Counsel, she did not believe it was fair that she could not recover because of what she believed was an error on the part of the U.S. Postal Service and/or Class Action Administration. Class Counsel Dec. ¶58. Ms. Haney explained that she believed the 2007 notice procedures requiring first-class mail delivery was inadequate and that "multiple notifications" or

other mailing options should have been utilized for it to be adequate. *Id.* At the end of the call, Ms. Haney thanked Class Counsel for its assistance and indicated that she would be sending in an "objection." *Id.*

### 2.   Ms. Haney Lacks Standing to Object.

Because Ms. Haney is not a Settlement Class Member, she has no standing to object to the settlement terms.   In keeping with law of the Circuit, this Court explicitly set procedures by which **class members** could object but established no such process for non-class members. *See* Doc. 147 at pp. 36, 39 (creating a process for class members to object); Doc. 145 at ¶11.14 (the Settlement Agreement allows only for Proposed Settlement Class Members in the New York I, California I and Remaining States Settlement Sub-Classes to object the settlement).   "'Only Class members have standing to object to the Settlement of a class action' because '[o]bjectors who are non-Class members lack standing to object to the fairness, reasonableness and adequacy of the Settlement.'" *In re Initial Pub. Offering Sec. Litig.*, No. MC 92, 2011 U.S. Dist. LEXIS 103698, at *3 n.11 (S.D.N.Y. Aug. 25, 2011) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 130 B.R. 910, 923 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992)); *Duchene,* at *7 (noting that objectors to FLSA and Rule 23 class settlement were "not members of the Class and thus lack standing to object to the settlement").

### 3.   The "Objection" Lacks Substantive Merit.

Even if Ms. Haney had standing, her objection is without merit.   As this Court has noted, "[t]he FLSA does not explicitly provide for notice of a collective action;" however, district courts have "discretionary power" to authorize notice. *Cruz v. Hook-SupeRx, L.L.C.*, No. 09-7717, 2010 U.S. Dist. LEXIS 81021, at *6-7 (S.D.N.Y. Aug. 5, 2010).   Here, the court-approved 2007 notice procedures were more than adequate.   On February 15, 2007, this Court approved

the content of Notices to individuals eligible to participate in the FLSA I collective action, and,

ordered that Notices be mailed "by first class mail to the individuals who fit the class

definition[s] at their last known addresses." *Id.* On April 10, 2007, the CAA, the claims

administrator who handled the mailing, verified that it sent, via first class mail 8,462 mailings to

individuals eligible to participate in the FLSA I Class. *See* Doc. 210, Exh. A (CAA Verification

of Mailing).

The form and provisions of a court-authorized collective action notice "are left to the

broad discretion of the trial court." *Hoffmann-La Roche*, 493 U.S. at 170.  Courts commonly

authorize notice to putative FLSA plaintiffs via first-class mail. *See Aponte v. Comprehensive*

*Health Mgmt.*, No. 10 Civ. 4825, 2011 U.S. Dist. LEXIS 60882, at *22 (S.D.N.Y June 1, 2011)

("I find that First Class mail is a sufficient to provide potential class members with notice in this

case"); *Reyes*, at *17 (approving notice in a combined Rule 23 class action and FLSA collective

action by "first-class mail to each class member at his or her last known address (with re-mailing

of returned Notices for which new addresses could be located)"); *Mohney*, at *14 (finding notice

by first-class mail "provided the best notice practicable under the circumstances"); *see also*

*Siewmungal v. Nelson Mgmt. Group Ltd.*, No. 11-CV-5018, 2012 U.S. Dist. LEXIS 28181, at

*10, *15 (E.D.N.Y. Mar. 2, 2012) (authorizing FLSA collective action via first-class mail); *Han*

*v. Sterling Nat'l Mortg. Co.*, No 09-CV-5589, 2011 U.S. Dist. LEXIS 103453, at *40 (E.D.N.Y.

Sept. 14, 2011); *Willix v. Healthfirst, Inc.*, No. 07-1143, 2011 U.S. Dist. LEXIS 21102, at *14

(E.D.N.Y. Feb. 18, 2011) (holding that notice sent by first-class mail provided "the best notice

practicable under the circumstances").

4.   <u>Modifications Were Made For Legitimate and Documented Flaws.</u>

Amongst the hundreds of calls and inquiries Class Counsel fielded, many individuals

raised questions or concerns about the notice process.  Class Counsel Dec. ¶59.  Many simply

could not remember or prove whether or not they had received the 2007 notice, ignored the 2007 notice, or affirmatively decided to reject the 2007 notice. *Id.* A smaller subset of individuals were adamant that they had not received the notice in 2007 whatsoever. Class Counsel dutifully researched and investigated each concern. *Id.* Most were unsubstantiated, and in at least one instance, our investigation uncovered that not only had the individual received a notice in 2007 but had also affirmatively opted-out. *Id.*

However, a few investigations yielded evidence of issues related to the mailing process and/or employment status of Settlement Class Members. In those circumstances, Class Counsel worked with Novartis to address these and any related issues. For instance, former Novartis employee Major Joseph Meadows provided proof of military service which indicated he was on duty in April 2007 when FLSA I notice was sent. Class Counsel Dec. ¶60. In addition, former Novartis employee Regina Bataineh provided proof that the FLSA I notice was mailed to the incorrect address. *Id.* Upon receipt of this information and supporing documentation from Major Meadows and Ms. Bataineh, Novaris agreed that both individuals should be properly included in the Settlement as FLSA I Subclass Members.

Ms. Haney has not alleged any similar, substantiated flaw. Instead, she takes issue with the Court-ordered mailing procedures, which were not only proper, but well within the parameters established by this courts within this Circuit. In light of the lack of supporting evidence, there is no basis to her objection of the 2007 mailing procedure or, by extension, her inability to participate in this Settlement. *See In re Initial Pub. Offering Sec. Litig.*, at *9 (finding that untimely, unauthenticated documentation of proof of class membership was inadequate because "[a]llowing someone to object to settlement in a class action based on this sort of weak, unsubstantiated evidence would inject a great deal of unjustified uncertainty into

73

the settlement process").

## IV.    CONCLUSION

The road to this Settlement was long, arduous, risky and expensive.  The Settlement is, by all measures, excellent.  No challenge or showing of cause in opposition to the Settlement has appeared since the preliminary approval hearing; instead, the response was overwhelmingly supportive.  Indeed, strong evidence of the excellence of the Settlement is the positive reaction of class members: the 84% opt-in rate; the lack of objection by class members; the sole request for exclusion; and the 95% overall participation rate in the Settlement.

For the reasons provided in this memorandum and in all of the preliminary and final approval submissions, the Court should certify the Settlement Class as final; approve the Settlement; award the requested monetary awards and service fees to the Named Plaintiffs and Deponents; and grant the application for attorneys' fees and expenses.  The Parties also seek this Court's order to dismiss the Civil Action with prejudice and require that all materials marked as containing Confidential or Highly Confidential Information pursuant to the Protective Order entered in the Civil Action be returned to the producing party or destroyed.

Dated:  May 21, 2012

Respectfully Submitted,

**SANFORD WITTELS & HEISLER, LLP**

_s/_ _____
David W. Sanford, D.C. Bar No. 457933
Katherine Kimpel, D.C. Bar. No. 493028
Grant Morris, D.C. Bar No. 926253
**SANFORD, WITTELS & HEISLER, LLP**
1666 Connecticut Ave., NW, Suite 300
Washington, D.C. 20009
Telephone: (202) 742-7780
Facsimile: (202) 742-7776

Jeremy Heisler, N.Y. Bar No. 1653484
Steven L. Wittels, N.Y. Bar No. 2004635
Andrew Melzer, N.Y. Bar No. 4270682
Deborah Marcuse (DM-1127)
**SANFORD, WITTELS & HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10022
Telephone: (646) 723-2947
Facsimile: (646) 723-2948

Janette Wipper, CA Bar. No. 275264
**SANFORD, WITTELS & HEISLER, LLP**
555 Montgomery Street, Suite 1206
San Francisco, CA 94111
Telephone: (415) 391-6900
Facsimile: (415) 391-6901

*Co-Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been served via the Court's Electronic Filing system on May 21, 2012, to the following:

Darin P. McAtee
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

***Counsel for Novartis Corporation***

s/ _____
Kate Nelson