## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Novartis Wage and Hour Litigation | 06-MD-1794 (PAC) |

### JOINT DECLARATION OF DAVID W. SANFORD, JEREMY HEISLER, AND KATHERINE M. KIMPEL IN SUPPORT OF THE PARTIES' JOINT MOTION FOR: (1) FINAL CERTIFICATION OF SETTLEMENT CLASS; AND (2) FINAL APPROVAL OF SETTLEMENT, SERVICE PAYMENTS TO CLASS REPRESENTATIVES AND CLASS MEMBERS, AND ATTORNEYS' FEES AND EXPENSES

David W. Sanford, Jeremy Heisler and Katherine M. Kimpel, ("the Declarants" or "Class Counsel") state as follows under penalties of perjury, pursuant to 28 U.S.C. § 1746:

1.     David Sanford is a founding partner in the Washington, D.C. office of Sanford Wittels & Heisler, LLP ("SWH").  Jeremy Heisler is a founding partner in the New York City office of SWH.  Katherine M. Kimpel is a partner in the Washington, DC office of SWH.  Mr. Sanford, Mr. Heisler, and Ms. Kimpel represent Plaintiffs and the Class.

2.     Based on Mr. Sanford's, Mr. Heisler's and Ms. Kimpel's active participation in the prosecution and settlement of this action, they have personal knowledge of the matters set forth in this certification, unless stated otherwise.

3.     Mr. Sanford, Ms. Heisler and Ms. Kimpel make this declaration in support of the parties' joint request that the Court (1) approve as final the Settlement Agreement and all of its terms, including an award of attorneys' fees and incentive payments; (2) dismiss the civil action with prejudice; (3) require that all discovery materials marked as containing Confidential or Highly Confidential Information pursuant to the Protective Order entered in the case be returned to the producing Party or destroyed.

1

## I.      BACKGROUND OF CLASS COUNSEL

4.      David W. Sanford graduated from Stanford Law School in 1995. He was a law clerk for Judge Gladys Kessler of the United States District Court for the District of Columbia from 1995 through 1996. He has been a member in good standing of the Maryland State Bar and the District of Columbia Bar since 1997. Mr. Sanford has been lead or co-lead Class Counsel in more than 50 Title VII and wage and hour matters throughout the United States in approximately 14 states and attained certification in about 30 of those matters. He is currently serving as Lead Counsel in numerous class, individual and qui tam matters. He is an "AV" rated attorney.

5.      Jeremy Heisler graduated *magna cum laude* from Brooklyn Law School in 1979. He worked as a law assistant in a New York State Appellate Court during 1980 – 1981. Mr. Heisler been a member in good standing of the New York Bar since 1980. Throughout his thirty year legal career, Mr. Heisler has had notable successes in class action litigation. He has been involved in approximately 75 class matters and attained certification in about half of those matters.     He has obtained approximately 40 class settlements in Title VII, wage and hour, consumer fraud, and securities matters across the country.

6.      Katherine M. Kimpel graduated from Yale Law School in 2006. She has been a member in good standing of the Wisconsin Bar since 2007 and the District of Columbia bar since 2008. She currently serves as lead counsel in numerous class actions. In addition, she continues to oversee the implementation of the Novartis gender discrimination class action settlement.

7.      Mr. Sanford and Ms. Kimpel were Lead Counsel in the Novartis gender discrimination class action, which SWH litigated for over six years before successfully mounting a seven-week trial and then negotiating a landmark settlement. Judge McMahon, in approving the settlement, noted that SWH "achieved a[n] [extraordinary] result. . . this was a well prepared

case. It was a brilliantly tried case by [SWH]. . . a one-of-a-kind result."

8.     SWH is a Plaintiffs' class action law firm with offices in Washington, D.C., New York, and San Francisco. It specializes in civil rights and general public interest cases, representing plaintiffs primarily in employment discrimination, wage and hour, whistleblower, and qui tam matters. SWH has reached multi-million dollar settlements in numerous cases throughout the United States. The firm is "AV" rated.

## II.     BACKGROUND OF THE LITIGATION AND SETTLEMENT

9.     This class litigation began on March 23, 2006, when original Named Plaintiffs, Simona M. Lopes and Carol Bollinger, filed a Class Action and Collective Action Complaint against Novartis in the United States District Court for the Southern District of New York, alleging that they and other similarly-situated Novartis employees were misclassified as exempt from overtime under the New York Labor Law and the Fair Labor Standards Act ("FLSA").  On May 4, 2006, Ms. Lopes filed her First Amended Class Action and Collective Action Complaint.

10.     On March 23, 2006, two additional Novartis Sales Representatives, Catherine E. White and Minel A. Hider-Tobertga, filed a Class Action Complaint against Novartis in the Superior Court of the State of California for the County of Los Angeles, alleging that they and similarly-situated Novartis employees were misclassified as exempt employees under the California Labor Code, the California Business and Professions Code and the California Code of Regulations.  On May 5, 2006, the action was removed by Novartis to the United States District Court for the Central District of California.

11.     On October 31, 2006, the New York and California cases were consolidated by the Judicial Panel on Multidistrict Litigation for pretrial proceedings in the United States District Court for the Southern District of New York as *In Re Novartis Wage and Hour Litigation*, Case

No. 06-MD-1794 (PAC).  On February 1, 2007, the Named Plaintiffs in the California case filed a First Amended Complaint and Demand for Jury Trial in the Southern District of New York.

12.     In February 2007, the parties moved jointly for an Order certifying a nationwide FLSA collective action and certifying two Rule 23(b) classes consisting of Novartis Sales Representatives who worked for the company in New York and California.  On February 15, 2007, the Court granted the motion.  (These classes are referred to herein as "Original Certified Classes").

13.     The Court-appointed administrator, Class Action Administration, Inc. ("CAA") mailed Notices via first class mail.  (Exhibit A – CAA Verification of Mailing).  In 2007-2008, 489 plaintiffs opted in as parties to the FLSA collective action, joining approximately 1,700 plaintiffs in the New York and California state Rule 23 classes.  In this notice process, Plaintiffs' Counsel spent extensive time answering questions and offering assistance to the class members.

14.     After this Court certified the above three classes, the Parties engaged in extensive merits, expert and damages discovery, which included numerous fact and expert depositions throughout the United States.  Plaintiffs' Counsel took and defended approximately 39 depositions throughout the United States, including seven 30(b)(6) depositions of Novartis corporate designees.  In addition, Plaintiffs' Counsel engaged an expert witness and deposed two of Novartis's experts.  Plaintiffs' Counsel reviewed and produced more than 5,000 pages of documents to Novartis and reviewed and analyzed hundreds of thousands of pages of documents produced by Novartis.

15.     On May 2, 2008, following the close of discovery, the Parties submitted cross-motions for summary judgment.  Throughout May, June and July 2008, both parties submitted Opposition and Reply briefs.  On November 18, 2008, the Parties presented oral arguments for

the Court. On January 12, 2009, the Court granted Novartis's motion for summary judgment, ruled that Novartis's sales representatives are exempt from overtime compensation under the outside sales and administrative exemptions of the FLSA and New York and California wage and hour laws and directed the Clerk of the Court to enter judgment and terminate the Civil Action.

16.      Plaintiffs appealed the Court's grant of summary judgment in favor of Novartis to the United States Court of Appeals for the Second Circuit. During the briefing for the Second Circuit, the U.S. Department of Labor filed an amicus brief on October 14, 2009. On February 19, 2010, the Parties presented Oral Arguments before the Second Circuit Court. On July 6, 2010, the Second Circuit Court of Appeals vacated and remanded the Court's summary judgment decision and granted summary judgment for the Plaintiffs, holding that Novartis's sales representatives are *not* exempt from overtime compensation under *either* the outside sales or administrative exemptions of the FLSA, New York or California wage and hour laws.

17.      On October 4, 2010, Novartis filed a petition for *certiorari* to the United States Supreme Court, requesting review of the Second Circuit's decision. Novartis was joined by the U.S. Chamber of Commerce and Pharmaceutical Manufacturers of America, both of which submitted amicus briefs on behalf of Defendant. Plaintiffs submitted an Opposition to Novartis's Petition. On February 28, 2011, the United States Supreme Court denied Novartis's Petition for *certiorari*, leaving the Second Circuit's decision intact. On March 1, 2011, the Second Circuit Court of Appeals issued a Mandate remanding the Civil Action to the district court for a jury trial principally on the amount of back overtime damages owed by Novartis to plaintiffs.

18.      After Plaintiffs filed the *Lopes* and *White* complaints in March 2006, numerous other firms across the country began filing and litigating similar matters against other

pharmaceutical companies. Many of these other cases were pushed quickly by counsel without the thorough and careful development of the record Class Counsel achieved here.[1] Consequently, many of these other pharmaceutical lawsuits rapidly were handed losses. Specifically, many courts ruled that pharmaceutical sales representatives were not eligible for overtime under applicable wage and hour law because they were exempt under the administrative exemption, the outside sales exemption or both.

19.     Although the United States Supreme Court declined to take up the question of overtime pay for the pharmaceutical sales industry when it denied Novartis's petition for *certiorari* in the present matter, it later granted cert in a different pharmaceutical wage and hour matter. On November 28, 2011, the United States Supreme Court granted cert on the question of whether the outside sales exemption applies to pharmaceutical sales representatives. *See, Christopher, et al. v. SmithKline Beecham Corp.*, No. 11-204, 2011 U.S. LEXIS 8505 (Nov. 28, 2011). The Court heard oral argument on April 16, 2012, and a decision is expected in the Summer of 2012. Whatever the result, the decision will have significant implications on pharmaceutical representatives' entitlement to overtime pay.

## III.    **THE SETTLEMENT**

20.     After the present matter was remanded to this Court for a jury trial principally on the amount of back overtime damages owed by Novartis to the Original Certified Class Members, the Parties agreed to attempt to resolve the Litigation through non-binding private settlement negotiations. In April 2011, the Court granted the Parties request for a stay of proceedings to permit the Parties to pursue settlement discussions.

21.     Over the course of approximately ten months, the parties met numerous times for

---

[1] The Department of Labor's *amicus* brief extensively referenced Plaintiffs' well-developed record. Brief for the Secretary of Labor as *Amicus Curiae* in Support of Plaintiffs-Appellants, Case No. 09-0437 (2d Cir. Oct. 14, 2009).

face-to-face negotiations.   In addition, the parties exchanged significant correspondence and engaged in frequent telephonic negotiations.   These discussions and correspondence related not only to the claims originally asserted in the Civil Action in 2006, but also to claims covering the period after the Court certified a class and collective action in 2007 and in states other than New York and California.   Once agreement on the basic terms was reached, the exchanges shifted to focus on similar lengthy, arms-length negotiations regarding the preparation and drafting of the voluminous settlement documentation now on file with the Court.

22.     During the litigation and settlement negotiations, both parties were represented by experienced counsel with substantial experience in employment class action litigation.   For example, Class Counsel has been recognized by numerous courts for their work in securing similar class action settlements, such as in the following matters: *Velez v. Novartis*; *Hernandez v. C&S Wholesale Grocers, Inc.*, No. 06 CV 2675 (CLB)(MDF), slip op. (S.D.N.Y. July 31, 2008); and *Bellifemine v. Sanofi-Aventis,* No. 07 Civ. 2207, 2010 U.S. Dist. LEXIS 79679 (S.D.N.Y. Aug. 5, 2010).   Novartis is represented by the law firm of Cravath, Swaine and Moore LLP and Kaye Scholer LLP, both preeminent law firms in the United States. Evan Chesler, Novartis's Lead Counsel, is Cravath's Presiding Partner and is also an adjunct professor of law at NYU Law School.

23.     In the midst of these negotiations, the Parties conducted a thorough and extensive investigation of the relevant facts and circumstances underlying the issues raised in the Civil Action, including issues specifically relating to the exempt status of and overtime worked by Novartis's sales force employees and the particular risks and exposures each side faced should the litigation proceed without settlement.   Class Counsel also performed detailed research on the overtime laws of all fifty states, Puerto Rico and Washington, D.C.

24.     The negotiations included an extensive analysis of the risks faced by Novartis if the litigation proceeded.  First among these was the fact that *In re Novartis Wage and Hour Litigation* was remanded for a jury trial on damages for the approximately 2,220 certified class members with an average total compensation rate of $91,500 and with testimony of working an average of 10-20 hours overtime per week.  Other factors included the risk of ongoing exposure from the more than 5,500 sales representatives who work or worked for Novartis but were not members of the originally certified class and the likelihood that Novartis might be subject to heightened liability for a knowing violation of the law, particularly for the period after the Second Circuit's decision on July 6, 2010.

25.     Although Plaintiffs won at the Second Circuit in July 2010 and the United States Supreme Court denied Novartis's petition for certiorari on February 28, 2011, Plaintiffs also faced significant risk should the litigation proceed.  First among these risks was the possibility that the United States Supreme Court would take up the issue of overtime pay for pharmaceutical sales representatives and rule in a way that would foreclose recovery for the Plaintiffs in the present matter.  As noted above, that possibility became ever more real when, on November 28, 2011, the United States Supreme Court granted *certiorari* on the question of whether the outside sales exemption applies to pharmaceutical sales representatives in *Christopher, et al. v. SmithKline Beecham Corp.*

26.     Other factors posing risks to Plaintiffs included the inevitable delay that comes with determining damages by jury trial and the possibility that appeals stemming from that trial might further delay the recovery to the class; the risk that the U.S. Department of Labor could change its position regarding the exemptions at issue in this matter, should there be a change in administration; the risk that this Court would not certify a class including Novartis sales

representatives from April 2007 to the present in light of Novartis's representation that it has changed the duties of sales representatives and has reduced the hours of work sales representatives work per week; the risk that this Court or others would apply the "fluctuating work week rule" of calculating overtime pay, thereby greatly reducing damages; and the risk that the "highly compensated employee exemption" would be held to apply, something that could potentially exclude thousands of employees from the class.

27.     Novartis sought to fully, finally, and forever settle, compromise, and discharge all disputes and claims of any and all current or former pharmaceutical sales representatives who might bring a claim for failure to pay overtime under federal or state wage and hour law. Plaintiffs sought to provide the benefits of any settlement to a larger group of employees – including the hundreds who contacted Class Counsel in the wake of Plaintiffs' victory at the Second Circuit – who were not members of the Original Certified Class.   In the process of these negotiations, the parties considered (a) which employees might be covered by state law and which employees would be covered only by the Federal FLSA; (b) the applicable statute of limitation periods; and (c) the corresponding Rule 23 opt-out or FLSA opt-in procedures required.

28.     Plaintiffs filed the January 25, 2012 Second Amended Complaint.  In addition to the Class Representatives already named in the First Amended Complaint, the Second Amended Complaint also names Kelli Shannon as the Class Representative for the new Rule 23 Settlement Subclass ("Remaining States Settlement Subclass") and names Terri Kelly as a Class Representative for the new FLSA Settlement Subclass ("FLSA Settlement Subclass II").

29.     Specifically, Plaintiff Kelli Shannon brought claims in the Second Amended Complaint under state law on behalf of herself and:

all Novartis Sales Representatives and Sales Consultants – as those terms have previously been defined – who worked:

> (a) in Alaska, Arkansas, Connecticut, the District of Columbia, Illinois, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, Washington, Wisconsin at any time from March 23, 2008 to the present;

> (b) in Kentucky at any time from March 23, 2006 to the present;

> (c) in Maine or Vermont from March 23, 2005 to the present; or

> (d) in New York or California (i) from April 8, 2007 to the present

and who are not part of the certified FLSA I, New York, or California Classes.

30.     Plaintiff Terri Kelly brought FLSA claims in the Second Amended Complaint on behalf of herself and:

> all persons who worked for Novartis Pharmaceuticals Corporation ("Novartis" or "NPC") in the States of Alabama, Arizona, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, Louisiana, Michigan, Mississippi, Nebraska, New Hampshire, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia or Wyoming as a full-time, active Sales Representative or Sales Consultant, including all non-manager job progressions from, and variations in, the Sales Representative and Sales Consultant titles in all NPC sales divisions or business units, including Mass Market, Specialty and Select Field Forces, for at least one day during the period January 25, 2009 through January 25, 2012, who timely opt-in to this action, and who are not a part of any of the remaining Classes or Subclasses.

31.     As a result of those negotiations, in September 2011 the Parties reached an agreement in principle to resolve all claims asserted in the 2006 Complaints and Amended Complaints in the *Lopes* and *White* Actions.  In January 2012, the Parties reached a broader agreement to resolve all claims asserted in the January 25, 2012 Second Amended Complaint.

32.     The Parties then executed a Settlement Agreement to resolve any and all federal and state wage and hour claims for any current or former Novartis pharmaceutical sales representatives under applicable laws.  Doc. 145.  The total value of the Settlement is just over $99 Million.

33.     In negotiating the terms of the Settlement Agreement, the Parties sought to

10

distribute the Class Monetary Award as equitably as possible.   Of particular concern was devising a formula that reflected both the relative likelihood of success and the comparative scale of a reasonable-expected recovery were each Settlement Class Member to proceed in standard litigation.

34.     Accordingly, the Parties devised a formula for the calculation of each individual's settlement award that ensures that each individual's recovery amount takes into account:

(1)     his/her tenure at the Company;

(2)     the applicable statute of limitations based on state or federal law;

(3)     whether he or she made over $100,000 in any year(s) within the class period, and if so, whether Novartis might have raised a "highly-compensated employee" defense based on the applicable law; *and*

(4)     the relative likelihood of his/her claims succeeding as reflected by membership in the 2007 certified class or in the newly-defined subclasses pursuant to the 2012 Second Amended Complaint.

35.     First, tenure is captured by basing the distribution on the number of eligible months worked, rather than by a division of shares equally across the Settlement Class.  Second, Novartis reported to the Claims Administrator the maximum number of months for which each individual has standing to recover as provided by the statute of limitations for the most protective state or federal law individually applicable.

36.     Third, the Parties agreed that the "highly-compensated employee defense" might well preclude or greatly reduce the recovery of much of the Settlement Class.[2]  The parties

---

[2] By "highly-compensated employee defense" the Parties referred generally to the provision in federal law that if an individual makes $100,000 or more in any given year, that individual is considered "highly-compensated," and the employer need only meet a reduced burden in showing that individual is not eligible for overtime compensation. *See* 29 C.F.R. 541.601(a) (2004).  Multiple states may recognize a similar defense either under their own law or

agreed that any months worked by highly-compensated individuals should be commensurately less valuable in the allocation formula. Specifically, the Parties agreed that class members should receive two times the amount for any months in which there is no potential for establishing a highly-compensated exemption.

37.     Fourth, the Parties agreed that the difference in the stage of proceedings – the difference between (a) a certified class that, after years of discovery and litigation, has secured a liability finding and (b) a prospective class that would likely require years of discovery and litigation before any such liability finding might be secured and that would have to do so in a very different and arguably less favorable legal environment for the Plaintiffs[3] – must also be reflected in the value of each individual award. Specifically, the Parties agreed that class members should receive six times the amount for those claims that were covered by the 2007 certified class.

38.     In negotiating the Settlement, the Parties sought to avoid a complicated claims process that might result in a lower participation rate or in fewer dollars actually distributed to the class. Accordingly the parties agreed that monies would be automatically distributed without the presentation of any individualized proof or the completion of any prolonged claims process. Doc. 145. A at ¶10.3.

39.     On January 25, 2012, this Court issued an order which:

> (1)     Preliminarily approved as fair, reasonable and adequate the Settlement Agreement, as well as the payment of attorneys' fees, costs, and Service Award Payments described in the Settlement Agreement;

---

through incorporation of the FLSA. *See, e.g.,* 1014 Code Ark. Rules & Regs. 002; 803 Ky. Admin. R. 1:070 sec. 9; Mont. Admin. R. 24.16.211; *Hardin v. Belmont Textile Mach., Co.,* No. 3:05-cv-00492, 2008 U.S. Dist. LEXIS 64081, at *11-12 (W.D.N.C. Aug. 20, 2008), *rev'd on other grounds,* 355 Fed. Appx. 717 (4th Cir. 2009); *White v. Murtis M. Taylor Multi-Service Ctr.,* 188 Ohio App. 3d 409, 413 (Ohio Ap. 2010).

[3] In addition, Novartis argues that the duties of the sales representative have changed to such a degree since 2007 that Novartis would be able to rely on the administrative exemption to defeat claims in more recent years.

(2)     Approved as to form and content the Notices of Proposed Class and Collective Action Settlement ("Notices");

(3)     Directed the mailing of the Notice (and Opt-In Form and Release, where appropriate) Rider to Claim Form, and Claim Form Instructions by first class mail to the Proposed Settlement Class Members;

(4)     Certified the Settlement Class, comprised of the New York I Settlement Subclass, California I Settlement Subclass, FLSA Settlement Subclass I, Remaining States Settlement Subclass, and FLSA Settlement Subclass II; *and*

(5)     Scheduled a Final Fairness Hearing to be held on May 31, 2012 on the question of whether the Proposed Settlement should be finally approved as fair, reasonable and adequate as to the Proposed Settlement Class Members. (Doc. 146 - Preliminary Approval Order).

## IV.   POST-PRELIMINARY APPROVAL DEVELOPMENTS

40.     The Parties jointly selected Rust Consulting, Inc. ("Rust") to serve as Claims Administrator, and this Court appointed Rust to serve as Claims Administrator on January 25, 2012.   The accompanying Declaration of Stacy Roe, Senior Project Administrator for Rust ("Rust Dec."), describes the actions that Rust has taken to date in the administration of this settlement.

41.     On February 24, 2012, Rust sent Notices to 7,730 Proposed Settlement Class Members via First Class Mail.  (Rust Dec. at ¶9).  It mailed a Notice of the Proposed Class Action Settlement and Settlement Hearing to 2,210 members of the California Settlement Subclass, the New York I Settlement Subclass, and the FLSA Settlement Subclass I; a Notice of Proposed Settlement, Settlement Hearing, and Opportunity to Participate and Request for Exclusion Form to the 3,004 Remaining States Subclass Members; and a Notice of Proposed Settlement, Settlement Hearing, and Opportunity to Participate, Opt-In Form, and Release Form to 2,520 FLSA Settlement Subclass II Members.  (*Id.*).  An additional 216 FLSA II Notices were

also mailed to Remaining States Settlement Subclass members in North Carolina. (*Id.*).

42.     Of the 7,730 Notices mailed, Rust received undeliverable Class Notices for a total of 81 potential Class Members. (Rust Dec. at ¶¶11, 12).  Ms. Roe explains the multiple steps that Rust took to track down new addresses for the undeliverable notices. (*Id.*)  After Rust followed the procedures for handling undeliverable Notices, just eight (8) Class Notices were returned as undeliverable a second time. (*Id.*)

43.     The deadline for FLSA Settlement Subclass II members to submit their Opt-In & Release Forms was Monday, April 16, 2012.  2,115 of the 2,520 current and former Sales Representatives who needed to submit a FLSA II opt-in form in order to participate in the Settlement did so.     (Rust Dec. at ¶16).   This represents an extraordinary opt-in rate of approximately 84%.  As of May 21, 2012, these opt-in forms have all been filed in accordance with the Court's March 23, 2012 Order. *See* Docs. 152-198.

44.     The deadline for the Remaining States Subclass to Submit Requests for Exclusions was Monday, April 16, 2012.   Only one Subclass Member, which represents approximately three-hundredths of one percent (0.03%) of the Remaining States Subclass and only one-hundredth of a percent (0.01%) of the entire Class, has timely excluded himself from the Settlement. (*See* Rust Dec. at ¶17).   That individual is represented by counsel in an independent action filed in state court in Puerto Rico. *Ruiz v. Novartis Pharmaceuticals Corporation*, Civil No. KPE2011-2935 (804) (P.R. Superior Court, San Juan).

45.     The deadline for Settlement Class Members to submit objections to the Settlement also passed on Monday, April 16, 2012.  None of the 7,328 Class Members objected. (Rust Dec. at ¶16).

46. In total, 7,328 Class Members – including 2,210 original Members,[4] 3,003 Remaining States Subclass Members, and 2,115 FLSA II Subclass Members – agreed to resolve their wage and hour claims pursuant to the terms of this Agreement.

## V.   CLASS COUNSEL'S ASSISTANCE TO CLASS MEMBERS

47. Since the announcement of the Court's Preliminary Approval of the Settlement on January 25, 2012, Class Counsel has devoted more than 1,000 hours to assisting individuals who have contacted Class Counsel's offices regarding the Settlement. Since Rust sent Notice to Class Members on February 24, 2012, approximately 340 individuals have contacted Class Counsel's offices with questions about the Notice or questions about their eligibility to participate in the Settlement. These contacts are in addition to the hundreds of inquiries and calls Class Counsel fielded in 2011 after the Supreme Court decided Novartis's *cert* petition. To date, Class Counsel has responded to questions from more than 756 individuals regarding eligibility to participate in the Settlement and the Settlement terms, and Class Counsel continues to receive additional inquiries on a daily basis.

48. Class Counsel staffs six attorneys and paralegals to handle Class Members' questions. For each individual who contacts Class Counsel, the staff conducts a call intake, which can range from two minutes to an hour. The average call lasts about eight minutes. Callers raise: general questions about the history of the litigation; general questions about the settlement terms; individual questions regarding previous severance agreements; and individual questions regarding eligibility, participation and recovery. Class Counsel staff clarifies terms of the Settlement; explains what each Class Member must do in order to participate in the Settlement; and, in general, assists with the overall Settlement process. Some callers require

---

[4] In addition to the 2,206 original Subclass Members, during the Notice-mailing process, Class Counsel and Novartis identified four (4) individuals who had been erroneously excluded from the data provided to Rust.

multiple calls, with increasing levels of attention from associates and, in some cases, Partners. While some calls are as short as two minutes, others can last an hour or more and may require extensive follow-up through correspondence or additional phone calls, verification of time records, as well as additional factual and legal research.

49.    In addition, Class Counsel has spent significant time working with Rust, Novartis and the claims administrator who handled the 2007 notice to handle anomalous claimants, inquiries about specific class members' eligibility and recovery periods, and other issues that arise in this process. Class Counsel reviews individuals' employment histories, verifies that time records are correct and conducts extensive research, factual and otherwise. Through this process, at least seven misclassifications or other issues were identified and corrected.

50.    Class Counsel's work and involvement will continue in the upcoming months. After a final settlement approval, Class Counsel will (1) remain directly involved throughout the monetary fund distribution process; (2) address any issues regarding individuals' eligibility to participate in the Settlement; (3) communicate with class members regarding questions on the settlement, the release and timing of the payment; (4) respond to the inevitable inquiries regarding the taxation of the award during the first quarter of 2013; and (5) communicate with Novartis's Counsel and the Claims Administrator to address any other issues that may arise.

51.    Based on prior experience in other matters, Class Counsel anticipates that such involvement is likely to continue to demand considerable time and resources. For example, in the *Velez* matter, also handled by Class Counsel, a similar number of settlement class members have required approximately 2,000 hours of additional staff and attorney time since the Court gave final approval in late 2010; of those, at least 600 are directly comparable to the work that will be required in this matter.

52.     In fact, because there are multiple subclasses in the present matter and because the formula is somewhat complicated, components of this settlement are more complicated than the *Velez* matter.  As such, it is likely that *more* than 600 hours will be expended is responding to class member concerns regarding payout amounts and whether the payout was properly calculated.

## VI.     THE LONE "OBJECTION"

53.     Zero class members have objected to the settlement.  The lone "objection" on file is an improper one, submitted by a non-class member whose fundamental dispute is not with this settlement or the administration of it but instead with the 2007 class notice.

54.     This objection regarding the 2007 FLSA I notice procedures was submitted to the Court on April 13, 2012 by Michelle Stahl Haney.  (Doc. 191).  Ms. Haney is not a Settlement Class Member, as her dates of employment exclude her from the FLSA II Settlement Subclass, and she did not opt into the FLSA I subclass during the proper period in 2007.

55.     Ms. Haney first raised questions with Class Counsel about her ability to recover as part of the Settlement on March 12, 2012.  Because she did not work with Novartis beyond October 2007, her only means of participating in the settlement would have been as a FLSA I member who opted into *In re Novartis* during the 2007 notice period.  Upon learning these facts, Ms. Haney stated that she did not receive notice in 2007.  Class Counsel obtained from Ms. Haney her correct mailing address in 2007 and promised to look into whether the mailing had been properly handled by Class Action Administration.

56.     In response to Class Counsel's inquiry, Class Action Administration – the Company that handled the 2007 notice – confirmed that notice to Ms. Haney was properly sent to the proper address in 2007.  Its records indicate that there were no mailing errors.  (Exhibit B -

Letter from Matthew E. Pohl, President of Class Action Administration, to Kate Nelson of Sanford Wittels & Heisler, LLP, Apr. 17, 2012).  It verified that on or around April 7, 2007, notice of the FLSA I action was mailed to Michelle Stahl, Ms. Haney's maiden name, at her proper address; that CAA did not receive a Consent Form from Ms. Haney; and that it has no record of any interaction with her.  (*Id.*).

57.     Accordingly, Class Counsel scheduled a call with Ms. Haney to review the contents of the letter from Class Action Administration and its implications for her interest in recovering a part of the Settlement Fund.  On that call, Ms. Haney expressed that she understood how the statute of limitations came to preclude her from participating through the new settlement subclasses and that her frustration was with the mailing in 2007.

58.     As Ms. Haney explained to Class Counsel, she did not believe it was fair that she could not recover because of what she believed was an error on the part of the U.S. Postal Service and/or Class Action Administration.  Ms. Haney explained that she believed the 2007 notice procedures requiring first-class mail delivery were inadequate and that "multiple notifications" or other mailing options should have been utilized for it to be adequate.  At the end of the call, Ms. Haney thanked Class Counsel for its assistance and indicated that she would be sending in an objection.

59.     Among the hundreds of calls and inquiries Class Counsel fielded, many individuals raised concerns about the notice process.  Many simply could not remember or prove whether or not they had received the 2007 notice, ignored the 2007 notice, or affirmatively decided to reject the 2007 notice.  A smaller subset of individuals was adamant that they had not received the notice in 2007 whatsoever.  Class Counsel dutifully researched and investigated each concern.  Most were unsubstantiated, and in at least one instance, our investigation

uncovered that not only had the individual received a notice in 2007 but had also affirmatively opted-out.

60.     However, a few investigations yielded evidence of demonstrable issues with errors in the mailing process or in the internal records used by Novartis and the Claims Administrator.   In those circumstances, Class Counsel worked with Novartis to address any resulting issues.   For instance, another former Novartis employee, Major Joseph Meadows, provided proof of military service indicating that he was on duty in April 2007 when FLSA I notice was sent.   In addition, former Novartis employee Regina Bataineh provided proof that the FLSA I notice was mailed to the incorrect address.   Upon receipt of this information and supporting documentation from Major Meadows and Ms. Bataineh, Novartis agreed that both individuals should be properly included in the Settlement as FLSA I Subclass Members.

## VII.   CLASS MEMBER AWARDS

61.     After the opt-in and opt-out periods expired on April 16, 2012, Novartis and Class Counsel began working on verifying and finalizing the details of the class list.   Once that process is completed and submitted to Rust Consulting, Rust – with the ongoing assistance of Novartis and Class Counsel – will calculate the total number of months worked by Settlement Class Members within the relevant class period.

62.     Should this Court approve the Settlement as final, all 7,328 Settlement Class Members will receive an automatic payment from the $99 million Settlement Fund, less service awards, attorneys' fees and expenses, per the terms of the Settlement.   The Settlement Class will include approximately 15 individuals who filed submitted their opt-in forms after the April 16, 2012 deadline and 15 individuals who submitted opt-in forms with illegible postmark dates. With the agreement of Novartis's Counsel, their opt-in forms were treated as timely and filed

with the Court.

63.     Should the Settlement Agreement be approved as final, Rust Consulting will calculate the individual's award, make the appropriate deductions and withholdings using Novartis's records for each Settlement Class Member's state of employment, statute of limitations and annual total compensation.  Each Settlement Class Member's award will be calculated using the following formula: Class Member Individual Award Amount = [Monthly Amount x Individual's HCE[5] months as defined in Settlement Paragraphs 2.21 or 2.34] + 2[Monthly Amount x Individual's Regular months worked as defined in Settlement Paragraphs 2.21 or 2.35] + 6[Monthly Amount x Individual's HCE months worked as defined in Settlement Paragraphs 2.3, 2.18 or 2.25] + 12[Monthly Amount x Individual's Regular months worked as defined in Settlement Paragraphs 2.3, 2.18 or 2.25]).  Rust will then issue and mail a settlement check.

64.     Based on the most recent data available regarding the class eligible months of those individuals participating in the settlement, the base month amount for payout calculations will be approximately $57.39.  As such, the lowest settlement award could be $57.39, with the highest award being more than $99,000.00.  Reasonable average awards (calculated with 3-5 years of eligible work months and a range of multipliers in effect) will be between $4,132.00 and $33,056.00.

65.     These award amounts are significantly higher than typical FLSA wage and hour payouts, where per-plaintiff settlement amounts are typically between $2,700-$5,600.  NERA Economic Consulting "Trends in Wage and Hour Settlements: 2011 Update," at 6 (Mar. 22, 2012).

---

[5] "HCE" stands for "Highly Compensated Employee." A "highly-compensated employee" is an employee earning $100,000 or more as reported on his or her W2.

66.     The Settlement Agreement anticipates that Settlement Class Members should receive their awards no later than August 2012.

## VIII.    SERVICE PAYMENT REQUESTS ARE REASONABLE

67.     The Settlement Agreement also provides for service payments to the five Named Plaintiffs and to the 21 deponents, in the amount of $40,000 for three Original Named Plaintiffs, $20,000 for the two Named Plaintiffs in the Second Amended Complaint, and $3,500 for each of the 21 deponents.  The amounts sought are minimal: a total of $233,500 – a mere 0.24% of the Settlement Fund.

68.     Such service payments are strongly supported by public policy and typically have been endorsed by courts as compensation for individual's services to the Class.  Without the efforts and sacrifices of the Named Plaintiffs and Deponents, this case may never have been brought or have achieved the successful result heralded by the class.

69.     The Named Plaintiffs and deponents have all: (1) risked economic harm, or (2) contributed significantly to prosecuting this action.  This is particularly true given the high-profile, landmark nature of this lawsuit.  The pharmaceutical sales field is small and tightly knit.  Within that community, each of the Named Plaintiffs and Deponents lent their names to the prosecution of this suit, at great personal sacrifice, and was instrumental in achieving this settlement.  Additionally, many of the Named Plaintiffs and Deponents travelled a reasonable distance to participate in full-day depositions after extensive preparation.

70.     Defendant Novartis has agreed to the requested service payments.  The court-approved Notice informed members of the Class about the service fees.  Armed with that knowledge, no class members have filed any objections to the proposed service awards.

IX.   **ATTORNEYS FEES AND EXPENSES ARE REASONABLE**

71.    Class Counsel acted as private attorneys general and prosecuted this case on a contingent fee basis, without any assurance whatsoever that they would ever be paid or compensated for the expenses they had to advance to secure the victory.

72.    The Settlement Agreement provides for up to 30% in attorneys' fees and for $400,000 in litigation expenses.  SWH's actual attorney fee application is 28% of the value of the total $99 million settlement, after expenses are deducted, and is consistent with percentage awards given in this Circuit and elsewhere in complex class action settlements.

73.    Although almost 8,000 individuals were given notice of the Settlement and the fee award that would be sought as part of that Settlement, not a single person objected to the 30% fee allocation.   In addition, of the more than 750 individuals to whom Class Counsel spoke, not a single person raised any questions or voiced any concern about the fee award.

74.    Over the past six years, Plaintiffs developed an extensive record; drafted and filed voluminous briefing including summary judgment briefing, appeal and certiorari briefing before the Second Circuit and the Supreme Court of the United States; and engaged in lengthy settlement negotiations.  In furtherance of these efforts, Class Counsel has dedicated more than 14,728 hours to prosecuting this litigation from its inception until submitting the preliminary approval papers, and 1,407 since then.  (See Exhibit C – SWH Hourly Report).  Since 2005, 76 attorneys and staff members have worked on this matter.  In order to minimize duplication of efforts, Class Counsel used a small team of attorneys at any one time.   Overall, the prosecution of this action required a high level of experience and expertise in complex class action litigation, as well as the ability to provide the highest caliber of legal services under challenging circumstances.

75.    In addition, the fee for Class Counsel agreed upon in the Settlement Agreement will also serve as the sole compensation for the extensive future services to be performed by Class Counsel in service to Class Members, which includes overseeing all aspects of the Settlement Agreement, ongoing communications with class members and Novartis, and coordination with the Claims Administrator.   Class Counsel expects to devote substantial additional hours overseeing the Settlement in the future.

76.    Plaintiffs have thus far incurred over $400,000 in costs and expenses.  (See Exhibit D – Catalogue of Costs and Expenses).    Plaintiffs anticipate spending significant additional dollars going forward, both on enforcing the terms of the settlement agreement and in maintaining and fulfilling its duties to the Class Members through regular communication and general availability.

77.    Class Counsel's "lodestar" to date – time expended, multiplied by hourly rates – is approximately $8,804,128.00.  Plaintiffs request a multiplier enhancement of 3.14.  As noted herein, Class Counsel anticipates spending additional time after this Court approves this Settlement.  Thus, a 3.14 multiplier would be significantly reduced over time.

78.    Current hourly rates for the SWH attorneys who were instrumental in the litigation are as follows:

- Partners: $790.00 for David Sanford, Jeremy Heisler and Steven Wittels; $700.00 for Janette Wipper; $650.00 for Katherine Kimpel.
- Of Counsel: $750.00 for Grant Morris; $700.00 for William Weinstein.
- Senior Litigation Counsel: $630 for Kyle Chadwick and Stefanie Roemer; $580 for Andrew Melzer and Kathy Leong; $475 for Felicia Medina; $420 for Deepika Bains.
- Associates and Legal Fellows: $265 for Class of 2010 - 2012 (Peter Aronoff, Carmen Byrd, Supawon Lervisit, Lauren Seffel, Jennifer Siegel); $315 for Class of 2009 or 2008 (Cate Edwards, Jinwoo Park, Steven Starr); $370 for Class of 2007 (Deborah Marcuse, Kate Mueting); $475 for Class of 2005

(Shayna Bloom); $525 for Class of 2004 (Tico Almeida, Angela Corridan, Matt Schmid); and $580 for Class of 2003 (Meenoo Chahbazi).

- Summer Associates: $210 (John Albanese, Jane Metcalf, Nicole Noonan-Miller, Ezra Schneck).

79.    The average hourly rate for partners is $744.

80.    Current rates for staff are $185 for junior legal assistants and $205 for senior legal assistants.

We declare under penalty of perjury that the foregoing is true and correct.

Dated: May 21, 2012            By:            _____s/_____

Dated:  May 21, 2012
By:    s/ David W. Sanford
By:    s/ Katherine M. Kimpel
David W. Sanford, D.C. Bar No. 457933
Katherine M. Kimpel, DC Bar No. 493028
1666 Connecticut Ave. NW, Suite 300
Washington, D.C. 20009
Telephone: (202) 742-7780
Facsimile:  (202) 742-7776

By:    s/ Jeremy Heisler
Jeremy Heisler, NY Bar No. 1653484
SANFORD WITTELS & HEISLER, LLP
950 Third Avenue, 10th Floor
New York, NY 10022
Telephone: (646) 723-2455
Facsimile: (646) 723-2948

*Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the foregoing has been served via the Court's Electronic Filing system on May 21, 2012, to the following:

>Evan R. Chesler
>Darin P. McAtee
>Cravath, Swaine & Moore LLP
>Worldwide Plaza
>825 Eighth Avenue
>New York, NY 10019-7475
>
>**Counsel for Novartis Corporation**

_s/_____
Kate Nelson
